IN THE

## COURT- FOR THE CORRECTION OF ERRORS

OF THE

# STATE OF NEW YORK.

DURING THE YEAR 1836.

---

HAWLEY AND KING, *appellants*, and JAMES and others,
*respondents.*

The creation of a trust term by will to continue *until the youngest of a tes-
tator's children and grand-children, attaining the age of twenty-one years,
shall have attained that age,* where the number exceeds *two,* is void under
the revised statutes of this state, as suspending the power of alienation,
of an absolute fee in possession for more than two lives in being, and with-
out reference to any designated life or lives.

In the creation of estates, the *power of alienation* can be suspended *in no other
way* than that recognized in the 15th § of the act, i. e. *during the contin-
uance of one or two lives in being at the creation of the estate;* and con-
sequently such power cannot be suspended for a moderate term of years,
for an average duration of lives, whilst certain specified minorities con-
tinue, or by any other limitation that may by possibility extend such sus-
pense beyond two specified lives in being.

Where a testator who had created a trust term, directed his trustees at the
expiration of the period prescribed for the continuance of the trust, to
divide his estate into twelve equal parts, and to allot, distribute, and con-
vey to certain of his children and grand-children severally certain portions
of the estate *for life,* with power to the grantee to devise the same *in fee* to his
or her lineal descendants in such manner or proportions as he or she might
think proper; and in the event of such grantee either leaving no de-
scendants or omitting to make a valid disposition of the same in execution
of such power, then *with remainder in fee* to such person or persons as
by the statute of descent would have been entitled to inherit the estate,
had the grantee, having derived the same from the testator, died intestate,

lawfully seised thereof in fee—It was held that the estate in remainder was an estate which suspended the power of alienation contrary to law, and that the estate in remainder, *including the life estates* and all the contingent remainders depending thereon, were *illegal* and *void;* and that the *real estate of the testator œscended to his heirs at law* free, as discharged of all conditions, devises, directions, authority, *power or control* of the trustees—saving, however, from the operation of the decree the lands of the testator situate in the state of *Illinois.*

*Annuities for life* having been given by the testator to two of his *sons,* and no other provision having been made for them by the will, and it having been adjudged that the *trust term* and the *remainders,* suspended thereon, were *void,* and that the estate descended to the *heirs at law* of the testator—It was held that such sons were bound to elect within a given period whether they would accept the annuities, or renounce them, and take as *heirs at law* and *representatives* of the testator.

Notwithstanding that the *trust term* and *remainders* were adjudged to be void, it was held that numerous *annuities* and *legacies* given by the will were good and valid, and the *trustees,* in their *character of executors,* were directed to carry into effect the directions of the testator in respect to such annuities and legacies.*

Appeal from chancery. William James, on the 24th July, 1832, made and published his last will and testament, in the following words :

1. " I, William James, in contemplation of the uncertainty of human life, and being desirous of making a just disposition of my property, do make and publish this my last will and testament, in manner following—that is to say :

---

* *Conclusions arrived at by the* Chief Justice *in the opinion, delivered by him :*

Under the article of the revised statutes "of uses and trusts," § 55, a *future trust,* whether contingent or not, cannot vest a *present* estate in or sustain a devise to *trustees :* to be valid, the trust must be active and present.

A trust, for the *accumulation of rents and profits* of real estate, where it operates to the benefit as well of *adults* as of *minors,* is void.

A trust to receive rents and profits to pay *legacies* is valid, but unimportant in this case; as when the legacies are paid, the trust ceases.

A trust to receive rents and profits to pay *annuities,* as to the object or purpose of its creation, is a valid trust within the statute, if otherwise unobjectionable, and vests the estate in the trustees until the expiration of the term created; it belongs to the class of trusts designated in the third subdivision of § 55 of the article of the statute relating to the *creation and division of estates;* and whether it belongs to the *second* or *third* subdivison of that section, the annuities are *inalienable.*

The trust term is inalienable, within the meaning of the article "of uses and trusts," as well in respect to the estate of the *trustees* as the interest of

2. " I give and devise to my wife Catharine James the mansion-house, now occupied as such by me, in the city of Albany, together with all the appurtenances thereunto belonging, during the period of her natural life, and with power to dispose of the same by will, to our lineal descendants, in such manner as she may think proper.

ALBANY,
Dec. 1836.

Hawley
v.
James

---

the *annuitants;* the latter have not the power to extinguish the trust by gift, release, or surrender.

The statute, relative to the suspense of the power of alienation, permits a limitation for two lives in being, and twenty-one years in addition in a case of *actual minority.*

The trust term, in this case, is virtually limited upon *thirteen lives,* and is consequently void; but if conceded to be a term for *twenty years and ten days* as adjudged by the chancellor, it still is void, because the limitation of the term by the *minorities* of the persons named, is equivalent to the creation of an estate, dependant upon the *lives* of such persons; for if two of the lives fall in before all attain *majority,* then the estate having been held for two lives, its further continuance, during the residue of the minorities, extends it beyond two lives, and the whole limitation is void; the possibility of the happening of such event being equivalent to the creation of an estate for a period of more than two lives.

In the creation of estates, the *power of alienation* can be suspended *in no other way* than that recognized in the 15th § of the act, i. e. *during the continuance of one or two lives in being at the creation of the estate;* and consequently such power cannot be suspended for a moderate term of years, for an average duration of lives, whilst certain specified minorities continue, or by any other limitation that may by possibility extend such suspense beyond two specified lives in being.

The limitation, in this case, being illegal, and the trust term void the *remainders* also are void, and the estate descends to the heirs at law of the testator, whose interest cannot be divested by the subsequent execution by the trustees of the *power in trust.*

The *power of alienation* cannot be postponed under a *power in trust* for a longer period than is permitted under an *express trust.*

Both the *substituted* and *ultimate* remainders created by the will, are void on the ground that they are contingent, and depend upon the limitation of the trust term, which being adjudged too remote, the contingent remainders limited upon it, of consequence, are too remote.

· The life estates are also void as well for the reason that the power of alienation is illegally suspended as that the permitting of those estates to vest after declaring the remainders void, would work injustice, and defeat the main intent of the testator.

Those of the heirs at law of the testator to whom valid legacies or annuities are given, are bound to make their *election* whether they will accept the provision made for them by the will, or take as heirs at law; they cannot do both.

ALBANY,
Dec. 1836.

Hawley
v.
James.

3. " I also give and bequeath to my said wife all my household furniture and utensils, including plate, pictures and other ornamental articles in the house, her personal ornaments and wearing apparel ; also my horses, harness, carriages and sleighs, and my library.

4. " Desiring that my family after my decease should live

---

*Conclusions arrived at by Mr. Justice* BRONSON, *in the Opinion delivered by him :*

A trust to receive the *rents and profits of lands* to pay debts, is void ; the statute only authorizing a trust to *sell* lands for the benefit of creditors.

A trust for the *accumulation of rents and profits* of real estate for the benefit of *adults* as well as *minors* is void.

A trust under the 3d sub. of the 55th §, to *receive rents and profits* and *pay them over*, is void ; the statute only authorizes a trust to receive rents and profits *and apply them to the use* of any person. The *trustee* must himself make the application.

The trust authorized by the 2d sub. of the 55th § to sell, mortgage or *lease* lands, is a trust for the *alienation of the whole or some portion of the estate* ; this clause will not warrant *a trust to receive rents and profits*, which suspends the power of alienation.

The trusts authorized by the 1st and 2d sub. of the 55th § are trusts for *alienation;* those under the 3d and 4th subdivisions are trusts *to receive rents and profits*, which suspend the power of alienation.

*Contingent provisions* as to the management of an estate, and providing for beneficiaries in the mode prescribed in a will, if valid as *express trusts*, cannot operate to vest the estate in the trustees until the happening of the events calling the trusts into active exercise.

The trust in this case in relation to its objects and the manner in which it is declared, is contrary to law and consequently void.

The power of alienation cannot be suspended for a longer period than during the continuance of *two lives* in being at the creation of the estate ; and every limitation by which the power of alienation *may* be suspended for a longer period, is void in its creation. The lives must be *designated*, either by naming two persons in particular, or by limiting the estate on the two first lives which shall fall in a class of several individuals.

The estate may be limited on some event *besides* life ; but life must in some form enter into the limitation, so that the power of alienation can *in no event* be suspended beyond two designated lives. No *absolute term*, however short can be maintained.

The trust term in this case depends in part on *time*, and in part on the *continuance of life ;* and there being thirteen persons upon whose *minorities* the term is limited, it depends upon more than two lives, and is therefore void.

The estate is inalienable during the trust term ; neither the trustees or the beneficiaries have the power to convey, and as by the provisions of the will the power of alienation *may* be suspended for a longer period than that prescribed by law, the trust is void.

respectably, but at the same time prudently and circumspectly, I further give, devise and bequeath unto my said wife, for her own support and for the education and support of our children, an annuity of three thousand dollars, to be paid in equal quarterly payments, or oftener should she have occasion therefor, during the period of her natural life.

An *express trust* can be valid as a *power in trust* only when it is created for a *purpose not enumerated as the proper subject of an express trust;* and consequently, if a testator attempt to create a trust for any of the purposes specified in the 55th §, which is not valid as an express trust, it cannot be carried into effect as a power in trust.

The statute regulating the suspense of the power of alienation applies as well to *powers in trust* as to *express trusts;* and if by possibility the power of alienation may be suspended under a power in trust for a period longer than that allowed by law, the power in trust is void.

*Conclusions arrived at by Mr. Justice* COWEN, *in the Opinion delivered by him:*

A direction in a will for the *accumulation of rents and profits* of an estate for the benefit of *adults* as well as *minors,* is void; but such direction, though void, does not invalidate the whole will. It is not like a *deed* which contains a provision to defraud creditors, and which on that account is void *in toto;* the *deed* is void because the statute *declares it so,* but there is no such declaration in respect to an instrument containing a direction for accumulation.

Where an estate is given to *trustees* for a specified term with remainders over for life and in fee, and the trust term is void, the principal devises are not affected by such avoidance. If there be a valid express trust, it must be satisfied; if the trust be illegal, the estate either passes at once to the remainderman, or that which was meant for the trustees descends to the heirs at law until the happening of the event when by the devise the estates in remainder are to take effect. The failure of a matter of form cannot affect the substance.

Although there be a *trust term* and it be *inalienable,* it cannot affect the principal devises of a will, especially where the estate is large and the trusts comparatively insignificant. The statute declares the interests of the *trustee* and *cestui que trust* inalienable, and that the whole legal estate is vested in the trustee, yet the legal consequences of such declaration are only complete as between the trustee and the *cestui que trust.* The party creating the trust may declare to whom the land to which the trust relates shall belong, in the event of the failure of the trust, and may devise it subject to the execution of the trust; and the grantee has a legal estate in the property against all persons except the trustees and those claiming under them. When the trusts are comparatively small and the estate large, the trusts should be deemed *a mere lien,* and on provision being made for their satisfaction, the owner of the body of the estate ought to be permitted to enter upon the enjoyment of his property. If there be an interest in one or more beneficiaries which is deemed inalienable,

5. " I also give and bequeath unto my said wife the sum of three thousand dollars, to be applied by her towards the maintenance, education and advancement of the children of her deceased sister, Jannette B. Gourley, in such proportions and at such times as she may deem proper.

6. " The foregoing devise and bequests to my said wife are

---

the substantial limitations of the will cannot for that cause be subverted ; on setting apart an adequate fund for the payment or security of the beneficiaries, it is the duty of a court of chancery to give the body of the estate to the principal devisees.

If the trust term be not counted in the line of perpetuity, and the substituted remainders be excluded, as they are by the decree, the devise of the eight and a half shares does not suspend alienation for a longer time than is allowed by law. Each twelfth constitutes an estate by itself in the contingent devisee, which must terminate in a fee on his death, and each of the nine devisees has an estate in severalty dependant on his own life and that only. To illustrate : *Augustus*, one of the principal devisees, takes an estate for life if he outlives the contingency, and it goes to his special heirs if he do not control it by the power of appointment conferred upon him. *This limitation is a fee after one life in being.* If Augustus die before his estate vests, (the substituted remainders being out of the way as involving too many expectants of a life estate,) the land will descend to the general heirs of the testator in fee. Thus there is but one contingent life estate in the several 8½ shares.

Admitting the whole estate to be vested in the trustees, both in law and equity, and that every sale by them in contravention of the trust is void, still they may unite with the *cestuis que trust* and sell the estate. The only trust which has a bearing upon this case is that which relates to the *receiving of rents and profits and applying them*, &c. The rents and profits, if they do belong to the express trust, do so because they are part of the *accumulating fund*. When the direction for the accumulation was adjudged void, the rents and profits were taken from the trustees and carried over to the eventual takers by the operation of the statute, and consequently there is no express trust in the matter, and the persons entitled to the rents and profits obtaining their right to them by operation of law and not under the will, are not prohibited, by the 63d § of the act, from assigning or disposing of their interest. The trust to pay *debts* and *legacies* will not render the estate *inalienable*, because they can be paid ; the debts may be discharged and legacies satisfied. As to the annuities : they are charges upon the whole estate, real and personal, and are not, nor are the legacies particularly charged upon the *rents and profits of the real estate*, but stand on the same footing with the *debts* of the testator ; and the trustees, if they choose so to do, may apply the income of the *personal estate* to the payment of the annuities, and thus the fund is not within the 63d §. Besides : the annuities are *sums in gross*, and are assignable within the very words of the exception to § 63.

intended to be, and I hereby declare them to be, in lieu and full satisfaction of her dower in my estate.

7. " To my son William James, I give and bequeath an annuity of two thousand dollars, during his natural life.

8. " To my son Henry, I give and bequeath an annuity of twelve hundred and fifty dollars, during his natural life.

ALBANY,
Dec. 1836.

Hawley
v.
James.

---

The power to settle annuities on such of the children as shall eventually be deemed unworthy to take a share of the estate, is a mere *power in trust* and does not render the estate inalienable.

The contingent advances for the purposes of business and of marriage portions are alienable and extinguishable by payment or release.

The contingent provisions for the testator's children and the widows of his sons and grand-children are charges upon the income of the trust property, *real* and *personal*, and not within the operation of the 63d §, which relates to income derivable from the rents and profits of land alone; nor do they come within the office of an *express trust*, as defined in the 55th §. But if this trust were within the disqualifying clause, it would not, when joined with the life estate in remainder, exceed two lives, the period allowed by law during which the alienation of an estate may be suspended. Besides, all these provisions are contingent, remote, and improbable to happen, and may be executed under the *powers in trust*.

A *power in trust* does not *suspend alienation*. The *cestuis que trust* can unite with the trustees and alien the whole estate subject to the life contingency; but if otherwise, the only power in trust open to the objection of perpetuity, is that of awarding, distributing and conveying the several interests devised; which power must be measured by those interests, and cannot by possibility exceed a single life in being in respect to each estate.

There cannot be a technical suspension of the power of alienation in a *vested estate* except in the single instance specified in the 63d §; and that has no bearing upon this case.

A mere *lien*, whether it be a mortgage, a judgment or an annuity, cannot create a perpetuity.

After all the purposes for which a trust is created have ceased, the estate of the trustee ceases.

The 63 § ought to be strictly construed, and no cases deemed within its operation but those within its very terms.

Approves of the limitation of the term of the trust estate to 20 years and 10 days, as adjudged by the chancellor; and considers it immaterial whether that term exceeds two lives in being, inasmuch as according to his view of the case there is no suspension of the power of alienation in respect to the term.

The *trust term* is valid. The first *remainders for life* are *contingent* and *not vested* remainders. Each remainder in fee vests, if at all, during or at the termination of the single life in being of a person who is exactly named and described. On the death of such person previous to the happening of the contingency, his interest fails as to the share which would otherwise vest in

ALBANY,
Dec. 1836.

Hawley
v.
James.

9. " To Catharine Tillman, sister of my former wife Elizabeth deceased, I give and bequeath an annuity of one hundred and twenty-five dollars, during her natural life.

10. " To Charlotte James, daughter of my deceased brother John James, I give and bequeath an annuity of one hundred dollars, during her natural life.

---

him, and it descends in fee to the *testator's general heirs,* and thus becomes alienable ; if such person survive until the remainder vests in him, then there is a contingent remainder over in fee to his special heirs, which must also vest at the termination of the life of the first taker, and thus alienation is suspended but for a single life, and in the mean time all the interests connected with the trust term remain *mere incumbrances,* extinguishable in various ways.

On the other hand, if the express trust be void, and the term for that cause expunged, the same consequences follow in another form : the authority of the trustees would still be maintainable as *trust powers.* The term being gone, there is nothing left to suspend the power of alienation beyond the single life in each estate ; there is no legal estate immediately vested by the will, and the *life estate* and the *estate in fee* which follows it are properly executory devises, and the suspense of alienation is exactly the same, being measured out by a single life in being. The trustees may still perform the office of awarding and conveying the shares of the estate at the expiration of the time of 20 years and 10 days, and the property in the mean time descends to the heirs at law of the testator : the whole being a subject of transfer in the market except what hangs on the single life.

---

*Conclusions arrived at 'by Senator* MACK, *in the opinion delivered by him :*

The power of alienation can be suspended *only* upon a life or lives in being at the creation of the estate, and in no other way ; the continuance or termination of such life or lives must measure the legal period of suspense of alienation.

An estate determinable upon the *ceasing of minorities* by the death of the persons named, is an estate *depending upon lives;* and if there be more than two *lives,* or two *minorities,* which in such case are convertible terms, the estate is *void,* as created in violation of the statute to prevent perpetuities.

The trust term and the estates limited thereon being created in violation of the statute, are *void ;* and the *powers in trust,* for the same cause, are *not valid* for any purpose whatever.

The provision in favor of the children of *Augustus,* one of the sons of the testator, should be carried into effect by the payment of *money* instead of the *conveyance of land ;* and all the *annuities* and *legacies* given by the will should be paid.

---

*Conclusions arrived at by Senator* MAISON, *in the opinion delivered by him :*

The *trust term* being to endure until the youngest of thirteen minors attaining the age of 21 shall attain that age, it may by possibility continue for

11. " To Susan Duffy, widow of John Duffy, late of the city of New-York, deceased, I give and bequeath an annuity of two hundred dollars during her natural life.

12. " To my nephew John James, son of my deceased brother John James, I give and bequeath the sum of one thousand dollars.

13. " I give and bequeath to the Society for the relief of Orphan and Destitute Children in the City of Albany, an annuity of one hundred and fifty dollars, to be paid by my trustees, hereinafter named, to the managers of the said society, for the use thereof, annually, until my said trustees shall find

ALBANY,
Dec. 1836.

Hawley
v.
James.

thirteen lives, and is therefore void : being in violation of the statute prohibiting the suspense of alienation for more than two lives.

The power of alienation is as effectually suspended by a power in trust as by an express trust, where giving effect to the power would render the estate inalienable for more than two lives.

The power of alienation can be suspended only by the creation of an estate for life or lives ; it cannot be done in any other mode—the statute does not admit of an equitable construction.

The disposition of the estate after the expiration of the trust term is the creation of one remainder, consisting of different estates, viz. life estates, substituted remainders and ultimate remainders, alternating upon certain contingencies ; and such remainder being contingent, it is void, as created in violation of the 20th § of the article of the statute relative to " the creation and division of estates."

The life estates being part of the remainder created on the trust term, which is conceded to be a term of years, and the creation of such remainder being forbidden by the 20th §, the whole remainder is void—the life estates, as well as the substituted and ultimate remainders.

The trust term and the remainder created thereon being void, the whole estate goes over to the heirs at law of the testator, under the statutes of descent and distribution.

Those of the heirs at law, for whom provision is made by annuities, are bound to elect whether they will take as heirs or under the will ; they cannot do both.

The trusts cannot be maintained as powers in trust, for the purpose of fulfilling the intent of the testator in the payment of annuities ; if the payment of the annuities is properly secured, the purposes of the trust cease.

The power to lease lands, under the 2d sub. of § 55, may be executed in such manner as not to conflict with the provision in restraint of perpetuities.

A sum in gross in the exception of the 63d § means a single, entire sum of money, and not a sum periodically becoming due to the beneficiary ; consequently, the interest of an annuitant is inalienable by himself, and cannot be reached by a court of equity for the payment of his debts.

ALBANY,
Dec. 1836.

Hawley
v.
James.

it convenient, out of the rents and profits of my estate, to in-
vest the sum of two thousand five hundred dollars in some
public stock, which I require them to do at some period of the
trust hereinafter created; and the stock so purchased shall
thereupon be assigned in perpetuity to the said managers, sub-
ject, however, to such limitations and conditions, not incon-
sistent with the object of this bequest, as my said trustees shall
prescribe.

14. "The foregoing legacy to my nephew John James shall
be paid by my said trustees within the period of fifteen months
after my decease; and the legacy of three thousand dollars
to my wife, for the benefit of the children of her deceased sis-
ter Mrs. Gourley shall be paid in such proportions and at such
times as she may desire; and in the event of her death before
the whole is paid, then I order and direct that so much as shall
remain unpaid shall be faithfully applied by my said trustees
to the purposes for which it is designed, according to their dis-
cretion.

15. "The said specific legacies and foregoing annuities
are not to be considered as charges upon my real estate,
but are to be paid by my trustees hereinafter named, out of
the rents and profits of my estate so far as the same may from
time (to time) be sufficient therefor; and all my just debts,
also all sums advanced to my children and grand-children as
hereinafter authorized, before the final division of my estate,
and all the expenses incident to the execution of the trusts
hereinafter declared, are to be paid in like manner. But if at
any time the rents and profits, then already accrued and in the
hands of my said trustees, shall be insufficient for these objects,
the deficiency shall be supplied out of other funds belonging
to my estate, or by temporary loans of money; and all sums
thus drawn from the capital or principal of the trust fund, or
borrowed, shall be charged against future rents and profits,
and be reimbursed therefrom as soon as may conveniently be
done.

16. "And in the final partition of my estate in the manner
hereinafter directed, such of the said annuities as shall not
then have ceased shall be effectually secured to the respective
legatees.

ALBANY,
Dec. 1836.

Hawley
v.
James.

17. "In order to preserve my estate from being wasted, and to insure its more judicious management, so that out of the rents and profits thereof ample means may be afforded for the purposes above mentioned, and for the support and education of my numerous offspring, and with an exclusive view to the true interest of all for whom it is my duty to provide, I have determined to confide the care and management of my estate temporarily to trustees. In pursuance of these designs, and in view also of the lamentable consequences which so frequently result to young persons brought up in affluence from coming at once into the possession of property, I have also determined that this trust shall continue, and that the final division of my estate shall not take place *until the youngest of my children and grand-children, living at the date of this my will, and attaining the age of twenty-one years, shall have attained that age.* And in order moreover to provide against accidental inequalities and diversities of condition, which at the expiration of the trust may exist among the cestuis que trust, but more especially with a view to discourage prodigality and vice, and to furnish an incentive to economy and usefulness, I have further determined to invest my trustees with extensive discretionary powers in regard to the disposition of my property, to be exercised by them with a just regard to circumstances, and especially to the respective merits of the several cestuis que trust hereinafter mentioned.

18. "I, therefore, appoint Gideon Hawley and James King, Esquires, and my son Augustus James, of the city of Albany, my said TRUSTEES: and I give, devise and bequeath to them, the said Gideon Hawley, James King and Augustus James, all my estate, both real and personal, of which I shall be possessed and entitled to devise and bequeath at the time of my death, and not herein before devised and bequeathed to my wife: IN TRUST, to manage and dispose of the same, and to receive and apply the rents, issues and profits, proceeds, interest and income thereof, in the manner hereinafter directed and expressed.

19. "As soon as it may be deemed proper, and within one month after my decease, my said trustees shall proceed

ALBANY,
Dec. 1836.

Hawley
v.
James

to make a full and particular inventory of the trust estate, arranging the different descriptions of property under different appropriate heads ; and shall immediately file a true copy thereof, attested by their oaths to be a just and true inventory of all my estate, both real and personal, as far as the same shall have come to their knowledge, and they have been able upon diligent examination to ascertain, in the office of the surrogate of the county of Albany ; and in case any other property belonging to the trust fund shall afterwards come to their knowledge, they shall in like manner make and file an inventory thereof.

· 20. " And with a view to the more prompt, systematic and easy performance of the various duties connected with the trust, it will be proper that they allot and distribute among themselves the details of the business arising therefrom.

21. " It is, however my wish, and I accordingly direct, that my son Augustus shall succeed me as a partner with Moses De Witt Burnet, of the village of Syracuse, in his lease of the salt works and flouring mills in that village, and that he shall attend particularly to the business of the firm, as an active partner in the city of Albany, in the manner now done by him and me. So long as he does this, he shall be entitled to receive, to his own use, the whole share of the profits of the partnership to which I am now entitled ; he paying the proportion of the rent that may accrue upon the said lease, which by the agreement between the said Burnet, Isaiah, Townsend, John Townsend and myself, I am obligated to pay.

22. " It is my wish also that my son Augustus shall be charged with and take upon himself the collection of all rents accruing to the trust estate, as well elsewhere as in the city of Albany, and that he shall continue to perform this duty so long as in the opinion of my other trustees he shall execute the same properly. And for the performance of this service I authorize him annually to retain to his own use, such reasonable per centage upon the amount collected, by way of commission, as the other trustees shall deem it proper to allow.

23. "It is also my will, and I accordingly order and direct, that in addition to the particular and exact accounts which must necessarily be kept by each of my trustees in regard to all matters of which they shall severally have the special charge, a full and accurate general account shall always be kept, by one of my said trustees, of the whole business of the trust ; whose duty it shall also be, at the expiration of each year, to furnish each of the other trustees with an accurate transcript of such account, or of so much thereof as shall exhibit in a satisfactory manner the transactions relative to the trust during such year. And it is my wish that this duty shall be undertaken by my trustee Gideon Hawley, and performed by him so long as he shall continue to reside in Albany and to act as one of my trustees. To this end I order and direct that full and exact reports shall be made to him while he shall continue so to reside and act, and afterwards to such other discreet person as may be appointed to succeed him in the performance of this duty, by each of my other trustees respectively, at least as often as once in each year, of all their proceedings, receipts and expenditures, in the exercise of their respective functions during such year. And I further order and direct that he shall have the immediate custody of all deeds, mortages, bonds, notes, and other evidences of title and of debt, and that all moneys belonging to my estate shall be paid to him, either directly or by my other trustees respectively, from time to time, without unnecessary delay, as often as such moneys shall have been received by them.

24. " It is also my will, that so long as my trustee James King shall continue to reside in Albany, and to act as one of my trustees, he shall be charged with and take upon himself the collection and securing of debts and demands belonging to my estate, for the collection or securing of which professional services may be required.

25. "It is, however, my express will and intention, that no one of my trustees shall, severally, have the power to perform any acts or duties whatsover in relation to my estate, or concerning the execution of the trust hereby

ALBANY,
Dec. 1836.

Hawley
v.
James.

created, excepting what pertains to the final distribution of my estate as hereinafter expressly provided, and excepting such subordinate acts as a trustee may lawfully perform by an agent, and which a majority of the other trustees shall have duly authorized him to perform as such agent; and I do further declare and direct that no sale or transfer shall be made of any part of my estate, real or personal, and no investment be made of any of the funds of my estate in the purchase of any property, real or personal, without the consent of a majority of the trustees; and I do hereby authorize and empower the majority of the trustees consenting to such sale, transfer or investment, to make and execute the necessary conveyances, instruments and contracts to carry the same into effect, without the concurrence of the other trustee, or by an instrument under their hands and seals to appoint and authorize one or more of their own number to execute the same.

26. "I further order and direct that my trustees shall proceed as expeditiously as is consistent with a just lenity to my debtors, to collect all debts due to me at the time of my decease, or to see that such debts are made secure.

27. "They shall also sell all my real property in all places other than the cities of New York and Albany, and the village of Syracuse, as fast as fair prices can be obtained therefor; and I hereby authorize them also, at their discretion, from time to time, to sell or exchange portions of my real estate in the said cities and village. I also empower them to invest so much of the proceeds of all sales, and of all other moneys which shall come to their hands, as may not be wanted to enable them to fulfil the other purposes of the trust and to pay legacies and debts, in the purchase of real estate, or in the erection of houses in either of said cities, or in the village of Syracuse, or in loans, annuities, or any other safe and proper manner: but they are, nevertheless, to bear in mind and keep steadily in view that my will and intention is, that investments shall from time to time be so made, as that at the time appointed for the ultimate division of my estate, the same shall consist chiefly or altogether in real estate.

ALBANY,
Dec. 1836.

Hawley
v.
James.

28. " For the doing and executing of all which, and for the doing and executing of all other acts and things necessary to the prudent management of my estate, and consistent with the declared objects of their trust, I hereby invest them with full power and authority.

29. " For the better education of my children who may be minors at the time of my decease, I give and dispose of the tuition and custody of them and each of them to my said wife, for such time as they or any of them respectively continue unmarried and under the age of twenty-one years; but if my said wife shall die during the non-age of my said children, then I give the tuition and custody of those so being under the age of twenty-one years at the death of my wife, to my trustees for the time being, who are to make suitable provision out of the rents and profits of my estate for their education and support, according to their several ages and exigencies.

30. " In the event of the death, during the continuance of the trust, of any one of my sons now living, leaving a widow and a child or children, or a child or children only; and in the event of the death of any one of my daughters leaving a child or children, my trustees are authorized and required, if necessary, to make suitable provision out of my estate for the support of every such widow and for the education and support of every such child, according to circumstances and to their respective exigencies ; provided, however, that such provision shall not exceed in any case the allowance of fifteen hundred dollars a year to the widow and children of any such deceased son, or to the children of any such deceased daughter.

31. " If, during the continuance of the trust, either of my sons, or of my grand-sons whose parent being my son or daughter, is deceased, having attained the age of manhood, shall desire to establish himself in any reputable profession or trade, and shall have need on that account of money for the purchase of professional books, implements or the like, or if he shall desire to purchase real property in the city or town where he may reside or intend to reside, for his own accommodation and use, or, to a moderate amount, with a view to

ALBANY,
Dec. 1836.

Hawley
v.
James.

speculation, in every such case I authorize my trustees, with the approbation of my wife, if she shall be living, at their discretion, to advance to such son or grand-son such sum or sums for either of these purposes as they may think fit ; but such advance to any one individual shall not in the whole exceed the fourth part of the probable amount to which such individual will be entitled upon the ultimate division of my estate.

32. " If, during the continuance of the trust, either of my sons, or of my grand-sons whose parent being my son or daughter is deceased, having attained the age of manhood, shall desire to engage in any honorable occupation requiring the employment of capital, and if in the opinion of my trustees for the time being, and of my wife, if she shall be living, it shall be expedient that he should do so, I authorize my said trustees at their discretion to advance to such son or grand-son a sum or sums not exceeding in the whole the fourth part of the probable amount to which such son or grand-son will be entitled upon the ultimate division of my estate.

33. " And if, during the continuance of the trust, either of my daughters, or my grand-daughter Mary Ann King, shall choose to marry, and provided she shall have at all times previously behaved dutifully and affectionately towards my wife and her other relatives, and if on account of her marriage it shall, in the opinion of my trustees and of my wife, should she be living, be in all respects fit and proper that such daughter or grand-daughter should then receive a portion of my estate, I authorize and require my trustees to pay to her a sum not exceeding three thousand dollars ; and I further authorize them, if it shall satisfactorily appear to them to be necessary, to advance to her from time to time such further sums, not exceeding two thousand dollars in any one year, for her support and the promotion of her welfare, according as the exigencies of her case may in their opinion require. And in like manner, upon the marriage of either of my grand-daughters, Anna M'Bride James, daughter of my son William, or Lydia James, daughter of my deceased son Robert, I authorize and require my said trustees

ALBANY,
Dec. 1836.

Hawley
v.
James.

under the like circumstances and upon the like conditions to pay. to her a sum not exceeding two thousand dollars.

34. " In order to entitle my several sons, John, Edward, and Howard, and my grand-son Robert, son of my deceased son Robert, to the full benefit of the provisions hereinafter made for them, they must severally learn some one of the professions, trades or occupations usually pursued in this country as a livelihood, and must assiduously pursue and practice the same.

35. " For the purpose of inculcating habits of industry and economy, I order and direct that all sums of money advanced by my trustees during the continuance of the trust, to. or on account of any one of my sons and daughters, grand-sons and grand-daughters, shall be charged against them respectively as debts due to my estate ; and that upon the final division of the residue of my estate as hereinafter directed, the sums so advanced to each, together with compound interest thereon at the rate of five per cent. per annum, shall be deducted from the respective shares of those to whom such advances shall have been made.

36. " I give, devise and bequeath to the children of my son Augustus and his present wife Elizabeth ; to my grand-daughter Anna M'Bride James, daughter of my son William ; and to my grand-daughter Lydia James, daughter of my deceased son Robert, in manner following, that is to say : At some period during the continuance of the trust, and as near the termination thereof as may be found convenient, my trustees shall, out of the rents and profits which shall have accrued out of my estate, purchase productive real property to the amount as nearly as may be of fifty thousand dollars, and shall, at the expiration of the period herein limited for the continuance of the trust, convey the same to such of the said children of my said son and his present wife then living, and in such proportion as my said son Augustus and his said present wife, or the survivor of them if only one shall be living, shall direct ; and if neither of them shall be living, then to such of their said children and in such proportions as my said trustees, together with my wife, should she be living and choose to act, may think proper. And to each of my grand-daugh-

ALBANY,
Dec. 1836.

Hawley
v.
James.

ters, Anna M'Bride and Lydia above named, my trustees shall set off and convey so much other productive real property belonging to my estate as shall in their opinion be worth twenty thousand dollars.

37. "I further order and direct, that at the expiration of the period herein prescribed for the continuance of the trust, my trustee Gideon Hawley, or such other person as may be appointed in his place in the manner hereinafter directed, together with such other trustees or trustee, if any, as may be appointed in the place of my son Augustus and James King, or either of them, and who shall not be interested in the division of my estate, shall, together with my wife, should she be living and choose to act, immediately proceed to divide the residue of my estate remaining in their hands, not herein before devised or bequeathed, as nearly as may be, into twelve equal parts, and shall allot and distribute, and my trustees shall thereupon convey the same to the persons, and in the proportions following, that is to say ; to my sons Augustus, John, Edward and Howard—to my daughters Jannette, Catharine and Ellen—and to my grand-daughter Mary Ann King, each one part ; and to my grand-son Robert, son of my deceased son Robert, one half of one part ; subject, however, to the conditions, limitations and retributive purposes hereinafter expressed.

38. "Out of the share to be allotted to my grand-daughter Mary Ann King, or to her heirs, as herein after provided, my trustees shall pay to her father James King, for his own use, the sum of ten thousand dollars, or, at their election, shall convey to him in fee so much of the real estate comprised in such share as shall, by them, be estimated to be worth that sum.

39. "In the event of the death of either of my said sons or daughters, or of my said grand-son Robert, or of my said grand-daughters Mary Ann King, Anna M'Bride and Lydia, or of the said James King, before or after my own decease, within the period above limited for the continuance of the trust, I order and direct that the share or portion of my estate to which such deceased person would, if living, have been entitled, so far as relates to the personal estate, if any,

comprised in such share, shall be allotted and conveyed in such manner as if such deceased person had died intestate lawfully possessed thereof, the same would have been bestowed by force of the statutes of this state regulating the distribution of the personal estates of deceased persons who have died intestate ; and so far as relates to the real estate comprised in such share, the same shall be allotted and conveyed in such manner as if such deceased person, having derived such estate from me, or, if a grand-child, from his deceased parent, had died intestate lawfully seised thereof in fee, the same would have descended by force of the statutes of this state regulating the descent of the real estate of persons who die intestate ; subject, however, to the conditions, limitations and retributive purposes hereinafter expressed.

40. " If either of my said sons, John, Edward and Howard, or my grandson Robert, shall fail to observe and faithfully to follow the directions herein before given concerning them ; or, if at the expiration of the period limited for the continuance of the trust, it shall satisfactorily appear to my trustee or trustees authorized to make the final partition of my estate, that any one of those who would otherwise have been entitled to share in such partition, leads a grossly immoral, idle, or dishonorable life, such delinquent shall not be entitled to the share of my estate herein before provided for such person, but shall be considered as having forfeited the same either wholly or in part ; and I do hereby order and direct my trustee or trustees authorized to make partition of my estate, to withhold from such delinquent such share, either wholly or in part, according to the degree of demerit by which such forfeiture shall be incurred ; of which, and of the existence of the facts rendering such forfeiture proper, my said trustee or trustees shall be exclusively authorized to judge ; and the portions of my estate so withheld shall be added to the residuary parts.

41. " As it regards the remaining three and a half parts of my estate, together with such additions, if any, as shall be made thereto in the manner above mentioned, I authorize and require my said trustee or trustees authorized to make partition of my estate, together with my wife, if she shall be

ALBANY,
Dec. 1836.

Hawley
v.
James.

ALBANY,
Dec. 1836.

Hawley
v.
James.

living, to apportion the same according to their discretion *among all or any number of those herein designated as in any event entitled to share in the ultimate disposition of my estate ;* but with a just regard to circumstances and a scrupulous attention especially to the personal merits and demerits of each individual. And my trustees shall execute conveyances, in pursuance of such apportionment.

42. " And although the extensive and extraordinary power herein conferred of punishing idleness and vice, and of rewarding virtue, must from its nature be in a considerable degree discretionary, and although its faithful exercise may prove to be a task at once responsible and painful, yet it is my full intention and earnest wish that it shall be carried into execution with rigid impartiality, sternness and inflexibility.

43. " In order to provide for the decent maintenance of those (if unhappily there should be any such) whose portions shall be wholly withheld, I order and direct that to every such individual an annuity for life shall be given, of such amount only as shall be sufficient to supply the probable actual wants of such individual.

44. " Having herein before provided for the division and apportionment of my estate among the several *cestuis que trust,* but without particularly designating the QUANTITY OF INTEREST to be conveyed to them, I now declare it to be my will, and I accordingly order and direct, that every conveyance of any portion of my real estate, to be executed by my trustees upon the expiration of the trust herein created, in pursuance of the foregoing directions, shall be to the grantee for life, with power to devise the same in fee to his or her lineal descendant or descendants, in such manner or proportions as he or she may think proper ; and in the event of such grantee either leaving no such descendant, or omitting to make a valid disposition of the same in execution of such power, then with remainder in fee to such person or persons as by the statutes of this state regulating the descent of real property, would have been entitled to inherit the estate, had the grantee, having derived the same from me, died intestate lawfully seised thereof in fee : excepting however the conveyance, if any, to James King or his heirs, which

shall be in fee; and the conveyances, to such of my descendants, if any, entitled to share in the division of my estate, as, by reason of their having been born subsequently to my decease, may be incapable of taking less than an estate of inheritance, which conveyances shall also be in fee.

45. "It being my intention that there shall always be three acting trustees of my estate during the continuance of the trust, all of whom shall reside in the city of Albany; I do hereby direct that in case any one or more of the trustees shall refuse to act or become incapable of acting as such, or shall resign, remove from the city of Albany, or die, it shall be the duty of the remaining trustees to apply by petition to the Chancellor for the appointment of a suitable person or persons to supply the vacancy or vacancies so created, and to name in such petition the person or persons whom they desire to be appointed. And every person so appointed shall succeed to and be fully invested with all the rights and powers, and be subject to all the duties and responsibilities pertaining to the office or place which he is appointed to fill, in like manner as he would have been had he been herein expressly named and appointed such trustee.

46. "And my will is, and I accordingly hereby declare, that my said trustees shall not be charged or chargeable with, or accountable for, any loss which may happen to my estate, unless such loss shall happen through their wilful default or neglect; and that they shall not respectively be held accountable for the separate acts of each other; but they shall in all things discharge the duties of the trust with care and fidelity according to the best of their skill and understanding.

47. "Forseeing that the duties imposed upon my trustees may require a considerable portion of their attention, I deem it proper to declare my views and intentions relative to the subject of their compensation. I consider the liberal and extraordinary provisions which I have made in favor of my son Augustus and his family as justly entitling me to expect that he will cheerfully take upon himself the burden of the trust without other compensation; and in like manner I ex-

ALBANY,
Dec. 1836.

Hawley
v.
James.

ALBANY,
Dec. 1836.

Hawley
v.
James.

pect that the liberal provisions herein contained in favor of Mr. King and his daughter, together with the emoluments likely to arise to him from being employed professionally in the management of my estate as herein provided, will be deemed by him an adequate compensation for his services. To my trustee, Gideon Hawley, esquire, in full compensation for the performance of all the duties required of him, I allow the sum of five hundred dollars a year, so long as he shall continue to perform such duties.   And should it at any time become necessary, as hereinbefore provided, to procure the appointment of another person in the place of either of my said trustees, he shall be entitled to such compensation for his services as my trustees upon whose petition he shall be appointed shall think proper to allow.

48. " And Lastly, I hereby constitute and appoint my trustees above named, and their successors appointed in the manner herein before directed, executors of this my last will and testament."

The testator died 19th December, 1832, seised of real estate and chattels real of the value of $800,000, including 40,000 acres of unimproved lands in the state of Illinois, and possessed of personal property to the amount of $500,000.   He was indebted $112,000.   At the time of the making of the will, and at his death, the testator had *nine children* living, and also one grand-daughter, the only child of a deceased daughter, and a grand-son and grand-daughter, the children of a deceased son, which twelve children and grand-children were his *heirs at law*.   His son William was married and had one child.   Another son Augustus was also married, and had three children.   No alteration took place in the testator's family between the making of the will and his death except the marriage of his eldest daughter Jeannette to W. H. Barker ; but after his death, and previous to the hearing of this case in chancery, William had another child born.   Mrs. Barker also had a child born, and John, another son of the testator, married.   All the children and grand-children, except William, Augustus, and Henry, were *minors* at the time of the death of the testator and at the time of the hearing.   The testator's

youngest *child* was born in November, 1828, and his youngest *grand child* William Augustus, was born on the 29th December, 1831, and of course would not arrive at full age until *twenty years and ten days* after the death of the testator. The widow *elected to take her dower* instead of the provisions made for her in the will.

On the 19th October, 1833, a bill in chancery was filed by Gideon Hawley and James King, two of the executors and trustees against Augustus James, their co-executor and trustee, Catharine James the widow, and the children and grand-children of the testator, and against the other persons who had either vested or contingent interests under his will, for the purpose of settling the construction of such will, and to have the trusts thereof carried into effect, under the direction of the court of chancery. William James and Henry James, two of the heirs at law of the testator, and defendants in the original suit, subsequently filed their cross bill, against the complainants and against their co-defendants in such original suit, to set aside the will of the testator, or such of the devises and trusts contained therein as should be adjudged illegal and void; and to have so much of the property as was not legally disposed of by the will, distributed among the several persons entitled to the same under the provisions of the Revised Statutes relative to descent and the distribution of intestates' estates. Several persons having by birth or marriage, become interested under the provisions of the will, subsequent to the commencement of the suit, they were brought before the court as parties, by a supplemental bill and cross bill; so that their several rights and interests in the estate of the testator might be ascertained and settled, and that they might be bound by the decree. The cause was heard in chancery, on the bills and answers, and upon the reports of a master to whom it was referred to ascertain the rights of the infant defendants.

In respect to the portions of the will upon which *appeals* were subsequently prosecuted, the chancellor decided,

1. That the estate devised to the trustees, is a *valid trust term for years*, for the term of *twenty years and ten days*

from the day of the testator's death, determinable upon the ceasing of the *minorities* either by lapse of time or the death under age of the testator's children and grand-children who were living at the date of the will.

2. That the *estates in remainder for life* given by the will to the children and grand-children designated as the recipients of the *eight and an half shares* of the estate, *are valid as contingent remainders*.

3. That if such remainders shall vest in interest and possession at the expiration of the trust term, *the remainders limited thereon* to the descendants or special heirs of the first remainder-men for life, *are also valid*, subject to the execution of the power of appointment ; but that the *power in trust*, given to the remainder-men for life to devise the *ultimate remainder*, in fee or otherwise to their descendants *not in existence* at the time of the death of the remainder-men, or to appoint any estate to their descendants other than an absolute and unconditional fee, except in the case of the death of the first appointee during minority, is *void.*

4. That the *substituted estates in remainder* in the 8½ shares *upon the death during the continuance of the trust term*, of the children and grand-children designated as the recipients of those shares, are *void ;* as are also the *ultimate* or *subsequent remainders* depending on the substituted remainders.

5. That the *estates in remainder for life* given by the will to Anna McBride and Lydia the grand-daughters of the testator, and the several *subsequent estates in remainder* in the portions devised to them, limited on such life estates, either as *substituted remainders* or otherwise, are *valid ;* but the power in trust to devise the ultimate remainders to descendants not in existence, &c. is illegal and *void.*

6. That the *estate in remainder for life* to the children of Augustus James *in esse* at the death of the testator and the *remainders in fee* to the after-born children of Augustus in the fund of $50,000, and the *ultimate remainders in fee* limited upon the life estates, are *valid ;* but that the power in trust to devise the ultimate remainders to descendants not in existence, &c. is *void.*

ALBANY,
Dec. 1836.

Hawley
v.
James.

7. That the trust to receive the rents and profits of the trust estate, and pay the legacy to John James and the annuity to the Orphan Asylum is *valid;* that the legacy given to James King and the *specific annuities* to divers persons, given by the will are also *valid.*

8. That the provisions in the will as to *marriage portions* to the grand-daughters Anna M'Bride and Lydia are valid ; but that the same provisions as to *marriage portions* and as to *advances* to the persons designated as the recipients of the 8½ shares of the estate are void.

9. That the directions of the testator to the trustees, to convert his personal property into real estate, are *valid;* but that the direction for the *accumulation of rents and profits* is void.

10. That the provisions in the will for the support of the minor children of the testator in the event of the death of their mother, and for the support of his grand-children and the widows of his sons, are valid provisions.

From the decree of the Chancellor two of the *trustees,* viz. Messrs. Hawley and King, appealed to this court. There were also various *cross-appeals* entered, and the matters of all the appeals were discussed in the same argument. The following were the points presented and insisted upon by the counsel for the several parties.

*S. Beardsley,* (attorney general of the state of New-York,) presented and discussed the following points on the part of the *appellants* Hawley and King, two of the *trustees* appointed by the will of the testator :

I. The trust *term* is valid ; the period limited for its duration is legal and free from objection. 1 R. S. 730, § 65, 63 ; 723, § 14, 15, 14, 16 ; 748, § 2. Randell's Law of Perpetuities, 48. Cruise's Dig. tit. Deed, ch. 23, § 19. 2 Black. Com. 173, 174, 168, 170. Fearne on Con. Rem. ch. 1, § 4, and cases cited. *Scatterwood* v. *Edge,* 1 Salk. 229. *Cotton* v. *Heath,* 1 Eq. Cas. Abr. 191. *Bate* v. *Norton,* Th. Raym. 82. *Bullock* v. *Stones,* 2 Ves. sen. 521. *Humberston* v. *Humberston,* 1 P. Wms. 332.

ALBANY,
Dec. 1836.

Hawley
v.
James.

II. The *trusts* declared by the will, some or all of them, are legal and valid. 1 R. S. 728, § 55; 729, § 58, 60; 725, § 36; 723, § 9, 10, 11, 12, 13, 15; 726, § 37, 40.

III. The 29th and 30th sections of the decree are erroneous: 1. In declaring that the sons of the testator, John, Edward and Howard, and his grandson, Robert, must learn and actually pursue some profession, trade or occupation, as a condition *precedent* to becoming entitled to their respective shares. 2. In declaring that the trustees authorized to make partition, are to *judge* whether this condition has been performed. 3. In declaring that the leading a moral, industrious and honorable life, at the end of the trust term, is, as to all the persons otherwise entitled to share in the estate, a condition *precedent* to their being so entitled. Cruise's Dig. Remainder, ch. 1, § 41. 4 Kent's Com. 194, 199, note. 1 R. S. 723, § 13. Fearne on Con. Rem. 215, 216. *Cunningham* v. *Moody*, 1 Ves. sen. 174. *Doe ex dem. Willis* v. *Martin*, 4 T. R. 39, 63, 70.

IV. The estates in remainder *for life*, in the *eight and a half* shares, of the twelve shares, are valid remainders and *vested* in interest; the fourteenth section of the decree is erroneous, in declaring that these remainders are *contingent*.

V. The estates in the *eight and a half* shares, which, (upon the death during the trust term, of the children and grand-children to whom said shares are in the *first place* limited, for life,) are substituted and limited to their representatives, are valid as *contingent* remainders; the 16th section of the decree, which declares that these *substituted* estates are void, is therefore erroneous. 1 R. S. 723, § 11; 724, § 20.

VI. The 26th section of the decree is erroneous in declaring that upon the death of either of the *seven* children or *two* grand-children, during the trust term, the *future* rents and profits of his or her share, for the residue of that term, will belong to the heirs at law and personal representatives of the *testator*. 1 R. S. 726, § 40.

VII. If the *substituted estates in remainder* in the eight and a half shares, by the 39th clause of the will, to the respective *heirs* of the seven children and two grand-children,

were even too remote to take effect *as remainders*, (the mode in which the testator intended the heirs should take,) the court will not permit the intention of the testator for that reason to fail; but by a well established rule at law and equity, will comprise the heirs in the previous devise to their respective ancestors, by enlarging the previous life estates into estates in fee, and execute the intention of the testator *in that mode*, by passing the estate to the heirs by *descent*.

*D. D. Barnard* presented and discussed the following points on behalf of William James, a son of the testator, Anna McBride James, the daughter of William, and Lydia James, the daughter of the testator's son Robert:

*First.* The devise to the trustees, with all authority under it is wholly void:

I. Because the testator entertained the design of effect· ing a certain end or object, namely, in general terms, *accumulation ;* and that end or object was such as the law prohibits. The trust estate had its origin in, and was expressly designed to accomplish this illegal intent; and there is no reason for believing that this estate would have been created, but for the purpose of effecting that object, or that the devise was in fact made for any of the other declared objects of the trust. S. C. 5 Paige, 480. 1 R. S. 726, § 27. *Perrin* v. *Blake*, 4 Burr. 2579. 1 R. S. 723, § 14, 15, and 16. Revisers' Rep. on ch. 1, part 2, p. 23. *Thelluson* v. *Woodford*, 4 Ves. jr. 227. Rev. Rep. 29. 4 Kent Comm. 295, 6. 5 Paige, 421. *Lorillard case*, Pamph. 186. *Mackie* v. *Cairns*, 5 Cowen, 580. Rev. Rep. 21, 89, 90. 1 R. S. 748, § 1 and 2. 5 Cowen, 548. 1 R. S. 726, § 37 (2.)

II. Because the trust term is so limited that the period at which it can be ascertained that the term has ended may far overrun the period at which it shall end. S. C. 5 Paige, 462–3 and 392–3. 4 Cr. Dig. 116, 117, tit. 23, ch. 7, " Lease." 1 Inst. 45 b. 1 Mod. 183, anon. 1 Cr. Dig. 253, § 30.

III. Because there is not one object or purpose of the trust, which the trustees can be called on to execute, for

ALBANY,
Dec. 1836.

Hawley
v.
James.

which an express trust to take immediate rents and profits, is authorized to be created. 1 R. S. 730, § 67. Id. 727, § 45. Id. 729, § 56, 60. Id. 733, § 87, (2.) Id. 730, § 63. Id. 729, § 58. *Lorillard case*, Pamph. 106. Rev. Rep. 42. 1 R. S. 733, § 87, (2.) 732, § 79. *Vail* v. *Vail*, 4 Paige, 328. 2 R. S. 82–3, § 6 (3.) ld. 87, § 29. Id. 92, § 52. Id. 82, § 6, (1.) Id. 87, § 25. Id. 100, § 1. Id. 102, § 14, 15. Id. 103, § 21, 16. Rev. Rep. 40. 5 Paige, 375.

IV. Because, by the estate devised, the power of alienation is suspended for a longer period than is allowed by law. It is not determinable with or within any two ascertained lives in being at the death of the testator. 1 R. S. 723, § 14. Id. 739, § 143. Id. 730, § 65 and 63. Id. 723, § 15. *Lorillard case*, Pamph. 97. 2 Bl. Comm. 174. 5 Paige, 398, 400, 461, 462, and 463. 9 Ves. 130. 1 R. S. 728, § 55, (3.)

*Second.* The powers of management, and of partition and distribution at the end of the term, and of all estates and things dependant on them, are wholly void.

I. Because the grand design of the testator, in the scheme of his will, was to devote his great estate to the production of an accumulated fund, and that in a way and for objects which the law forbids. This was the design of the devise to the trustees; and these powers, and all estates directed to be created under them, were contrived expressly for the purpose of disposing of the fruits of this illegal design when accomplished; and there is no reason to believe that these powers were granted for the purpose of disposing of the original property of the testator, or that the estates ever would have been directed to be created, or were, in fact, intended to take effect on the original property. 1 R. S. 748, § 2. *Lorillard*, Pamph. 188.

II. Because the power of disposition relates to the whole fund to be disposed of, as one subject; and the power itself is an entirety, which cannot be executed to answer the intent of the testator, unless it be executed entirely and fully, as directed. *Lorillard case*, Pamph. 188–9.

III. Because the power of creating estates includes a power to grant a power, which is not authorised by statute. 1 R. S. 734, § 94—5. Id. 732, § 81 85. Id. 729, § 58. Id. 732. § 75. Pow. on Powers, 14.

IV. Because the power can only be exercised when the term can be ascertained to have ended, and if the term shall end before it can be ascertained to have ended, (as it may) then the estates created under the power, may and probably would go to other persons than those who ought to have received them.

V. Because, until the execution of the power over the estate of the testator at the end of the term, there can be no persons in being by whom an absolute fee in possession can be conveyed ; and the power is not to be executed, and the estates directed to be created are not to take effect during the continuance, or at the termination of any two specified lives in being at the death of the testator. 1 R. S. 737, § 128. Id. 723, § 13. *Lorillard case*, Pamph. 94. 1 R. S. 727, § 15. 5 Paige, 461.

*Third.* If the trust estate shall be declared valid, then so much of the rents and profits and income of the estate as are not wanted for the valid purposes of the trust, belong to the heirs at law and the widow and next of kin of the testator.

*Fourth.* The annuity to William James is valid.

*Fifth.* The provisions for Lydia James and Anna McBride James are valid, and they are entitled to receive the bequests immediately.

*Sixth.* The bequest to the children of Augustus James is invalid.

*J. I. Roosevelt jun.*, presented and discussed the following points on behalf of the three infant children of Augustus James, living at the date of the will :

1. The devise of the fifty thousand dollars, to be laid out in land, was intended by the testator for the benefit solely of the three children of his son Augustus who were in being at the date of the will, and not of such as might be born after that period.

ALBANY,
Dec. 1836.

Hawley
v.
James.

2. The interest intended to be given to them in the land so to be purchased, was an estate not for life, but in fee.

3. In the direction to make the purchase in question out of the rents and profits of his estate, the testator meant to include the income as well of personal as of real estate.

4. Inasmuch as the duration of the trust is uncertain, the purchase ought to be made out of the first income that may be received by the trustees.

5. Should any of the directions of the will affecting the rights of these infants appear to be ambiguous, they ought to receive that interpretation, if any, which the law sanctions, and not that which it prohibits.

6. The devises in favor of these children being, not direct, but executory, it is competent to the court, should there be any difficulty in a strict interpretation, to direct a settlement in such manner as will carry into effect so much of the intention of the testator as may be warranted by law.

*As to the other devises to these children.* I. The share of the estate generally, given to these children by the 39th clause of the will, in the event of the death of their father within the period limited for the continuance of the trust, is a valid alternative contingent remainder, and will vest in interest immediately on the happening of that event, should it happen within the period so designated; and the further condition as to "grossly immoral" conduct if applicable at all to these children, is a condition not precedent, but subsequent, by means of which the estate may be divested or " forfeited." But even if it were a condition precedent, the remainder would still be valid.

*First.* The absolute power of alienation is not suspended at all.

*Second.* If suspended, it is not suspended for a longer period than is allowed by law. 1. The law permits, in its spirit, if not in its letter, a suspension for 21 years. 2. The testator did not intend to create a suspension for more than two lives. When language is susceptible of two interpretations, that which is lawful is to be adopted. 3. If he did mean more than two lives, it would nevertheless be valid for the lives " of the two persons first named ;" who in this

case, are the two youngest of his descendants " in being at
the creation of the estate ;" or at least for the lives, of the
two who should first die.

ALBANY,
Dec. 1836.

Hawley
v.
James,

*Third.* The purposes of the trust and the powers granted
to the trustees are lawful. *Purposes.*—1. To pay debts
and legacies, and make advances to the adult sons and
grand-sons going into business, and to the daughters and
grand-daughters marrying. 2. To apply so much of the
rents and profits as may be necessary to these uses and to
the support and education of widows and children. 3. To
accumulate the surplus for the benefit of the minors. 4. To
preserve the capital, so far as may be, entire to the end of
the trust term. *Powers.*—To sell : to mortgage : to apply
rents and profits and, of course to receive them ; and if to
receive rents and profits, of course, to lease : to make par-
tition.

*Fourth.* If there be any direction to accumulate beyond
minorities, it does not vitiate the devise, nor even the whole
direction, but is void only for the excess.

II. The remainder given to these children, by the 44th
clause of the will, is a valid remainder limited upon the life
estate of their father and subject to the power of appoint-
ment therein mentioned.

*S. Stevens* presented and discussed the following points
on behalf of the five youngest children of the testator, and
two grand-children :

*First.* The devise to the trustees is illegal and void : 1.
It is in violation of the provisions of the Revised Statutes
against perpetuities, inasmuch as it suspends the power of
alienation for a longer period than is allowed by law. 1 R.
S. 723, § 14 and 15. 2. It is not created for any of the
purposes for which an express trust is authorized by law to
be created. 1 R. S. 727, § 45. Id. 728, § 55. 3. The
great end which the trust was intended to effect, viz. the
accumulation and increase of the testator's estate, with a
view to its distribution at a distant period, being illegal, the
trust estate must fall with it.

ALBANY,
Dec. 1836.

Hawley
v.
James.

*Second.* The devises and bequests to those who are heirs at law of the testator must, in the event of the trust being declared to be void as above insisted, be decreed to be extinguished, or they must elect between their portions as heirs at law, and the provisions made for them by the will. *Newman* v. *Newman*, 1 Bro. C. C. 186. *Lewis* v. *King*, 2 id 600. *Thellusson* v. *Woodford*, 13 Vesey, 209. 2 Ves. 618. *Brodie* v. *Barry*, 1 V. and B. 130. 1 Powell on Dev. 443. Jer. Equity Jur. 535–6. 1 Ves. jun. 523. *Blake* v. *Bunbury*, 4 Bro. C. C. 21. *Noys* v. *Mordaunt*, 2 Vern. 581. *Tibbits.* v. *Tibbits*, 19 Ves. 656. *Dillon* v. *Parker*, 1 Swanston, 394, note.

*Third.* The devise to Anna McBride James, and also the devise to the children of Augustus James, are both invalid : 1. They are directed to be raised out of accumulated rents and profits, and the direction for such accumulation being void, the fund out of which they were to be raised has failed, and the devises fail with it. 2. Because if the trust estate is declared void, it cannot be ascertained or determined that it was the intention of the testator to make those devises.

*Fourth.* But if the trust is good for the purpose of paying legacies and annuities, still the whole estate of the testator should not be retained in the hands of the trustees for that purpose alone, and the heirs at law and next of kin deprived of enjoying their portions thereof, until the expiration of the trust term, and especially as to the three and one-half shares as to which the testator died intestate, inasmuch as full and ample provision can be made to satisfy those objects of the trust, by setting aside a fund sufficient, under any circumstances for that purpose.

*Fifth.* If the trust term is good, the estates for life in the eight and one-half twelfths of the testator's estate devised to his seven children and two grand-children mentioned in the 37th clause of his will, *if valid are vested in interest:* 1. The conditions annexed to the said estates by the 34th and 40th clauses of the will, are not conditions precedent to their vesting in interest. 1 Preston on Estates, 41. *Peyton* v. *Bury*, 2 P. Wms. 626. 2. The trustee or trus-

tees authorized to make partition of the "testator's estate, are not vested with the power of determining whether the estates in the eight and one-half shares shall vest in possession in the nominees. 3. Because the power of the trustees is a power of appointment merely, and does not suspend the vesting in interest of the subsequent estates. Fearne on Rem. 226, 229. Sugden on Powers, 147, 154. *Madoc* v. *Jackson*, 2 Bro. C. C. 588.

*Sixth.* If the devise to the trustees is good, then the substituted remainders created by the 39th section of the testator's will, are valid: 1. As contingent remainders; or, 2. As alternate future estates. 1 R. S. 724, § 25.

*Seventh.* If the true construction and legal effect of the will is not as contended in the two last points, then it is insisted that the devise to the trustees or the trust estate, and all estates and devises depending thereon, are void, independently of any of the reasons before given, because the intention of the testator in regard to the provision which he intended making by his will, for his children and grandchildren, named in the 37th clause thereof, and their heirs would be entirely frustrated.

*H. R. Storrs,* counsel for *Augustus James,* argued in support of the decree.

*J. C. Spencer,* presented the following view of the case, and discussed the following points on behalf of *Henry James,* a son, and *William H. Barker,* a son-in-law of the testator.

The general frame of the will is as follows:

1. It creates a trust term in certain trustees for certain purposes, to continue "until the youngest of my children and grand-children, living at the date of this my will, and attaining the age of twenty-one years, shall have attained that age," and during that time vests the legal estate of all the testator's real and personal property in his trustees. Clauses 17 and 18 of the will.

2. It directs that at the expiration of the trust term the trustees shall convey to the four sons named, three daughters named, and one grand-child named, each one-twelfth

ALBANY
Dec. 1836.
Hawley
v.
James.

of the whole estate óf the testator, and to another grand-child named, one-half of one-twelfth; and in case of the death of either of them during the term, it directs such conveyances to be made to those who would be their heirs. Clauses 37 and 39 of the will. And these conveyances, by the 44th clause, are to be for life, except in some special cases.

3. By the same 44th clause, the conveyance for life, is to contain a clause authorizing the tenant for life to devise the share so given him, to his descendants; and in case of omitting to do so, then the will declares that the remainder, in fee, shall go to the lawful heirs of such tenant for life. Three distinct estates are thus carved out. 1. The trust term. 2. The remainder for life upon that trust term. 3. The remainder in fee. Three-twelfths and one-half of one-twelfth of the whole estate, are, by clause 41, to be divided by the trustees, at the expiration of the trust term, according to their discretion, " among all or any of the persons in any event entitled to share in the ultimate disposition of the estate." It is also contended that the testator has directed an accumulation of the rents and profits of his real estate and of the income of his personal estate, after payment of debts and of certain charges to be made, which will become a part of the capital or principal of his estate, and at the expiration of the trust term, is to be divided into twelve shares, and conveyed as before stated, with the mass of his real and personal estate.

First GENERAL HEAD, *relating to the trust term.*

I. It suspends the power of alienation of an absolute fee in possession, for more than two lives in being, and is void. 1. During its continuance, no conveyance of an absolute fee in possession can be made. 2. It is limited to continue until some one out of thirteen minors shall live to attain the age of 21 years, and is therefore dependant on more than two lives in being. 2 Cruise's Digest, tit 13, ch. 11, § 5. 3 Atkyns. 774. Ambler, 204. 2 Ventris, 336. 1 Vernon, 104. 3. If it is to be considered as a definite estate for a given period, determinable upon any one out of thirteen minors attaining 21 years (or living to attain 21 years,) it is

determinable with lives and dependant on them, and on more than two lives in being. 1 Cox, 324.

II. It does not specify any two certain lives during which the power of alienation is to be suspended, but the suspension may continue beyond some two of the twelve lives enumerated.

III. Its duration is so vague, fluctuating and uncertain, that no fixed and precise interest is vested, and it is void for this uncertainty. Fonblanque's Equity, 427. Powell on Devises, 411. Comyn's Digest, "Grant" E. 14. Viner's Abridgment, vol. 21st, title "Uncertainty." Peck v. Halley, 2 P. Wms. 387. Shephard's Touchstone, 415 and 433. 10 Modern, 103. 2 Vernon, 404. Attorney-General v. Hinzman, 2 Jacob and Walker, 277. 1 Merrivale, 314. 1 Swanston, 200. 7 Vesey, 128.

IV. The trust term is not created for any legal purposes of an express trust, which can support the term in the hands of the trustees. 1. One purpose of the trust term is to receive and accumulate the rents and profits; and this direction for accumulation is wholly void, because, 1st, it is not directed for the benefit of minors exclusively; 2d, it is not to terminate with the minority of any person for whose benefit it is directed; 3d, a portion of the benefit of the accumulation, to wit, the interest on the accumulated fund, is to be enjoyed by the tenants for life during their lives, all of whom by the very terms of the will, must be adults; and 4th, because the principal sum thus accumulated is to go to those who by the provisions of the will are to enjoy the remainder in fee in the testator's estate, persons altogether uncertain, contingent and unknown. 2. Another purpose of the trust term is to make partition of the estate and convey it to the tenants for life, as before stated. This is not among the express trusts authorized by law, but is a mere power in trust, and of course cannot sustain the trust term. See Revisers' notes to chap. 1, part 2, note to § 55, p. 43; and Ch. J. Savage's opinion in the Lorillard case, p. 113. 3. Another purpose of the trust is to pay debts. As no authority is given " to sell lands for the benefit of creditors," but on the contrary the payment of debts is to

be made out of rents and profits (clause 15 of the will,) no express trust is created within the provisions of § 55, of title 2, chapter 1, part 2, Rev. Stat.; Fonblanque's Equity, 449. The direction to pay debts is, therefore, a charge upon income, and upon personal property undisposed of by the will; and as there is a sufficient fund for that purpose, as will subsequently appear, there cannot in any view be any legal object of the trust term connected with the payment of debts. 4. To pay the annuity of three thousand dollars to Mrs. James for the benefit of herself and her children, (4th clause.) The Chancellor having decided that this annuity had lapsed, and there being no appeal from that part of the decree, it cannot be set up as an object of the trust. 5. To pay the gross sum of three thousand dollars for the benefit of Mrs. Gourley's children, directed by the 5th clause of the will; the one thousand dollars to John James, directed by the 12th clause of the will; and the principal sum of two thousand five hundred dollars, to the orphan asylum, by the 13th clause. These may be paid at once out of the personal estate or out of the first year's rents and profits. 6. To pay James King ten thousand dollars, or to convey him land equal in value, (38th clause.) If this be a portion of the devise to Mary Ann King, and if that devise be good, this bequest may be satisfied as to the money, at once, as it is very certain her share will exceed the amount; and if it is to be satisfied by a conveyance of land, it is not an express trust, but a mere power in trust. 7. To convey to the children of Augustus James, land to the value of fifty thousand dollars; and to Anna McBride James and to Lydia James, land to the value of twenty thousand dollars each, as provided in the 36th clause of the will. These are powers and not express trusts. 8. The provision by the 29th clause, for the support and education of minor children during their non-age, is invalid as an express trust by reason of its operating to prevent the power of alienation for more than two lives; but if valid originally, it ought not now to be maintained as an express trust, as the cases for which the provision was intended will not exist. 9. The provision by the 30th clause of the will, in

favor of the widows and children of sons who should die during the continuance of the trust, and in favor of the children of any danghters who should so die, is dependant upon the trust term created by the will to continue until the youngest child, &c. should attain 21; and if there is no such trust term, then this provision cannot be maintained as a separate and distinct express trust, to support a trust term for its own purposes, and the trust is besides invalid from its being uncertain and contingent. 10. The provisions in the 31st and 32d clauses of the will, for advances to the sons and grand-sons, are dependant on the devises for life, and will be in effect advances of those portions; and if those devises are invalid, the sons and grand-sons will take the whole principal as heirs at law; and these clauses contemplate, and in fact direct, an accumulation of rents and profits which renders them void, and they are void also for uncertainty. 11. The provisions in the 33d clause of the will for paying $3,000 to daughters and grand-daughters on their marriage, and for paying them an annual sum not exceeding two thousand dollars, stands on the same footing with the previous provision for the sons, being advances of portions of the life estate, and dependant on the validity of those devises. 12. In reference to the provisons of the 29th, 30th, 31st, 32d, and 33d clauses and the 38th clause, these, general objections exist to them:—1. They are intended to be advances out of an estate consisting of the capital left by the testator, and of the accumulations directed by his will, and these directions for accumulation being void, the intention of the testator cannot be carried into effect; 2. These provisions are made under the idea that the *whole estate* will be retained by the trustees for the purposes of the will, and that, therefore, special provision was necessary in the cases provided by those clauses. But as the *cestuis que trust* will receive their portion of the principal of three and a half shares, and the income of the remaining eight and a half shares, they will be provided for, and the necessity contemplated by the testator will not exist; and the intention founded on that supposed necessity

should not be carried into effect, as it is no longer the real intention of the testator. 13. Another purpose of the trust term was to pay the *annuities* mentioned in the 7th, 8th, 10th, and 11th clauses of the will. The trust term created by the will cannot be maintained for the purpose of *paying over* these annuities. No trust term can be maintained for that purpose, but an express trust may be created to sell, mortgage, or lease land, to pay them, which may be executed at once and without retaining the estate in the hands of the trustees. 14. The 27th clause of the will does not contain any object of an express trust; the authority there given is merely incidental to the purposes of the will, so far as such authority is valid. The power to invest the proceeds of sales is not an express trust. 15. *Recapitulations :* The above purposes are, then, either 1st, illegal; or 2d, powers in trust; or 3d, such as can be executed without a term for years being vested in the trustees; or 4th, such as are dependant on other devises, and if executed would be violations of the testator's real intentions: the trust term, therefore must fail. 1 R. S. 730, § 67.

V. Should any of the above purposes be such as may maintain the trust term for any time, so much only of the estate of the testator as may be necessary to carry such purpose into effect, should be deemed vested in the trustees, to be ascertained by a master, and the residue should be declared to belong to the heirs and next of kin of the testator.

VI. If the legal estate of the whole of the testator's real and personal property is to continue in the trustees, the surplus of the rents and profits after satisfying the legal express trusts, will belong to the heirs and next of kin of the testator as a resulting trust, and should be paid over to them by the trustees: because, 1st. the devise of the life estates is invalid, and 2d, if good, the seven children and two grand-children named in the will, are not presumptively entitled to the next eventual estate.

SECOND GENERAL HEAD, *relating to the life estates.*

I. The life estates are contingent remainders created on a term of years—the trust term. Opinion of Ch. J. Savage, in *Lorillard's case,* 92, 102, &c.

II. The contingency on which they are limited to take effect, is not such that those remainders for life must vest in interest during the continuance of not more than two lives in being, or upon the termination of such lives. 2 R. S. 724, § 20, tit. 2, ch. 1, part 2. 1. There must be ascertained and specified lives, during which, or at the termination of which, the life estate must commence in interest. 2. " The nature of the contingency on which the remainder is limited," means the occurrence of some event on which the remainder for life is to commence, to begin, to *vest;* and in this case it is the same event by which the precedent estate is to terminate. And the life estate does not *vest in interest* until *the persons* who are to take it are ascertained. Cruise's Dig. Remainder, tit. 16, ch. 1, § 10 to 27 ; *Lorillard's case,* p. 103. 3. The contingency on which the trust term is to terminate and the estates for life to commence, is not dependant upon any specified lives, but is dependant upon the contingency of some one out of thirteen minors living to attain the age of 21 years. It was therefore dependant upon a double contingency : first, upon the continuance of some one out of thirteen lives ; second, upon such continuance until a certain period, viz. until some one should attain majority. And the addition of the second does not destroy the first contingency. 4. The position of the Chancellor in referring to the child or grand-child *first* entitled to take the remainder for life, as the specified life during which the remainder vests in interest, is not to be understood as the sole test of the commencement of the life estate, or if to be so understood, is not correct. It may be one *test,* but that fails in the present case.

III. The estate for life is in itself a suspension of the power of alienation for more than two lives in being. 1. The estate for life carved out by the will is to be regarded not only under the 37th but also under the 39th clause of the will. 2. This estate for life is not for any one specified life, but in the case of the twelfth devised to Augustus James, it is for three specified lives, and in the case of the others it may be for ten specified lives ; that is, the life es-

ALBANY,
Dec. 1836.

Hawley
v.
James.

tate in these shares may vest in interest during the continu-
ance of ten lives in being at the death of the testator.

IV. The substituted remainders for life, directed by clause
39 of the will, are void, because they are contingent and
vest in interest after the expiration of the trust term and
after the termination of an additional life, instead of vesting
as required by § 20 during the continuance or at the expira-
tion of two lives in being ; and also because they suspend the
power of alienation for more than two lives in being.

THIRD GENERAL HEAD, *relating to the remainders in fee.*

I. Being dependant on a trust term and on a precedent re-
mainder for life, one or both of which are invalid, the remain-
der in fee necessarily falls with them. They are to be taken
as a whole.

II. As the remainders for life created by clauses 37 and
39 fail, in case of the death of the seven children and two
grand-children named, the remainders in fee cannot be limited
on the trust term ; and they are void for the same reason that
renders the substituted remainders for life void.

FOURTH GENERAL HEAD, *relative to the three and a half shares,*
*and the shares that may be forfeited.*

I. The devise in the 41st clause of the will respecting the
three and a half shares is illegal and void, because it is a
limitation of a contingent remainder upon the trust term which
will not vest in interest during the continuance or at the expi-
ration of not more than two lives in being.

II. It is also void on account of the uncertainty as to the
persons who are to take the property therein described.

FIFTH GENERAL HEAD, *regarding the total suspension produced*
*by the trust term and the life estate.*

Whatever may be the conclusion, viewing the trust term
separately and the life estate separately, yet when joined, a
suspension of the power of alienation is produced beyond the
period prescribed by law.

SIXTH GENERAL HEAD, *relating to the provisions of the will*
*being regarded as powers in trust.*

I. If the directions to execute the purposes for which the
trust term is created, are to be deemed powers in trust, they

are liable to the same objections as the legal trust term ; on the ground of their suspending the power of alienation for too long a period. 1. They are charges on all the lands of the testator by § 107, title 2, ch. 1, part 2 Revised Statutes, so that the interest of the heirs in any portion of the estate would be defeated by the execution of the power, and as the power is imperative by § 96, there can be no absolute fee in possession conveyed, while any power remains to be executed. 2. All those directions, except such as direct the payment of gross sums, and particularly those relating to the annuities, if regarded as trust powers, will suspend the alienation in fee for more than two lives in being.

II. The directions to convey the life estate, if valid as a special power in trust, is imperative by § 96, and necessarily suspends the power of alienation, and this suspension is not for any two ascertained lives, but for a large number of lives.

III. It was not competent to the testator to grant a double power over the same property—first a power to the trustees to convey, and second a power to the tenants for life to convey in fee ; they are both special powers in trust to be exercised in succession.

IV. Many of the independent directions of the will are not valid as powers in trust, 1. The authority in clause 18, " to manage and dispose of the property," is neither a power in trust nor an express trust, and so far as it imports any power beyond what is necessary to carry into effect the valid powers in trust, it is void. 2. The power to sell and exchange, given by the 27th clause, and to vest the proceeds in certain property, is neither a power in trust nor an express trust, and is wholly inoperative. 3. The power in the 41st clause to distribute the three and a half shares is void on account of the uncertainty as to the persons who are to take. 4. The power given by clause 44 to devise to descendants, who may not be in existence at the death of the tenant for life, is void.

SEVENTH GENERAL HEAD *relating to the consequences of the will being declared invalid in many of its essential provisions.*

I. By the decree of the Chancellor, many essential pro-

visions are declared void ; and as but a few clauses of those parts of the decree have been appealed from, it is assumed that they will remain, and in consequence, the following provisions cannot be executed. 1. Those directing an accumulation during the trust term. This accumulated fund enters into the whole frame of the will ; and there is not a direction or devise that was not founded on that fund. 2. The substituted remainders for life, which, by the will, are directed to be conveyed to the heirs at law of such of the seven children and two grand-children as shall die during the continuance of the trust term. 3. The directions respecting the three and a half shares. 4. The power given to the tenants for life to devise their shares to their descendants not in existence at the death of such tenants for life. 5. The forfeited shares, instead of being distributed as the testator directed, will belong to the heirs at law and next of kin of the testator. 6. The advances to the sons and grand-sons directed by the 31st and 32d clauses of the will.

II. Besides these provisions, it is believed that many others will be declared invalid, as herein contended.

III. So much of the will has failed, therefore, that the intentions of the testator can no longer be carried into effect. Judge Nelson's opinion in the *Lorillard case* p. 142 to 144. Senator Maison's opinion in the same, p. 158, 162, &c. *Osgood* v. *Breed,* 12 Mass. R. 534. 1 Russel, 217. 1 Tamlyn, 261.

IV. The court cannot model and mould the will without violating the general intent of the testator, and, in effect, making a new will for him. Judge Nelson's opinion in the *Lorillard case,* p. 141.

V. An instrument declared void by statute, is void wholly, and no part of it can be maintained ; and if its provisions are such that a statute *may be* violated by their execution, they are void. *Troyne's case,* 3d Rep. 323. *Hyslop* v. *Clark,* 14 Johns. R. 464. *Mackie* v. *Cairnes,* 5 Cowen, 580. *Marshall* v. *Halloway,* 2 Swanst. 476. 13 Viner's Abr. Fait E, a, 13.

VI. The will should therefore be declared entirely void, except as to the gross sums and annuities in the 5th,

ALBANY,
Dec. 1836.

Hawley
v.
James.

9th, 10th, 11th, 12th and 13th clauses, and except also as to the 21st clause and the devises in the 36th clause, and perhaps the 38th clause; provision should be made for the gross sums and annuities by setting apart a sufficient amount of the personal property to pay the sums in gross, and by directing the trustees to lease lands for rents that will pay the annuities during the lives of the respective annuitants, and, at the expiration of the leases, the lands to revert to the heirs at law of the testator. And the trustees should be directed to convey at once, pursuant to the directions in the 36th clause, as near as may be, and, if the 38th clause is valid, pursuant to that also; and the residue of the testator's real estate should be declared to belong to his heirs at law, according to the statute of descents, subject to the widow's dower as declared in the Chancellor's decree, and the residue of his personal estate, after payment of debts, funeral charges, expenses of administration, the gross sums to be paid, and the taxable costs of all the parties in the court of chancery and in this court, should be declared to belong to his widow and next of kin, to be distributed as undisposed of by the will according to the statute in such case made.

*A. C. Paige,* as counsel for *Marcia James,* the wife of William James, *Elizabeth Tillman James,* daughter of William James, and *Mary Helen James,* wife of John B. James, submitted the following points.

1. The provision made in the 30th clause of the will of the testator in favor of the widows and children of his sons, and of the children of his daughters, is a valid provision and not contrary to law: and the widows of the testator's sons will respectively be entitled to the same, although their husbands should die leaving no child or children by them surviving, and although said husbands should not die until after the expiration of the trust.

2. This provision can be sustained although it should be determined that the trust estate devised to the trustees is void.

ALBANY,
Dec. 1836.

Hawley
v.
James.

3. The validity of the trust created by the will, and to what extent the same is valid, are questions which are submitted to the court for its decision.

4. It is contended that the estate devised to the trustees is valid only as to the trusts for receiving the rents and profits, and the income, for the purpose of paying the debts of the testator, and the several valid annuities, legacies, and provisions specified in his will ; and that as to all the other trusts it is void.

5. The several estates in remainder for life devised and bequeathed in the 8½ shares and the several remainders limited thereon, and all the substituted estates in remainder in the said 8½ shares, and the subsequent remainders depending on the same, and also all the estates in remainder for life, devised and bequeathed to Anna McBride James, Lydia James, and to the children of Augustus James, and the subsequent estates limited on such life estates, and all the estates devised and bequeathed in the three and a half shares are illegal and void.

6. The powers of appointment and of division conferred on the trustees in. the will are also void.

7. The whole real estate of the testator descended to his heirs at law ; and his personal estate belongs to his widow and next of kin, subject only to the payment of the testator's debts and funeral expenses, and the several valid annuities, legacies and provisions given in his will.

The next friend of Marcia James, and the guardian ad litem of Mary Helen James and Elizabeth Tillman James, relies upon the arguments of the counsel for Henry James and for Lydia James, as supporting all or the greater part of the foregoing points.

*A. C. Paige,* as counsel for *William James Barker,* son of *Jeannette,* the daughter of the testator, submitted the following points :

1. The provision made in the 30th clause of the will of testator, in favor of the children of the testator's daughters, is valid and not contrary to law.

2. The estate devised to the trustees by the testator is a valid trust term for years, for the term of 20 years and 10 days from the testator's death, determinable upon the ceasing of the minorities, either by lapse of time or the death under age of the testator's children and grand-children who were living at the date of the will.

3. The several estates in remainder for life after the termination of the trust term devised and bequeathed in the eight and a half shares are valid as vested remainders, and the respective remainders limited thereon by the 44th clause of the will, to the lineal descendants of the first remainder-man for life, are also valid.

4. The substituted estates in remainder in the eight and a half shares, as devised and bequeathed by the 39th clause of the will, are also valid as contingent remainders.

The guardian ad litem of William James Barker relies upon the arguments of the counsel for the trustees, and for Augustus James, as supporting all or the greater part of the foregoing points.

*B. F. Butler*, (attorney-general of the United States,) in behalf of Messrs. Hawley and King, the two trustees, presented and discussed the following points, *in reply* to the various positions contended for by the other parties in the case ;

I. In support of the decree.

*First general head.* The devise to the trustees, or the *trust estate*, including the powers of management, &c. to be executed during the trust term.

I. The objection that the trust estate had its origin exclusively in an illegal intent to violate the statute against accumulations, &c. is unfounded. Mr. Barnard's first head, point I. Mr. Spencer's seventh general head, points I. IV. V. 1. Although it must be conceded on the part of the trustees, that the powers of investment and re-investment given in the will, would in certain events, involve an accumulation not allowed by the statute, there is no evidence of an *actual intent* to violate or evade the statute

(1.) No accumulation is directed in express terms; and none could ever occur except of the *surplus* rents and profits not required for the payment of debts, legacies, annuities, and other charges specified by the will. (2.) All the persons to be interested in the accumulation, if any occurred, were minors at the date of the will, except one; it was certain that at least one would continue to be a minor until the end of the term; and it was possible that, at the testator's death, all the persons so interested might be minors, and might continue to be minors until the very end of the trust term. (3.) The implied direction to accumulate was evidently founded on a mistake as to the effect of the new statute, and not in any settled design to contravene its provisions. 2. The extent and character of the testator's affairs, and the condition of his family, rendered it not only expedient, but highly necessary, to the proper disposition of his estate by will, that such will should create an *active trust estate*. 3. The various provisions of the will, not connected with the implied trust for accumulation, were natural and proper dispositions; and evidently sprang, not from the illegal design imputed to the testator, but from the necessities of his family, and from his duties as a parent. They are not *contrivances* to effectuate an illegal accumulation, nor to evade the law, but fair and legitimate provisions. 4. The solemn declarations of the testator, as to his motives and intent in creating the trust estate, are in accordance with the condition of his affairs and of his family, and with the duties which belonged to that condition, and are worthy of entire credence. 5. The question of *illegal intent*, except so far as such intent may be demonstrated by provisions actually embodied in the will, is not a question for discussion. If any provision is contrary to law, it will be void; but its invalidity will not vitiate or affect other provisions not contrary to law, except where the latter are so blended and mixed up with the illegal provision as to be incapable of being severed therefrom. *Mackie* v. *Cairnes*, 5 Cowen, 580. Dyer, 294 b, 295 a. *Robinson* v. *Bland*, 2 Burr. 1077. *Moneys* v. *Leake*, 8 T. R. 415. *Doe* v. *Pitcher*, 2 Marshall, 61, S. C. 6 Taunton, 359. *How* v. *Singe*, 15

East, 440. *Prince* v. *Shepherd*, 9 Pick. 184. 6. The preceding rule applies to a trust estate; the invalidity of any one or more of the purposes for which such an estate is created, will not affect other trusts which are valid and capable of a separate execution. The illegal direction for accumulation contained in this will, is expressly placed on this ground by the statute. *Thellusson* v. *Woodford*, 4 Ves. 325, 329. *Trelawney* v. *Molesworth*, Colle's Parl. Cas. 163. *Lord Southampton* v. *Marquis of Hertford*, 2 Ves. and B. 54. *Roper* v. *Radcliff*, 5 Brown's Parl. Cas. 360 of Tomlyn's ed. 1 vol. 450, Dublin ed. 1 R. S. 726, § 37, 38, 40.

II. The trust term is well limited in respect to the period at which it is to end. Mr. Barnard's first head, point II. Mr. Spencer's first general head, point III. 1. The objection that " the trust is so limited that the period at which it can be ascertained that the term *has* ended, may overrun the period at which it shall end," is not well founded ; and even if such should be the case, it would not constitute a fatal objection to the trust. 2. There is no other uncertainty in the duration of the trust estate, as to render it invalid. (1.) There is no other uncertainty in the words used by the testator, than such as exists in all cases where written language requires to be judicially expounded. (2.) The will, when properly expounded, creates a term for 20 years and 10 days from the death of the testator, determinable sooner if all the minorities shall cease before that time. Cases cited in the Chancellor's opinion, 185. (3.) On the above construction, or any other construction which shall ultimately be given to this part of the will, there will be no difficulty in ascertaining when the trust shall have ended.

III. The trust estate does not suspend the absolute power of alienation, for any longer period than is allowed by law. Mr. Barnard's first head, point IV. Mr. Spencer's first general head, points I. II. Second general head, points II. III. 1. The statute against perpetuities, on its sound construction, does not require that the duration of a trust estate, or of any other estate suspending the power of alienation, shall in all cases be dependant on a specified life or lives.

It may be limited by any other event which will certainly happen, and which will unfetter the estate at a period shorter than the average duration of human life. 1 R. S. 722, 723, 724, § 3, 4, 10, 14, 15, 16, 22, 24, 26, 27, 28, 32, 34, 35, p. 728, § 55; and Revisers' notes thereon. 2 R. S. 105, § 36. 2 R. S. 325, § 52. Laws of 1830, chap. 75, p. 76, § 2. Meyer on Life Insurance, 85. 2. The duration of such an estate may be measured by a moderate term of years; a suspense of alienation being allowed in such cases by the common law, which, in this respect, is yet in force. Such a suspense of alienation is also authorized by the new provisions allowing the creation of estates to commence at a future day, without the intervention of a precedent estate, and on the determination of a term of years. Twenty years and ten days is such a moderate term of years. Cases cited in 5 Paige, 397 to 402. 3. The duration of such an estate may at all events be measured by the minorities of infants, in being at the creation of the estate, and having an interest therein. (1.) This principle is recognized in the statute. 1 R. S. 723, § 16. Id. 736, § 27. (2.) It is not contrary to a sound public policy, but agreeable therewith. Powell's Fearne on Ex. Dev. 113, note. Revisers' notes on title 2. (3.) It does not tend to a perpetuity, and is not within any of the mischiefs intended to be remedied by the statute. 4. If it be necessary to the validity of an estate suspending the power of alienation, that it should be limited on a specified life or lives, still as there can be no objection to terminating the estate *prior* to the end of such life or lives, the present trust estate may well be supported, because the words admit, without violence of each of the following contructions, either of which will be sufficient. (1.) By an easy and natural ellipsis, the testator may be understood as directing that the trust " shall continue, &c. until the youngest of my children and [*the youngest of my*] grand-children living, &c. and attaining the age of 21 years, shall have attained that age." The term would, then, be determinable by the expiration of the minorities of Howard and William Augustus, or by their deaths under age. Cruise, tit. 38, devise, ch. 19, § 18. *Archibald* v.

*Thomas,* 3 Cowen, 284. *Jackson* v. *Blanshan,* 6 Johns. R. 64. *Jackson* v. *Strange,* 1 Hall's Sup. Court. Rep. 1. *Rogers* v. *Eagle Fire Ins. Co.* 9 Wendell, 611, 617, 631, 642. (2.) Or the testator may be understood as directing, that the trust shall continue until the youngest of his children and grand-children living at the date of his will, treating them as all composing one class, and attaining the age of 21, shall have attained that age; that is to say, until William Augustus (the youngest of such class,) shall have attained his full age, or shall have died without attaining the same. (3.) Or the court may model the term by declaring that in case any two of the minor children or grand-children of the testator shall die before the expiration of the twenty years and ten days, the term shall cease with their deaths. *Lorillard case,* 100, 101, 143. *Humberston* v. *Humberston,* 1 P. Wms. 332. *Chapman* v. *Brown,* 3 Burr. 1626. *Pitt* v. *Jackson,* 2 Brown's Ch. Cas. 51. *Nicholl* v. *Nicholl,* 2 Wm. Bl. 1159. *Hopkins* v. *Hopkins,* 1 Atk. 581, Cas. Temp. Talb. 44. *Marryatt* v. *Townley,* 1 Ves. sen. 102. 1 R. S. 748, § 2.

IV. The objects or purposes of the trust, to be executed during the term, are sufficient under the statute concerning uses and trusts, to sustain the devise to the trustees, and to entitle them to take possession of the lands, to lease the same and to receive and apply the rents and profits thereof. Mr. Barnard's first head, point III. Mr. Spencer's first general head, point IV. 1. The eighteenth section of the will states the trust on which the estate is devised, to be " to *manage* and *dispose* of the same, and to *receive* and *apply* the rents and profits, &c." in the manner thereinafter directed. This necessarily includes the power of *leasing,* as the appropriate mode of raising rents and profits; and that the testator intended this mode should be adopted, is fully evinced by other parts of the will. 2. The leasing so authorized, is for the benefit of *legatees,* and for the satisfaction of *charges,* and is an express trust sanctioned by sub. 2 of § 55. (1.) The specific legacies and annuities are directed by § 15 to be paid out of the rents and profits. (2.) So are the portions and the moneys authorized to be

advanced. (3.) These legacies and annuities are all *charges* on the land, within the meaning of the statute, and may be legally satisfied out of the rents and profits as they accrue. 3. The annuities given by the will, and the various advances directed or authorized to be made to the testator's descendants and their families, and provided for in the decree, are within the third subdivision of § 55. (1.) There is no limitation on the number of life annuitants, to whose use the rents and profits of land may be received and applied, when, as in this case, the lives of the annuitants do not protract the term nor suspend the power of alienation. (2.) The contingent provisions, and those which are discretionary, are also within the statute. 4. There is no objection, either upon the words or the general policy of the statute, to anticipating the rents and profits for the purposes above mentioned: it is not an *accumulation* of rents and profits, but the reverse.

V. It is no objection to the trust estate, that certain powers which are not enumerated in § 55 are also given to the trustees to be executed during the term. If they are not valid as trust powers, they will not affect the trust estate; and if they are valid as such, they will be imperative on the trustees, and at the proper time may be enforced in favor of the parties entitled to the execution thereof. Mr. Barnard's first head, point III. Mr. Spencer's first general head, point IV. Sixth general head, point IV.

VI. The intent of the testator being clear, and his directions explicit, that the moneys necessary for the purposes of the trust should be raised by the application of the *annual rents and profits*, and there being at present no necessity for resorting to another mode, the court cannot order the same to be raised by sale or mortgage; although if such necessity should hereafter arise from an unexpected determination of the trust, that course may no doubt be adopted. *Joy* v. *Gilbert*, 2 P. Wms. 8, 19. *Evelyn* v. *Evelyn*, id. 666. *Mills* v. *Banks*, 3 P. Wns. 1, 8. *Okeden* v. *Okeden*, 1 Atk. 551.

VII. The legal estate being well vested in the trustees,

ALBANY,
Dec. 1836.

Hawley
v.
James.

for the purpose of executing numerous valid trusts which are not yet expired, the estate must remain in their hands, there being no power in any court to divest the legal title as to any portion of the estate, for the purpose of vesting it in the heirs at law under the notion that the estate is larger than is required by the purposes of the trust. Mr. Barnard's third head, Mr. Spencer's first general head, point V. 1 R. S. 729, § 60. Id. 730, § 65. *Carteret* v. *Carteret*, 2 P. Wms. 133, 134. *Vail* v. *Vail*, 4 Paige, 328.

VIII. The rents and profits, of the *eight and a half* shares were properly adjudged to the nine children and grand-children, as the persons presumptively entitled to the next eventual estates in those shares. Mr. Barnard's third head, Mr. Spencer's first general head, point VI. 1 R. S. 726, § 40. 2 Ves. and B. 54. *Marshall* v. *Halloway*, 2 Swans. 460. *Baron* v. *Proctor*, 1 Turn. and Russ. 40.

IX. In regard to the rents and profits on those shares, and on the other shares, resulting trusts in favor of the persons presumptively entitled as to the former, and in favor of the testator's heirs at law as to the latter, arose as declared in the 26th and 27th sections of the decree. Mr. Barnard's third head, Mr. Spencer's first general head, point VI. 1. R. S. 728, § 50. Cruise, tit. 12, Trust, ch. 1, § 38. 1 R. S. 729, § 62.

X. The provisions of the decree in relation to the legacies to the children of Augustus James, and to Anna McBride and Lydia James, are correct. Mr. Roosevelt's points as the legacy of $50,000. Mr. Barnard's fifth and sixth heads. Mr. Stevens' third point.

SECOND GENÉRAL HEAD. The powers of partition and distribution at the end of the trust term, so far as the same have been sustained by the Chancellor in his decree, are valid.

I. The general design of the testator was to create a lawful and valid trust estate for the convenient and safe disposition of his affairs, and the welfare of his family; and if in any of the details his directions are contrary to law, such illegal directions, and those only, are void. Mr. Barnard's

second head, point I. Mr. Spencer's seventh general head, point I. sub. 1.

II. There is no warrant for the objection, that the trust term may have ended, before it can be *ascertained* to have ended, and that in consequence thereof the estates created under the power, may go to other persons than those intended by the testator. Mr. Barnard's additional point.

III. The power of disposition, so far as relates to the eight and a half shares, is plainly separate and distinct from the power to dispose of the three and a half shares with the additions which may be made to them by *forfeitures*, and therefore the invalidity and failure of the latter do not at all affect the validity of the former. The same may be said of other particulars in which the powers have been or may be adjudged invalid. And it is manifestly agreeable to the general intent and great object of the testator, that the parts of the will left by the Chancellor's decree should be carried into effect. Mr. Barnard's second head, point II. Mr. Spencer's fourth general head, and so much of his sixth and seventh general head, as relates to these subjects.

IV. The objection that the power conferred on the trustees, of dividing and conveying the estate at the termination of the trust, includes a power *to grant a power*, is entirely unfounded. Mr. Barnard's second head, point III. Mr. Spencer's sixth general head, point III.

V. The inalienability of the estate, during the trust term, is authorized by law; and as the estate is to be divided and conveyed immediately on the expiration of that term, and as those distributees who were not in being at the testator's death, are to take *estates in fee simple absolute*, and as those who were then in being are to take estates for life with remainders in fee, which will, then, be vested in interest, each share will be immediately alienable, and the suspense of alienation in respect to any given share, will not have exceeded the period authorized by law. Mr. Barnard's second head, point IV. Mr. Spencer's second, third, fourth and fifth general heads; also, sixth general head, points I. II.

THIRD GENERAL HEAD. Should the decree, establishing the validity of the trust estate, be *reversed* by this court, then it is insisted:

I. That all the annuities will fail; and that the annuitants respectively, who are parties to this suit, must refund to the estate the sums already advanced to them on account thereof.

II. That the several specific legacies will be valid, including that of $10,000 to James King, which being intended as a compensation for services to be rendered by Mr. King, as an executor as well as trustee, became vested in him on his accepting the office of executor.

III. That provision should be made in the decree of reversal, for protecting the trustees for all acts done by them in good faith, in the execution and protection of the trust, and especially that all expenditures so made by them, be charged on the assets in their hands, as executors.

II. In support of the appeal of the trustees.

The points presented, on their behalf at the commencement of the argument, are insisted on in reply. Cases cited in opening points. Also, *Jennings* v. *Gower*, 5 Viner's Ab. Condition, 75. Id. pl. 20, 23, 34, 53, 68. Id. p. 92, pl. 6. *Robinson* v. *Comyn*, Cas. Temp. Talb. 166. *Bromfield* v. *Crowder*, 1 Bos. and Pull. and 1 New. 313. Watkins on Conveyancing by Merrifield, 140, 141. *Harvey* v. *Ashton*, Comyn's Rep. 744. Sugden on Powers, 147 to 153. 2 Chance on Powers, 462 to 476. *Maddock* v. *Jackson*, 2 Brown's Ch. Cas. 588. *Stanley* v. *Stanley*, 16 Ves. 491.

The following opinions were delivered by members of this court:

By Chief Justice NELSON. The view which I have taken of this case is confined chiefly to an examination of the questions involved in the trust term, and the estates in remainder limited thereon. There are some minor points which it will become necessary to notice, in the disposition and settlement of several independant bequests, upon the conclusions at which I have arrived.

The trust term has been properly divided into two branches; 1. Its object, or the purposes for which it was created, and whether it is authorized by law; and 2. Its duration,

and whether it be limited in this respect according to law. There can be no doubt the will must have been pronounced valid previous to the revised statutes. The celebrated case upon the will of *Thellusson,* and the more recent one upon the will of *Henry Bengough,* establish principles at common law that would sustain every provision now considered objectionable. The great and fundamental difficulty in the will under consideration consists in the objection, that it transgresses the statute forbidding perpetuities beyond a certain period. The above cases show these were permitted before the statute for any number of lives in being, and twenty-one years ; a rule comprehensive enough to sustain in this case the trust term, the accumulations, and all the remainders ; but their validity now depends upon the statutes, which must necessarily lead us to an examination of them in connection with the several provisions of the will that have been deemed objectionable.

As to the object of the trust term, or purposes for which it was created : the testator has declared his object to be to confide his property to the care of trustees for greater caution, till his minor children and grand-children become of age ; and as a natural consequence he has created numerous trusts and directed them to be executed for the benefit of his family, or of those dependent upon and entitled to the enjoyment of the estate during the time they are thus deprived of it. This trust term, which is the estate of the trustees, since the revised statutes, depends upon the validity of these trusts or some of them ; and it will therefore be necessary briefly to refer to them. My examination, however, shall be confined to those which operate to sustain the devise of the legal estate to the trustees ; all the others are mere *powers in trust* that have no necessary connection with the term. In the case of a devise to executors or trustees, there are but three kinds of express trusts that are accompanied with the legal estate authorized by the revised statutes. The trust to sell or mortgage lands, in the first and second subdivisions of the 55th section, which, if created by deed, carries the title, does not do so in the case of a will, according to the provisions of the 56th section. These three kinds of

trusts in a will are, 1. A trust to lease lands for the benefit of legatees, or for the purpose of satisfying any charge thereon which is within the 2d subdivision of the 55th section ; 2. To receive the rents and profits of land and apply them to the use of any person, which is authorized by the 3d subdivision ; 3. To receive the rents and profits of land and to accumulate the same under the 4th subdivision. The trusts provided for under the 1st and 2d subdivisions, with the exception of the one to lease under the 2d, to which I have referred in the case of a devise, should have been classed under the head of powers, as the legal estate descends to the heirs at law or passes under some other clause of the will as the case may be, subject to the execution of the power, § 58. From this view, it is apparent, there can be no more than three descriptions of trusts in the will that can sustain the legal estate in the trustees, and of course that can in any way affect the trust term. These may be classed under the three authorized trusts, as follows : 1. The trust to pay legacies, and under which head may be included the trust to pay portions, such as the $50,000 to the children of Augustus, the testator's son, and the $20,000 to each of the two grand-daughters ; to make advances to the sons and grand-sons, during the term, not exceeding one fourth of their anticipated shares, and to pay portions to the daughters and grand-daughters, in the event of marriage ; all these are in the nature of legacies, and may be properly classed with them ; 2. The trust to educate and support the minor children, in the event of the death of Mrs. James, and to support the widows, and to educate and support the children of deceased sons and daughters, and to pay annuities ; and 3. The trust to accumulate the rents and profits not wanted for the purpose of the will. All these are trusts which may be lawfully created under the 55th section, and when they are, vest in the trustees the legal estate for the purpose of their execution. Whether they have been created in conformity to the section, so as to sustain the estate in the trustees, is another question which I will now examine. For the sake of brevity and clearness, I shall divide these trusts into two classes : 1. Those which are future

ALBANY,
Dec. 1836.

Hawley
v.
James.

and contingent, and 2. those which are present and active. It is to me an obvious proposition upon the statutes, that a *future trust*, whether contingent or not, cannot vest a present estate in the trustees, or sustain a devise of it to them. Until the trust arises, or becomes active so as to require the collection and application of the rents and profits, the trustees can have no concern with the estate. By the creation of a future or contingent trust, they are not authorized to lease lands or receive the rents and profits till the beneficiaries are entitled to them. In the case of a contingent trust this may never happen, nor can it happen in respect to a future one, in any case, till the time when it takes effect in possession. It is only express trusts that vest the estate in the trustees, and as defined in the 55th section in the case of a will, are, to lease lands, and to receive rents and profits for purposes there specified. The legal estate is given to them as convenient if not necessary to enable them to perform the trusts, to lease the lands, collect the rents, &c. ; but great abuse would follow, if permitted to vest them now with the legal estate to enable them to perform a future trust that *might or might not happen*. They would hold the title without any right to the possession. The estate would be in one person, and the possession and profits in another. *This was a defect in the old law* which it was intended to remedy in the 55th section, by confining trusts to active, and which must, of necessity, be present trusts. Where no present authority is given to lease, or to collect the rents, but to take effect at a future day, until it takes effect, it cannot be said that any trust exists. It is in expectancy, or a trust by possibility. This view disposes of all the trusts in the will except three, viz. the trusts, 1. To accumulate rents and profits ; 2. To pay legacies ; and 3. To pay annuities. And all the other are future, and most of them contingent and may never arise. The trust to pay debts I have not noticed, because it is an unlawful one ; no such trust is authorized except to sell lands.

The trust to *accumulate rents and profits* was adjudged void by the chancellor, and was conceded to be so by most of the counsel on the argument. The 37th section of the

1st article authorizes an accumulation for the benefit of *minors* then in being, and which is to terminate at the expiration of their minority. Here it is for the benefit of *adults* as well as *minors*, and is therefore an express violation of this section. The trust to pay *legacies* is no doubt valid, but it is an unimportant one as respects the trust term, because the will requires them to be paid in a short time, and when paid the trust ceases. The trust to pay *annuities* amounting to $3675 is valid, and took effect immediately on the death of the testator, and vests in the trustees the legal estate under the operation of the 60th section, and as it is to continue during the time for which the term is limited, it might sustain it throughout. There is some difficulty in determining whether this trust falls under the 2d or 3d subdivision of the 55th section, though I am inclined to the opinion it should be classed under the latter. Considering an annuity as legally comprehended in the term legacy, or as being simply a charge upon the land, it would come within the trust authorized by the 2d subdivision. If it may be considered with more propriety a trust to receive rents and profits and apply them to the use of a person, then it falls under the 3d. An annuity may be included within the term legacy for some purposes, unless there is something to show that the testator himself distinguished between them. This has been repeatedly so decided in respect to the fund or provision for payment, as in the case of the will of the Duke of Bolton, where Lord Thurlow held that *legacies* being a charge on the real estate, *annuities* were also charged within the meaning of the term. 7 Ves. 534. In the cass of *Hancock* v. *Horton,* 7 Ves. 503, they were considered distinguishable upon the terms of the will. Under the influence of this rule, the trustees might possibly execute the trust within the power to lease for the benefit of legatees and to pay charges, contained in the 2d subdivision. The annuitants being considered legatees or the annuities a charge upon the lands, as they virtually are by the 15*th* clause of the will; but the receipt of the rents and profits to pay them seems more appropriately to come under the trust in the 3d subdivision. It is a receipt of them to be applied to the use of persons

ALBANY,
Dec. 1836.

Hawley
v.
James.

during their lives, or for a shorter period, as the case may be ; here it is for the period of the trust term. It is of no other importance under which subdivison this trust is classed, than in respect to the power of the annuitants to assign their interest, If viewed strictly as coming within the term legacy, which means a gross sum, or as a charge upon land and nothing more, they then might sell and convey their interest ; if viewed as a receipt of rents to be applied to the use of them, and they are prohibited from selling by the 63d section. It appears to me, however, if it should be determined that it came within the 2d subdivision, upon the principles stated, still the interest ought to be considered *unassignable* within the section. It provides that no person beneficially interested in a trust for the receipt of the rents and profits of lands, can assign or in any manner dispose of such interest. If the section stopped here, there could be no doubt even a vested future legacy could not be sold, for the prohibition applies to every case of a person interested in the receipt of rents and profits by the trustees. It however goes on : " but the rights and interest of every person for whose benefit a trust for the payment of a *sum in gross* is created is assignable." This qualification saves legacies and charges which are gross sums ; but to include annuities, we must not only consider them as coming within the term *legacy*, for the purpose of payment, but adjudge them to be a gross sum. It seems to me this would be a forced construction of the language of the section, especially when its object evidently is to prohibit the assignment of an interest in the periodical application of rents and profits to the use of persons. I have always believed the trust that would be most usually created, under the authority of the 3d subdivision, to receive rents and apply them to the use of a person would be by way of annuity—payable monthly, quarterly, semi-annually or annually. In this way the person creating it fixes the amount which he intends shall be thus periodically paid, to a son, a daughter, or other object of his regard. It is the obvious propriety of permitting him to fix the amount, if he pleases, instead of compelling him to refer it to the arbitrary discretion of his trustee, that has

led me to the opinion that such a trust is fairly within this 3d subdivision. I could not believe that the legislature intended to compel a father to give an estate absolutely to an improvident son, or put it into the hands of a third person to dole it out at his will; but that he might fix the amount to be paid and the times of payment. Without, however, pursuing this inquiry farther, whether the trust may be properly classed under the 2d or 3d subdivision, I think it is valid under one or the other, and is one of the express trusts that may sustain the legal estate in the trustees throughout the limitation of the term.

The next subject of consideration is the trust term in respect to its duration, that is, whether it is properly limited under the statutes. The limitation is found in the 17th clause of the will, where the testator directs that the trust term shall continue, and the final division of the estate shall not take place "until the youngest of my children and grand-children living at the date of this my will, and attaining the age of 21 years, shall have attained that age." At the date of the will, there were six children and seven grand-children, minors, in all thirteen; and it is apparent from the language and intent of the testator, the trust was to continue till the whole thirteen, or those surviving the period of the limitation, should reach the age of 21 years. *Youngest of my children and grand-children*, standing alone, might well enough refer to the youngest of each class; but the remaining part of the clause is conclusive against this interpretation; it must be not only the youngest, but the youngest living and attaining the age of 21 years, and who shall have attained that age. If the youngest of each class should die, short of minority, the event designated has not happened, because there may be one living who will attain the age of 21, and who would be the youngest of the class attaining that age. The thirteen minorities, therefore, must all be extinguished, by death or lapse of time, before the trust terminates according to the intent of the will. Although the testator obviously contemplated the possible death of some of the minors before the youngest living, who might arrive at majority, had attained that age; and therefore comprehend-

ed in the class all his minor children and grand-children; still he has not expressly provided for the termination of the trust upon the event of the death of all of them before that period. He seems to have expected that some of them would attain the age of 21, and having provided for the duration of the trust till the youngest living of the class should attain that age, he thereby insured its continuance till the termination of all the minorities. It is manifest, however, from this limitation and other provisions of the will, he intended the trust should terminate with the minorities, and that the division of his estate should then take place. This view of the 17th clause, and which was the one taken by the court below, was not seriously questioned upon the argument. The trust estate or term, then, may be said to depend upon lives, upon minorities, and upon both combined. The thirteen may all have died before any one attained the age of 21. In this respect it depended upon lives—upon thirteen lives; all might survive the period when the youngest reached that age; then it depended upon minorities; some of the minors might die and others attain their majority; then its duration might be said to depend upon lives and minorities combined. In the first case, the trust term would be one whose duration depended simply upon lives; in the second, it would be a term for 20 years and 10 days, as the youngest of both classes, which was a grand-child, would not reach 21 till the expiration of that period: and in the third case its duration may be said to depend upon lives and minorities combined. Now if in either aspect the limitation of the estate might suspend the power of alienation beyond the time allowed by the law, it will be impossible to sustain it, because the rule is well established that a limitation which, *by possibility*, may create such a suspension, is void. Executory devises and the limitation of springing and future uses and trusts, are entailments of property which cannot be barred by fine or otherwise; and therefore, unless the limitation or settlement be such that the future estate must certainly vest at some definite time, a perpetuity may be created. Courts therefore heretofore, and the legislature now have fixed upon such time; and if the limita-

tion be not such that it *must* take effect, if at all, within the prescribed period, it is void. So strict is the law not to permit a perpetuity, that it is not sufficient if in the event at the death of the testator, it turns out that the estate is alienable within the proper time, but it must be made so by the will, and not be the result of chance. The proposition is laid down by Mr. Cruise, and may be found in all the books on this subject, that it is not material how the facts turns out; for the possibility, at the creation of such executory limitation, that the event on which its existence depends may exceed in point of time, the limits allowed, vitiates it *ab initio.* 4 Cruise, 449. 4 Kent's Comm. 283. Ram. on Wills, 6. At the common law a perpetuity could be created only by means of a contingent *future* estate. Before the occurrence of the contingency and the actual vesting of the estate in some one, there was no person in being who could unite with the owner of the present or prior estate in the conveyance of the fee. Where the remainder or future estate is vested, or where lands are given to A. for life, remainder to B., a person then in being, there is no suspense of the power of alienation ; for the owners of the two estates uniting may convey the whole, each one being able to convey his own absolute interest. The revised statutes have made *present vested estates* inalienable, and therefore perpetuities may now be created in cases unknown to the common law ; still many of the common law rules concerning perpetuities created by future estates must be applicable to the creation or settlement of present estates as they are now liable to like abuses. These must now be circumscribed as carefully within the proper limits as future estates formerly were. Like an executory devise or future use, their tendency to a perpetuity cannot be barred by fine or recovery, or by any other means ; and if not limited within the period allowed by law, the limitation must of necessity be pronounced void, or perpetuities may exist in spite of the law. In this case the trust term is a present vested estate, and is subject to the statutory inalienability during the whole period of its limitation. The trustees cannot convey by rea-

ALBANY,
Dec. 1836.

Hawley
v.
James.

son of the 65th section; the annuitants, for whose benefit alone, upon my view, the trust estate exists, cannot by reason of the 63d section. There exists, therefore, a complete suspension of ownership during the term. Even if we should concede the trust to pay annuities came within the 2d subdivision, so as to be unaffected by the 63d section, and therefore the interest assignable, still, in my judgment, the term would be inalienable. The trustees being unable to alien under the prohibition of the 65th section, the legal estate must remain in them during the trust. If the annuitants should sell to third persons, the trustees would hold for their benefit; and if they should sell to the trustees, in equity they would then hold for the benefit of themselves. The trust would not cease, because the purposes of it would not be at an end. Perhaps the annuitants might release it, give it up, and thereby extinguish the trust, and thus put an end to the term; but the court, I apprehend, cannot act upon this possibility. This would not be a power to alien or assign, but to destroy an estate; not to sell for value, but to make a gift; and if a sufficient reason for taking the trust out of the prohibition against perpetuities, the statute would be virtually repealed, for then a trust might be limited for any period of time, however remote—one hundred years or more, if the annuitants possessed the power to put an end to it by voluntary gift: a very different power, in respect to the transmission of property, from the one to sell for value. It is obvious if the power to destroy the trust estate, by a sacrifice of it, satisfies the statute, then the 63d section seems to me to have been always nugatory; it prohibits assignment, and if to destroy is equivalent to assignment, then in no imaginable case, except perhaps of minority, could there be a trust where the 63d section would operate to suspend ownership. Upon this interpretation, every *cestui que trust* could give up or abandon his interest to the trustees; it may be done in all cases of trusts coming directly within this section, and if this is assignment then the interest is alienable. This cannot be the power of alienation contemplated in the 14th and 15th sections of the statute. They mean a power to sell and convey in the ordinary way for value. The trust

ALBANY,
Dec. 1836.

Hawley
v.
James.

term then I consider inalienable, both as it respects the estate of the trustees and the interest of the annuitants, and the question then fairly arises, and must be decided, whether its limitation is within the prescribed period of the statute prohibiting perpetuities.

The 15th § of the 1st article, 1 R. S. 723, gives the rule, which is as follows : " The absolute power of alienation shall not be suspended by any limitation or condition whatever for a longer period than during the continuance of not more than two lives in being at the creation of the estate, except in the single case mentioned in the next section." The next section allows a contingent remainder in fee to be created on a prior remainder in fee, to take effect in case the persons to whom the first one is limited should die under age, or upon any other contingency upon which the estate may determine before they attain full age. Taking the two sections together, and they are so to be construed, they permit a limitation for two lives in being, and twenty-one years in addition in case of actual minority— for example, an estate to A. for life, remainder to his children in fee ; but in case such children shall die under the age of twenty-one years, then to B. in fee. Here the ownership may be suspended for the life of A., and the actual infancy of his children, but in no event can exceed that length of time. If one of the children reach 21 years, B.'s remainder is void. The case upon the will of Henry Bengough was decided in 1827 ; it involved this question, the only important one in it, viz. whether as the law then stood in England, there could be a suspension of the power of alienation for any number of lives in being, (there were 28 in that case,) and 21 years as an absolute term without regard to infancy. The court held that though the rule of law was framed in analogy to the case of a strict settlement, where the 21 years was allowed in respect to the infancy of a tenant in tail, it had been fully settled that a limitation by way of executory devise or springing use, might be made to depend upon an absolute term of 21 years after lives in being. The 16th § was intended to change this rule, and confine the 21 years to the case of

ALBANY,
Dec. 1836.

Hawley
v.
James.

actual infancy, as the 15th had changed the other branch of it, and cut down the lives from an unlimited number in being to two only. The maximum duration, then, of the suspension of the power of alienation, according to the statute, is for the period of two lives in being, and twenty-one years in addition, in case of infancy.// This is the longest possible time, under any view of the section, that is permitted; and if the opinion before expressed, that this trust term is so limited as to depend upon *thirteen lives* in one aspect of it, is not a mistaken one, and I understood to be conceded upon the argument that it is *so limited*, it is directly repugnant to the letter of the statute. It seems to me there can be but one answer to this conclusion, and that is a denial that the term depends upon lives at all; for if it depends upon one, it may depend upon all, as no distinction can be made between them. The court below sustained the term and expressed the opinion, 1. That the 15th section did not absolutely require the trust estate authorized by the 55th § to be limited so as to depend upon two specified lives—a position I shall hereafter examine; and 2. That the limitation in this case was an estate for years, for 20 years and 10 days, determinable not on lives, but upon minorities. I am not disposed to deny it may be deemed an *estate for years*, and assuming the youngest grand-child to live and attain 21, it would be a term for 20 years and 10 days; and if it depended exclusively upon minorities, would be a term for that number of years, determinable sooner if the minorities should sooner cease; but when we speak of an estate depending upon minorities as contradistinguished from lives, we must and should mean minorities ceasing by lapse of time—ceasing by reaching *majority*. When we contemplate their termination by death, and the estate as depending or ending upon that event, it depends upon and is determinable by *lives*. It was conceded on the argument by most if not all the counsel, that upon the most reasonable construction of this clause of the will, the term depended on the lives of the 13 as well as on their minorities. This follows, even from the position that the term was to continue until all the minorities terminated, for

while human life is uncertain, it is impossible to limit an estate upon a number of minorities without including a limitation upon as many lives; and if it be illegal to make such a limitation upon lives, the combination of minorities cannot help it, any more than any other contingency that would not necessarily happen, short of the termination of the lives. If it could be certain that the minorities would cease by lapse of time before the termination of the lives, then I admit it would be an estate depending upon minorities and not upon lives; but as it may terminate upon the death of all of the thirteen before any one attains majority, it is clear that in that view it is an estate depending upon 13 lives, and may terminate with them.

There is another view of this part of the case which is perhaps more satisfactory and conclusive. The absolute term of 20 years and 10 days, determinable by the ceasing of the minorities, is in no respect different from such a limitation determinable upon lives as to its possible duration. In either view it may continue the whole of the limited period—the 20 years and 10 days. The minorities may not cease till the youngest grand-child arrives at the age of twenty-one, in the one case, and the lives may not expire till that period in the other; it may; therefore, be an absolute term for twenty years and ten days in either case, and if the principle is established, there may be an absolute term for 21 years, as the youngest child may not be a day old at the creation of the estate. To test such a limitation by the statute, we will take an example. Suppose an estate to A, for 21 years, and during the lives of B. and C. then in being, and remainder over; now the utmost limit of the statute is the two lives: "the absolute power of alienation shall not be suspended by any limitation or condition whatever for a longer period than during the continuance of not more than two lives in being at the creation of the estate." We have now a limitation of twenty-one years, and during the lives of the two persons in being. Suppose these lives should drop at the end of ten years, is not the authority of the statute to suspend the ownership exhausted? Two specified lives in being, and upon whom in one aspect the

estate depended have expired, the precise measure given; and yet eleven years remain unexpired of the estate, and upon the construction contended for, may still continue, and the ownership be suspended for the remaining eleven years. Again, an estate to A. for the lives of B. and C., or twenty-one years, which of these two limitations shall control according to the statute, the two lives or the twenty-one years? According to the construction contended for, if the two lives should fall in at the expiration of ten years, the estate would continue for eleven more, which to my conception is in the teeth of the statute. Again, let us take the case as presented upon this will. An estate to J. K. and H., trustees to hold in trust for twenty years and ten days, determinable upon the ceasing of the minorities of the thirteen infant children and grand-children, then over to the remainder men. At the end of ten years, two of the thirteen lives fall in. Have not two lives in being at the creation of the estate, upon which with eleven others the limitation of it depended, expired? two specified lives and yet half the trust term remains and may continue ten years longer. It seems to me, after the most deliberate consideration of this part of the case, and I have examined it with a distrust of the soundness of my views, differing, as I am obliged to do from such high authority, it seems impossible to avoid or explain away the repugnance between the limitation of the term and the rule of the statute; testing it in any possible way of which it will admit, still it may exceed the perpetuity there allowed, the duration of two lives being at its creation, and then the principle before adverted to, and stated upon the authorities, applies that if a limitation be too remote in its commencement, it is void, and cannot be helped by a subsequent event, or by any modification or restriction in the execution of it. In the language of Chancellor Kent, the possibility at its creation, that the event, upon which it depends, may exceed in point of time the authorized period, is fatal to it. 4 Kent's Comm. 283. 4 Cruise. 449. 2 Burr. 873.

We shall now recur to the other question growing out of the trust term, and which should now be settled—though in

my view not essential to the decision of this case, it is vastly the most important question in it, as it respects the community. Until it is settled by this court, the disposition of estates and family settlements must be made under serious embarrassments. I allude to the question whether the limitation of estates, with a view to suspend the power of alienation, must be upon one or two specified lives in being within the true construction of the 15th §, or whether this measure may be departed from, and the courts permitted to regulate their judgment in each particular case upon the reason or equity of the statute ; in short, whether we shall have a fixed and definite measure of duration, or as many as the courts, in the exercise of their discretion, think fit to establish. The grounds taken in respect to this case are, 1. That the 15th section does not require that the trust term authorized by the 55th § should be *limited upon two specified lives*—this is the position of the court below ; and 2. That an estate may be limited to depend upon a " moderate term of years" at common law, within the average duration of a life or lives in being, and that this rule has not been abolished by the statute. The two positions are so connected that they may properly be considered under one view ; for if the terms of the statute or measure of duration there given, may be departed from, as contended for, then it would seem necessarily to follow, that a moderate term of years within the reason and spirit of the statute must be allowed : this would be approaching the statutory limit as near as practicable, without adopting its very terms. The first article of the revised statutes concerning " the creation and division of estates," does not profess to abolish all the rules relating to them which previously existed at common law : in this respect, it is distinguishable from the articles on " uses and trusts" and " of powers." But where a positive rule of real property is enacted, therein modifying or contradicting a former one, the latter is plainly abrogated, and the rule of the statute the only one in force. Both cannot exist. As it regards *future estates,* and those in *reversion* at common law, they are entirely abolished in the article, and none such are allowed to be created except

as there defined. By the 42d §, it is provided that all expectant estates, except such as are enumerated and defined in this article, are abolished. The 8th and 9th § define estates in expectancy to include all future estates and estates in reversion. The courts must hereafter look exclusively to the rules prescribed in the statute, when called upon to expound the law respecting these estates. *Present estates*, then as they existed before the revised statutes, are the only estates that were not abolished. They were extensively altered and modified, as is apparent upon a reference to this first article; but as it respects them, it is conceded they may be said still to exist at common law, subject to these modifications. Now, as to future estates, they being the creatures of the statute, legally existing only as there enumerated and defined, it would seem to be a difficult undertaking to maintain that they may be limited so as to suspend the power of alienation in any other mode than that expressly pointed out by the statute. As to them it cannot well be argued that an estate may be limited for a "moderate term of years," as at common law, within the average duration of a life or lives in being, which rule had not been abolished, because the statute rule, if one exists, and that only must be regarded; that enters into and helps to define these estates; it is one of the most important rules to be observed in the creation of them, and if disregarded, or the estate limited in violation of it, I do not comprehend how its validity can be sustained, Though the difficulty may not be so great in justifying a departure from the statute in respect to *present* as in the case of *future estates* as they still exist at common law, it is somewhat enhanced by the above view, because it is reasonably certain but one rule was intended to be prescribed for both. No reason can be given for any distinction between them; and besides it has already been decided in the case of *Lorillard's will*, 14 Wendell, 265, that the 15th § applied equally to both; and hence so far as the argument upon this point is concerned, we may consider present as well as future estates mere creatures of the statute, and the only rule prohibiting perpetuities, the one there prescribed.. It

si worthy of remark that this 15th section, as it originally passed, was exclusively applicable to *present estates*, and was more definite in its language than it now is. It was as follows: " The absolute power of alienation shall not be suspended by any limitation or condition whatever for a longer period than during the continuance and until the termination of a life or lives in being at the creation of the estate." Here the legislature did not leave it to construction, how long the ownership could be suspended, having declared it must not extend beyond the termination of the lives. There must be no limitation or condition whatever " moderate term of years," average duration of lives, minorities, or any other contingency that may by possibility suspend the ownership beyond the termination of the lives in being. Language could hardly be selected more comprehensive and definite if the legislature had intended to exclude all other measures of duration, and to leave no discretion in the matter to the courts. If the suspension of ownership must end at the termination of the lives, how can the injunction of the statute be obeyed unless the limitation of the inalienable estate depends upon them. Put it upon any other measure, and it may exceed any lives that might have been selected. Though the terms of the present section are not quite so precise, there is a word substituted for those omitted, that clearly shows no alteration could have been designed; indeed, we know the only alteration intended was the reduction of the lives from an unlimited number to two only. The words now are, " for a longer period than during the continuance of not more than two lives in being, &c." One of the counsel for the trustees, in commenting upon this branch of the case, contended the word *not* was unmeaning, and only proved that the legislature had used bad grammar; but whether the construction should be the same with or without it, it is most apparent that it gives point and distinctness to the meaning of the legislature; and to me it adds some force to the argument, that they intended in express and positive terms to preclude the limitation of an estate that might by

possibility extend the suspension of the power of alienation beyond two specified lives in being. During the continuance of not more than two lives, and until the termination of two lives impart the same idea. We may further remark, that the different sections concerning the creation and limitation of estates, universally refer to the statute rule against perpetuities and no other. Thus, the 17th section provides that where a remainder shall be limited on more than two successive estates for life, all, except the two first, shall be void. So in the 19th §, when a remainder shall be created upon any such life estate, that is for the life of a person other than the grantee, and more than two persons shall be named as the persons during whose lives the estate shall continue, it shall take effect upon the death of the two first. The 20th §, a contingent remainder shall not be created on a term of years, unless the nature of the contingency on which it is limited be such that it must vest in interest during the continuance of not more than two lives in being. The 26th §, a fee may be limited on a fee upon a contingency, which, if it should occur, must happen within the period prescribed in this article. So the trusts, to receive rents and profits, and apply them to the use of a person, (the very case under consideration,) are brought within the prohibition against perpetuities by an express reference to the statutory rule prescribed in the first article. No other rule is referred to, and if there should be one at common law not abolished by the 15th §, it could not help out this trust term, because it is emphatically a creature of the statute, being under the control of the trust which exists only by force of the statute. Thus it is seen that the legislature, in the modification and limitation of estates, have acted throughout with a single view to the rule established by themselves prohibiting perpetuities. In the consideration of this question upon the statute, the observation must occur to every one, that if the legislature had intended to permit the application of any other rule or measure of time in the limitation of estates, they would have prescribed it. The mind of that body, having been brought to act directly upon the subject, and impressed with the

importance of changing the law as it then existed, and having acted by fixing a measure or time of suspension, it is to me difficult to resist the inference that they intended to leave nothing unsettled, or open to doubt and discussion. There is nothing in the subject itself, involving any intrinsic difficulties, or that could prevent a complete settlement by positive law, or that could recommend its reference to the determination of courts. On the contrary, the history of the law of perpetuities much of which was before them in the notes of the revisers, was calculated to admonish them of the importance of definite and permanent rules. It had been a subject of discussion, and of various and contradictory judicial legislation, for more than two centuries; even as late as 1827 the point was most zealously contested and claimed to be unsettled in the court whence we have derived the rule, by eminent counsel, whether 21 years after lives in being were admissible to suspend alienation except in case of infancy. Chancellor Kent, in the 4th volume of his commentaries, p. 262, presents a concise but comprehensive history of executory devises, and of the leading cases from the earliest times to the present day, and he seems to exult at the close of it as if weary with their diversity and contradiction in the following observation: " and thus," he says, " notwithstanding the constant dread of perpetuities, and the jealousy of executory devises, as being an irregular and limited species of entail, a sense of the convenience of such limitations in family settlements, has enabled them after a struggle of nearly two centuries, to come triumphantly out of the contest." If the learned commentator had been aware of the construction of the new statute upon the point contended for, and could have anticipated a confirmation of it by this court, the exultation which he very naturally indulged at the permanent settlement of the law, at the end of two centuries, must have given place to the opposite sentiment, despair; for scarcely had the old rule became thus settled beyond doubt or litigation, when it was abrogated by the statute; and if courts may depart from the precise measure of time substituted, and fix other standards in the exercise of their discretion, a new subject

of contention has just arisen in respect to the rule which it may not take centuries to settle, but which I will venture to predict this generation must leave as an inheritance to those who will succeed them. If limitations are to be sustained because the court may pronounce them within the equity of the statute, or within the average duration of two ordinary lives in being, it is obvious cases will be constantly occurring like the one in question, and pressed upon the courts as coming within these principles. The settlement of fixed and permanent general rules must be impracticable, the entire subject not being under the absolute control of the courts as formerly. The spirit of the statute at least must be regarded, and a system of law must spring up under it by successive adjudications founded upon the notion of equities, and each case necessarily turning upon its own peculiar circumstances. We shall have neither the common law nor statute rule, but rules derived by construction from the spirit of the statute. If the limitation in this case be sustained, we determine that twenty-one years is not too long a suspension within the statute, because that is the principle involved in the decision. The next case may press upon us twenty-five, thirty, thirty-five, or forty years, or any other number, supposed to come within the equity of the statute or the average duration of two lives; and suppose we should finally determine, by reference to the tables of mortality, that forty years was within the average duration of two good lives, and that no limitation should exceed it; must not the court, to be consistent, sustain a limitation depending upon ten lives, if they were taken at such advanced ages, that by the tables of mortality the whole of them would not exceed the duration of two ordinary lives? If the one measure is within the equity of the statute, why is not the other? The tables would prove that the average period of the duration of all of them would not exceed forty years, perhaps not the twenty-one we are now called upon to establish. But without pursuing the enquiry any farther, after the best and fullest consideration I have been able to bestow upon this point of the case, I cannot doubt but that if any other

ALBANY,
Dec. 1836.

Hawley
v.
James.

modification of the common law rule than the one contained in the 15th § had been believed necessary or useful in the settlement of estates, it would have been incorporated in it. The legislature could themselves have fixed the "moderate term of years," or the period of time deemed equivalent to the two lives in being, or any other absolute period, much more satisfactorily than courts of justice. They possessed all the means of information within the power of the court to settle understandingly the proper limit, and the measure by which it might be attained, and then certainty and stability would thus have been given to the law.

From the foregoing view of the questions involved in the trust term, I have arrived at the following results, which it may be proper now to bring within more condensed limits: I. That the *trust to pay annuities* is a valid trust within the 3d subdivision of the 55th section, and may sustain in the trustees the devise of the legal estate during the term under the 60th section. II. That all the other trusts are either invalid or are so limited that they cannot sustain it for that period of time: they are future or contingent, or trusts that are immediately executed and cease. III. That the estate thus vested in the trustees is inalienable during the existence of the trust term: 1. By the operation of the 63d and 65th sections, it being a trust within the 3d subdivision of the 55th section; or 2. Assuming the trust to be within the second subdivision, the term is equally inalienable, as the trustees cannot convey the legal estate in violation of the 65th section, and therefore, though the annuitants may assign their interest, the whole or absolute interest is inalienable; and IV. That the trust term is void, 1. Because it is an estate limited to depend upon thirteen lives, as well as upon minorities, and may postpone the power of alienation for a longer period than is allowed by law, 15*th section;* 2. That if it should be considered properly a term for 20 years and 10 days, determinable upon thirteen minorities, it is still void, because power of alienation *may* be suspended for more than two lives of the thirteen individuals upon which it depends; and 3. Because the trust term is not limited to depend upon *one or two specified lives* in be-

ing, within the true construction of the 15th section—the only measure for the suspension of the power of alienation, since the adoption of the revised statutes, being a life or lives.

What then becomes of the remainders? They cannot *vest in possession* under the will, because that expressly limits them upon the ceasing of the thirteen minorities. By the 17th clause the testator declares, " I have also determined that this trust shall continue, and that the final division of my estate shall not take place, until the youngest of my children and grand-children living at the date of this my will, and attaining the age of 21 years, shall attain that age." The 37th clause also expressly limits the distribution to this period of time, and until then the trustees have no authority under the power conferred to make the division. This was the view of the chancellor, upon the supposition that the trust term should be considered invalid. He directed the surplus rents and profits, the accumulation being void, to be paid to the persons presumptively entitled to the next eventual estate under the 46th section of the statute, 1 R. S. 726. But this was directed upon the ground that the trust estate was legal and valid and continued under the management of the trustees. By that section, when in consequence of a valid limitation of an estate, there shall be a suspense of the power of alienation, and during the continuance of it the rents and profits are undisposed of, they shall belong to the persons entitled to the next estate. This applies only to the case where there is a valid suspense of the ownership and no disposition is made of rents for the intermediate time. Were it not for this section, which changed the common law rule, it is conceded those surplus rents, on account of the void accumulation, must have gone to the heirs during the term. When there is no valid suspense of the power of alienation by the trust estate, it is obvious the 46th section does not apply. The limitation being illegal and the trust term void, the estate does not remain in the lands of the trustees, but must descend to the heirs at law who are immediately vested in possession and entitled to the rents and profits.

We shall next inquire whether the remainders are valid, so as to divest the heirs of the estate on the execution of

the power by the trustees in pursuance of the 37th and 44th clauses of the will. The power to make distribution is a special power or trust, as defined by the 78th and 95th sections of the article on powers. A special power exists, 1. Where the person, or class of persons to whom the disposition of lands under the power is to be made are designated, and 2. Where the power authorizes the alienation by means of a conveyance, will or charge of a particular estate or interest less than a fee ; and a special power in trust is when the disposition which it authorizes is limited to be made to any person or class of persons other than the grantees of such power. Here the class of persons to whom the conveyance is to be made by the trustees is designated, and to some of them the estate is to be less than a fee, and it is a disposition limited to be made to persons other than the grantees of the power. By the 107th section, every power is made a lien or charge upon the land which it embraces, as against creditors and *bona fide* purchasers, from the time the instrument containing the power is recorded, and against all other persons from the time it takes effect, § 128. The period during which the absolute power of alienation may be suspended by means of a power, shall be computed from the time of its creation. This section recognizes the principle that the suspension of ownership cannot be postponed for a longer time, by means of a power, than is authorized by law ; and even without it, the 15th section is sufficiently comprehensive to have embraced the case, because the terms there used, " by any limitation or condition whatever," would reach any attempt to create a perpetuity through a limitation under a power. We have seen that the power is a lien upon the land, from its creation till the execution of it at the termination of the minorities, or in other words till the termination of the trust term, which, according to the views before stated, must be deemed void, as suspending the power of alienation longer than is allowed by law ; and it is an obvious conclusion, that if during all this time these life remainders are inalienable, the suspension of ownership is as objectionable in this respect as the trust term, and must be declared void. It is a suspension de-

pending upon the same events, and must necessarily continue for the same period of time.

Are these remainders alienable before the execution of the power of distribution by the trustees? The statute declares such power of alienation is suspended when there are no persons in being by whom an absolute fee in possession can be conveyed. Could the absolute interest in any one of these life estates be conveyed during the term? Suppose *Augustus* should sell and convey the interest in his share to A., what estate would pass? Not the absolute interest, because upon the distribution, by the trustees under the will, this whole share must be conveyed to Augustus, and to him alone, if living; if dead, to his heirs. It seems clear then to me, that the purchaser could not acquire the absolute estate in remainder belonging to either of the seven children and two grand-children, in the eight and a half twelfths of the estate, within the meaning of the 14th section. But it may be said that the first remainders are vested, and may take effect immediately in possession upon the avoidance of the precedent or trust estate. We have already seen that they must be valid, if at all, at their creation, in other words, at the publication of the will; for if not, they cannot become valid by the happening of subsequent events. This is the settled rule of the common law; it is also now the rule of the statute in respect to these remainders. They are future estates, and by the 14th section, 1 R. S. 723, every future estate shall be void in its creation which shall suspend the power of alienation for a longer period than prescribed in this article. We have also seen that future estates are the creatures of the statute, and must stand or fall by the rules there prescribed. It is important to this view, in the first place, to ascertain with certainty what the remainders after the trust term are, their nature or character and precise limitation, in order to test their validity by the statute. There are three descriptions of them, all going to different classes of persons, upon the happening of different events; 1. The remainders *for life*, with the power to devise; these are the first estates in remainder, and are limited to the seven children and two grand-children; 2.

The remainders to the descendants or heirs of these, should any of them die before the expiration of the trust term? these may be called the *substituted* remainders; and 3. The estates in remainder to those to whom the seven children and two grand-children, or persons taking the life estates, may elect to devise, in case they survive the trust term or execution of the power by the trustees; these may be called the *ultimate* remainders, and depend upon the 44th clause of the will. Now I may concede the life estates to the seven children and two grand-children are vested within the statute or common law definition of such estates. I speak without regard to the condition of good moral character, upon which the court below pronounced them contingent. By the statute, § 13, a remainder is vested when there is a person in being who would have an immediate right to the possession of lands, upon the ceasing of the intermediate or precedent estate. These seven children and two grand-children are in being, and on the expiration of the trust term, which is the precedent estate, have an immediate right to the possession. A vested or executed remainder, at common law, is one where a present interest passes to the party to be enjoyed in future, and by which the estate is invariably fixed to remain in a designated person after the particular estate is spent; as an estate to A. for 20 years, remainder to B. in fee; here B. has a vested remainder, which nothing can defeat or set aside. True, he may die before the precedent estate terminates; but that only makes the vesting in possession, not in interest, uncertain or contingent. The present capacity of taking effect in possession, if it were to become vacant before the remainder determined, is said universally to distinguish a vested from a contingent remainder. 2 Black. Comm. 169. 4 Cruise, 260. Fearne on Conting. Rem. 216. 2 Cruise, 270. Here, it is apparent, nothing can prevent the life estates from vesting in possession, but the death of the remainder-men before the termination of the trust or precedent estate. The other two remainders are clearly contingent, as will be seen on a brief examination. They are contingent, says the statute, § 13, whilst the

person to whom, or the event upon which they are limited to take effect remains uncertain. According to Mr. Fearne, there are four kinds of contingent remainders, of which I shall notice only two, the third and fourth classes. The third is where some uncertain event, unconnected with and collateral to the determination of the preceding estate, is by the nature of the limitation to precede the remainder; as if a lease be made to A. for life, remainder to B. for life, and if B. die before A., remainder to C. Here the event of B.'s dying before A. does not affect the precedent estate, but the event must precede and give effect to C.'s remainder. The event is of course uncertain; B. may or may not die before A.; and the remainder depending upon it, must therefore be contingent. In the language of the statute, the event upon which they (the remainders) are limited to take effect remains uncertain. Now the *substituted remainders* depend upon the event of the death of the seven children and two grand-children, or some of them, during the existence of the trust term or precedent estate. This must precede and give effect to the remainders to their descendants, under the 37th clause of the will, like as the death of B. Before A. gave effect to C.'s remainders in the example stated. The death of the seven children and two grand-children is a certain event; but death at or within a particular time is uncertain. The death therefore of all or any of them, before the ceasing of the trust term, is uncertain; it may or it may not happen, and the remainder depending on this event must therefore be contingent. As to the remainders under the execution of the power to devise, given to the persons to whom the life estates are to be conveyed by the trustees, these are the *ultimate* remainders. By the statute, the remainder is contingent while the person to whom it is limited to take effect is uncertain, as well as when the event is uncertain. The fourth class of Mr. Fearne is where a remainder is limited to a person not ascertained, or not in being, at the time when such limitation is made; as an estate to A. for life, remainder to the right heirs of B. Now there can be no heirs of B. till after his death, and that may not happen till after the determination of the precedent estate. There is then no

person ascertained or in being, in whom the estate can vest, as the heirs cannot be known till the death of B., which may or may not happen before the death of A., upon whose life the precedent, estate depends; the remainder is therefore contingent. In the consideration of these remainders I do not intend to overlook a rule of law that appears to be well settled, namely, "that where a power is given to appoint a remainder among a particular number of persons, or class of persons, who are known and ascertained, with a limitation over to the whole number as tenants in common or otherwise, in default of the appointment, the remainder is vested subject to be divested by the execution of the power." Sugden on Powers, 151, and cases there cited. Fearne on Conting. Rem. 227, 233. 4 T. R. 39. 5 Paige 186. According to this rule the uncertainty, 1. Whether the power would be executed or not by the life remainder-men, assuming they survived the trust term; or 2. The uncertainty of the persons in being who would take upon the execution of the power, as the whole estate may be devised to one of the descendants, according to the 44th clause of the will, would not make the remainder contingent as to those in being at the death of the testator or persons then ascertained: the estate would vest in them subject to be divested on the execution of the power: but as to all the descendants, born after the death of the testator or persons not ascertained at his death, the remainders are contingent and continue so till birth or till ascertained. They are contingent because the persons are not in being, or ascertained, to whom the remainders are limited. All these ultimate remainders then are contingent, except in respect to the three grand-children of Augustus who were living at the death of the testator. They are contingent as respects the descendants or heirs of the other six children and two grand-children and the children of Augustus subsequently born. Being contingent, it is obvious they might continue so throughout the duration of the trust term, because the descendants may never be born, or persons may never be ascertained, the event upon which the vesting of the remainders depends; or they may not be born or be ascertained till after the expiration of the trust

term or precedent estate. These are obvious propositions; and then if right, in the conclusion that the trust term is void on the ground of its being so limited as to suspend the power of alienation longer than two lives in being these contingent remainders which may produce precisely the same effect, for while they are contingent, we have before seen they suspend the ownership, are equally objectionable and void. They are void from their creation, according to the 14th section of the statute. "Every future estate shall be void in its creation which shall suspend the absolute power of alienation for a longer period than is prescribed in this article." It was said that we should vest these remainders in the children of Augustus living at the death of the testator; but a satisfactory answer is, that it would in effect be an exclusion of all children subsequently born, because as to them the remainders are void. This would be unjust, and besides a palpable violation of the intent of the testator.

But it is said we have still the *life estates*, vested and conceding all the others to be contingent and void, why not execute these immediately in possession? I have before shown that the power of the trustees to allot and convey these estates, at the termination of the trust term, rendered the absolute ownership inalienable within the meaning of the 15th section till the execution of the power, and therefore they were as objectionable in their limitation as the trust term itself. But there are to my mind other objections equally conclusive: The trust term is void and gone; the substituted and ultimate remainders are also void and gone; these life estates are the only ones left that can be sustained under any view. If we should vest these estates on the death of one of these devisees, his power to devise being void, the share would descend not to the heirs at law of the devisee, not to his children, but to those of the testator. As there are eleven heirs, the children of one of the devisees of the life estates would inherit one-eleventh of the share of their parent, the other ten-elevenths passing to the other heirs of the testator. For example, suppose the life estates were now vested in possession and Augustus should die, his children would inherit one-eleventh of his share, and his brothers and sisters

and nephews and nieces, as the case might be, would take the residue. If this share was $100,000, his children would inherit about $9000 of it: thus, for a time at least, these children instead of representing their father and inheriting his share according to the will, would receive little more than sufficient to furnish them with the necessaries of life, while the surviving children and grand-children, holding their shares under the will, would receive in addition thereto a large and disproportionate interest. The last survivor would be in possession of about twice the interest intended by the testator, and more than that proportion over any of the descendants of his brothers and sisters. I can never consent to modify and maintain last wills and testaments, where the intent of the testator is thus palpably defeated, and where great injustice must be the consequence to a portion of his descendants. True, the testator intended the seven children and two grand-children should enjoy the shares to be allotted to them for life, but not in connection with the consequences that must follow the execution of such an intent by reason of the illegal remainders, which have been declared void. So much of the will is broken up as illegal, and the parts are so connected with these life estates, if deemed valid, it is impossible to separate them without disregarding the direction of the testator. If then right in the conclusion that the limitation of the trust term is too remote, as tending to a perpetuity in violation of the 15th section of the statute, the limitation of these remainders tending to a like perpetuity, being inalienable for the same length of time, are equally objectionable and void. The entire estate must therefore descend to the heirs at law. and they cannot be subsequently divested on the execution of the power by the trustees.

Should the court concur with me in the conclusion at which I have arrived, it will become necessary to inquire into its effect upon the annuities, legacies and portions, and to shape the decree which shall finally be made accordingly. As to those heirs to whom beneficial interests have been given under the will, in the shape of legacies or annuities, which are consistent with the law and valid, they must be

ALBANY,
Dec. 1836.

Hawley
v.
James.

ALBANY,
Dec. 1836.

Hawley
v.
James.

put to their *election*. They cannot be permitted to take under and also in hostility to the will, unless such is the clear intent of the testator, about which there can be no doubt in this case. The first case upon this question is *Noyes* v. *Mordaunt*, 2 Vern. 581. There the testator devised to his daughter A. lands in fee simple, and to his daughter B. lands settled upon him in tail : and it was decided that if A. should claim a share of the entailed estate under the settlement, as this devise was void, she must give up the land in fee simple ; for, it was said, the testator having disposed of his whole estate among his children, what he gave to them was upon the implied condition that they should release to each other. This principle has been recognized and applied as sound law, ever since the decision, which was in the year 1706. In the case of *Whisler* v. *Webster*, 2 Ves. 367, the testator, before his death, transferred to a friend leasehold property and moneys in trust to raise £3000, which after his death was to be paid to his *children*, in such manner as he should appoint by his last will, and in default of such appointment, among them equally. By his last will he gave several legacies to his children out of other property, and under the above reserved power of appointment gave several legacies to his *grand-children*. These were void, as by the terms of the settlement the appointment could only be made to his *children*, and in default, the money was to be paid among them equally. Some of the children filed their bill to set aside the legacies to the grand-children. They were conceded to be void, and the only question in the case was whether the children were bound to elect. The master of the rolls considered it a clear case of election, and observed that the cases of *Noyes* v. *Mordaunt*, and *Streetfield* v. *Streetfield* had established this broad principle, that no man shall claim any benefit under a will, without conforming as far as he was able, and giving effect to every thing contained in it whereby any disposition is made, showing an intention that such a thing shall take place, without regard to the circumstance whether the testator had any knowledge of the extent of his power or not. He concluded by making the children elect whether they would

take their legacies under the will, or give them up and take under the settlement. In 13 Ves. 209, after Mr. *Thellusson's* will had been before the house of lords and the trusts in it sustained, it came again before the chancellor upon a question of election. The testator had purchased real property after the publication of his will, which of course did not pass under it, and descended to the heir at law. But he had contemplated such purchase before its execution, and provided in it that all such contracts should be completed by his trustees, with the conveyances taken to themselves, and that they should stand seised of the estates for the benefit of the several trusts in the will. The heir at law had a legacy and some other beneficial interests devised to him, and the question presented was, if he was bound to elect whether he would take under the will or as heir at law. The lord chancellor said that the jurisdiction exercised by this court compelling election may be thus described; a person shall not claim an interest under an instrument without giving full effect to that instrument as far as he can. If therefore a testator intended to dispose of his property, and making all his arrangements under the impression that he has the power to dispose of all that is the subject of the will, mixes in his disposition property that belongs to another person, or property as to which another person has a right to defeat his disposition, giving to that person an interest by his will, that person shall not be permitted to defeat the disposition where it is in his power, and yet take under the will. The reason is the implied condition—he shall not take both; the consequence follows, he says there must be an election. Again, he observes, this is a case of a man having a clear right to dispose by will of both his real and personal estate; but his disposition fails as to these real estates by his ignorance of the distinction that a will of a subsequent date was necessary. That Mr. Thellusson, the heir, takes the estates, therefore, as if his father had not made a will; but he says, my opinion is he cannot also take what is given to him by the will. See also 2 Ves. & Beame, 187. Gilb. Eq. R. 15. Sugden on Vendors, 170 and note. 1 Swanst. 402, note.

2 Maddox, 47, 50.   Upon these principles and cases, it is very clear that the heirs who will inherit the estate upon the will *being declared void, and to whom beneficial interests have been bequeathed, must be put to their election.*

By Mr. Justice BRONSON.   The rule that the intent of the testator is to govern in the construction of wills has no necessary connection with the inquiry whether the devise or bequest is consistent with the rules of law.   When we have ascertained what particular disposition the testator intended to make of his estate, then, and not before, the question arises whether the will is valid.   If the disposition actually made is not inconsistent with the rules of law, the will is good and must be carried into effect, whatever the testator may have thought about the legality of the act; and on the other hand, if the disposition actually made is contrary to law, whether it happened through design or the want of accurate information, the will is worthless, and we have no choice but to declare it void.

The will may be good in part and bad in part.   Distinct independent provisions, which are in themselves free from objection, will not be invalidated by other separate provisions which are contrary to law.   But if the good and the bad are so intermingled that the one cannot be separated from the other, then both must fall together; and where a particular disposition, which would be valid if it stood alone, forms a part of, or depends on a general purpose which is contrary to law, there both will be alike void, and must share a common fate.

In connection with this remark, I will briefly compare the will as it stands, on the decree of the chancellor, with the original disposition made by *William James.*   In doing so, I shall only notice some of the most important particulars in which the intent of the testator has been overthrown by the decree.

The decree declares that the whole annuity of $3000 to *Mrs. James,* became lapsed by her election to take dower in the real estate.   This annuity was given not only for her own support, but for the education and support of the

children, and was the only provision made by the testator for minors during the life time of their mother. The directions in the will for making advances and giving marriage portions to the seven children and two grand-children interested in the eight and a half shares, are also declared void. These, with the annuity to Mrs. James, constitute the only provisions made by the testator for most of his children during the life time of their mother; and if other parts of the will had not also been overturned, the children would at this moment have been utterly destitute of the means of support, unless they were derived from some other source than the estate of their father.

But there are other and more important points in which the intent of the testator has been frustrated. He directed the estate to be divided into twelve equal parts, and then disposed of the whole. As to three and a half of those shares, the will is declared void by the decree.

The testator in effect directed an accumulation of the rents and profits of the estate during the continuance of the trust. Under this provision it is but reasonable to suppose that the estate, subject to all the probable charges on rents and profits, would have doubled in value before the final distribution. The whole provision for accumulation is declared void. This part of the decree alone defeats the intent of the testator to the extent of one half the probable value of the estate at the end of the trust term.

As to eight and a half shares of the annual rents and profits, the decree declares that they belong to the seven chilren and two grand-children as the persons presumptively entitled to the next eventual estates in eight and a half shares on the final distribution of the property. The effect of this part of the decree is to give this portion of the rents and profits to the nine children and grand-children immediately; whereas, by the will, they would receive nothing until the end of the term, and if they did not live until that time, they could never take any portion of the rents and profits—they were to go to others.

Enough has been said to show that the will of the testator has undergone a great change in passing through the

court of chancery. I shall only notice one other particular in which the intent of the testator has failed. If either of the nine beneficiaries die during the term, the will directs the trustees to convey his or her share to other persons. The decree declares all the substituted estates in remainder void. To arrive at the effect of this part of the decree, let it be supposed that Augustus James, one of the beneficiaries, dies during the term. The estate devised to the trustees, after paying debts, was valued at about twelve hundred thousand dollars. Without any advance in value, the share which would go to the family of Augustus in the event of his death during the term, would be one hundred thousand dollars. In consequence of declaring the substituted remainders void, this share will go, not to the family of Augustus, but to the family of the testator. As Mr. James left nine children and grand-children representing two others, the share must be divided into eleven parts, and the family of Augustus, instead of receiving one hundred thousand dollars as the testator directed, will get only one-eleventh part of that sum, or a fraction over nine thousand dollars. And if, upon the true construction of the will the three and a half shares were to be divided among the same persons who are to take the eight and a half parts, then the family of Augustus, in the event of his death before the end of the term, should receive more than one hundred and forty thousand dollars. But under the decree, they will only get a fraction over nine thousand dollars, or less than one fifteenth part of what they would take under the will. The same consequences must follow in relation to any other of the nine beneficiaries who may die during the term.

If the law has rendered void so large a portion of the trust which the testator attempted to create, it is well worthy of consideration whether the residue can be sustained. But in the view which I have taken of the case, it will be unnecessary to pass upon that question.

I shall now examine the will as it came from the hand of the testator, for the purpose of ascertaining whether the whole or any part of it can be carried into effect consistently with the rules of law.

The testator, after providing for his wife, devised all the residue of his estate to trustees for a period of about twenty years, in trust to receive the rents and profits, and from them to make certain payments and advances; and at or near the end of the term to make partition of the estate among the designated objects of his bounty. The questions which lie at the foundation of the whole case are,

*First.* Whether the devise to the trustees is valid, so as to vest the estate in them; and

*Second.* Whether any part of the the will can be carried into effect under the doctrine of powers.

Both of these inquiries depend principally on the true construction of the second title of the act concerning the acquisition, enjoyment and transmission of property. 1 R. S. 721, 738. This statute has made great, and, in some respects radical changes, in the law of real property, and very little has yet been done by way of giving a judicial interpretation to its provisions. Whether it was the dictate of a wise public policy to make so great an inroad upon settled principles, as was effected by this enactment, is not my province to determine. In this place 1 shall neither praise nor condemn the late revision of the laws. It is enough that they have passed through all the forms prescribed by the constitution, and furnish the rule of decision to this and all other cases falling within their influence. Like other statutes, they must be so construed as to carry into effect the intent of the law makers; and we are not at liberty to turn aside from the path where they lead, for the purpose of avoiding consequences which may not correspond with our notions of what is best for the interests of society. If these laws, when fairly expounded in accordance with established principles of interpretation, are found to operate injuriously in any particular case, the remedy must be applied by the legislature, and not by courts of justice.

*First.* In considering that branch of the subject which relates to the validity of the devise to the trustees, 1 shall inquire,

I. Whether the trust is valid in relation to the objects or purposes for which it was created, and the manner in which it is declared :

II. Whether the power of alienation is suspended during the trust term : and

III. Whether the trust term is limited according to law.

It is important to notice at the outset that all uses and trusts, except as authorized and modified by the statute, are abolished, § 45. Trusts, arising or resulting by implication of law, are for the most part preserved, § 50, 54. But there can no longer be any express trusts except such as are authorized and defined by the statute, and those are all enumerated in the 55th section. To give effect to the statute in the spirit in which it was enacted, we must, as far as practicable, eradicate from our minds all that we have learned in relation to the doctrine of trusts as they existed before the late revision, and read the statute as though the particular kinds of express trusts which it specifies were now for the first time authorized by law. We may resort to the common law for definitions and rules of construction where the statute itself is deficient. But in attempting to ascertain whether any particular trust can now be created, we cannot resort to the common law, for the obvious reason that this light has been extinguished by the legislature. Whether a particular description of trusts is adapted to the wants of the society in which we live, or would prove beneficial to any class of individuals, is a question with which, in this place, we have no concern. We can only read the statute, and give effect to such trusts as it has specially authorized—all others being illegal and void, unless capable of execution in another form, § 58.

All formal or passive trusts are abolished, § 45, 47, 49; and those active trusts which are specially authorized, have undergone some important modifications. With a single exception, § 56, every valid express trust vests the whole estate in the trustee, both at law and in equity, subject only to the execution of the trust ; and the beneficiary takes no estate or interest in the lands, § 60. Where the trust is expressed in the instrument creating the estate, a sale by

the trustee in contravention of the trust is absolutely void, § 65; and where the trust is for the receipt of the rents and profits of lands, the *cestui que trust* cannot assign or in any manner dispose of his interest, § 63. If the testator has created an express trust not enumerated in the 55th section, it is either absolutely void, as being contrary to law, or may be carried into effect as a power in trust: but in either case no estate vests in the trustees, and the lands descend to the heirs at law, § 58, 59.

Courts of equity often regard things agreed or ordered to be done as actually performed ; and as the testator has in effect directed all his personal to be converted into real property, we may regard the conversion as actually made for all the purposes of passing upon the validity of the trust.

I. Was this trust valid in relation to the objects or purposes for which it was created, and the manner in which it was declared?

1. One of the declared objects of the trust was the payment of the debts of the testator. The first subdivision of the 55th section authorizes a trust " to sell lands for the benefit of creditors." The testator has not attempted to create such a trust as the statute authorizes. That is a trust *to sell* lands—a trust for alienation ; but the trust in the will is of the opposite character ; it is a trust to tie up the estate and prohibit all alienation during the term. The debts are to be paid not from the *sales,* but from the *rents and profits* of lands devised to the trustees. It cannot be maintained that this was such an express trust as would vest the estate in the trustees.

2. Another and an important object of the trust was to confer on the trustees the power of making partition and conveyances of the estate at or near the end of the term. It has not been pretended that this was a valid trust within the 55th section. Whether it can be executed as a power in trust will be considered hereafter. The provisions in the 36th clause of the will for conveying $50,000, in value of the estate to the children of Augustus James, and $20,000, each to Anna McBride James and Lydia James, depend on the same principle as the power to make partition. These

ALBANY,
Dec. 1836.

Hawley
v.
James.

portions are to be carved out of the estate at or near the end of the term, and are in effect only a part of the general distribution which the trustees are directed to make. To the same class of trusts may also be referred the advances which, by the 31st and 32d clauses of the will, are directed to be made to sons and grandsons, on establishing themselves in business, or engaging in any occupation requiring the employment of capital and the marriage portions directed to be paid by the 33d clause of the will. Taking these clauses in connection with the 35th, it will be seen that they only provide in another form for the ultimate partition of the trust estate. They are advances or loans at compound interest in anticipation of the final distribution, and as such they are to be taken into the account, and deducted from the respective shares of the persons to whom the advances may be made.

There is some uncertainty about the persons who may be entitled to advances under the 31st and 32d clauses, but I think none are included but those who may take on the final partition. It is expressly provided, that " the advances to any one individual shall not in the whole exceed the fourth part of the probable amount *to which such individual will be entitled upon the ultimate division of my estate.*" This plainly evinces the intention of the testator to exclude all his sons and grandsons who were not to share in the final allotment of the estate. There is still some doubt about the persons who may claim advances, and there is room for question whether these provisions are not void for uncertainty. But I shall not examine that question. Assuming that advances may be made to some of the persons presumptively entitled to share in the ultimate distribution of the estate—and very few of them can in any sense be said to have " attained the age of manhood" during the trust term,—still if the advances only constitute a part of the final partition, they are not express trusts within the 55th section of the statute, and consequently will not carry the estate to the trustees.

There is another remark applicable to the advances and marriage portions. They are future and contingent trusts

which may never be called into exercise. If they are valid as express trusts, they can vest no present interest in the trustees.

3. There are several other future and contingent trusts. By the 29th clause of the will, the trustees are directed to make suitable provision for the education and support of the testator's minor children, in the event of the death of their mother during the term. The event upon which this trust is to be called into exercise is not only uncertain, but the *cestuis que trust* are all to share in the final division of the estate, and all payments on their account would be charged against them under the 35th clause of the will. By the 30th clause of the will, the trustees are directed in certain events to make provision for widows and children. These are also contingent trusts which may never be called into action; and so far as they relate to any of the grandchildren of the testator, who may be entitled to share in the ultimate partition of the estate, they also fall within the 35th clause of the will. The provision in the 33d clause of the will, for the support and promotion of the welfare of the daughters of the testator and of his grand-daughter *Mary Ann King*, in case they shall marry and afterwards need assistance, may never become an active trust in relation to any of the beneficiaries; and if it should, all the advances which they might receive would be taken into the account on the final partition.

If any contingent provision can be valid as an express trust, within the 55th section, it cannot operate to vest the estate in the trustees until the happening of the event which is to call the trust into active exercise. The trustee cannot take the legal estate in the lands so long as it is uncertain whether there ever will be a *cestui que trust* to demand the rents and profits. If the event contemplated by the donor should never happen, there would be no person to enforce the performance of the trust, § 60; and the trustee would take the rents and profits for his own benefit. If the testator has not created some present active trust, the estate has not vested in the trustees, but has descended to the heirs at law.

4. The ground principally relied on in support of the trust is the direction for paying legacies and annuities. There can be no question that a valid trust to pay legacies and charges on land may be created under the second subdivision of the 55th section. It expressly authorizes a trust "to sell, mortgage or lease lands for the benefit of legatees, or for the purpose of satisfying any charge thereon;" but I think the testator has not created, and that he did not intend to create a trust under this provision. He certainly has not in terms conferred any power to *sell, mortgage* or *lease* lands for any purpose; but he has in terms authorized the trustees to *receive the rents and profits* of lands, which is a trust falling under either the 3d or 4th subdivision of the section. Trusts under the second subdivision, like those under the first, are trusts for the alienation of the estate; but the trust which the testator had in view was one of an entirely different character—one which should tie up the estate. He therefore by express words created a trust to receive rents and profits—a trust which, if properly declared, suspends the power of alienation until the purposes for which it was created have been accomplished, § 60, 63, 65.

There may be some difficulty in ascertaining why the word *lease* was inserted in the second subdivision, and if we attach to it all the consequences which may be deduced from the common law doctrine in relation to the power of making leases, it will include the right to take rents and profits. But that consequence will not follow in this case, for the reason that it would be against the manifest intent of the legislature; and it is one of the first and most important rules of interpretation, that a statute shall be so construed as to carry into effect the intent of the law-makers. It has already been remarked that all express trusts, save such as are particularly enumerated and defined in the statute, are abolished. This subdivision does not in terms authorize a trust to receive rents and profits, and if we allow such a trust to be built upon it, we shall permit that to be done which the legislature has forbidden. That it was not intended that trusts under this subdivision should work any suspense whatever of the power of alienation, may be in-

**153**

ferred from the fact that they are not in terms subjected to the prohibition against perpetuities, while the two classes of trusts which may suspend alienation are by express words subjected to the rules prescribed in the first article. This caution on the part of the legislature, in repeating the prohibition against perpetuities as often as a trust to receive rents and profits was mentioned, proves most satisfactorily that it was not intended to authorize such a trust under the second subdivision.

The first subdivision authorizes a trust "to *sell* lands for the benefit of creditors." This is a trust for alienation, and it would have been absurd to subject it to a provision against perpetuities. The second subdivision is of the same character. It authorizes a trust to " *sell, mortgage* or *lease* lands for the benefit of legatees, or for the purpose of satisfying any charge thereon." A *mortgage* is one mode of aliening the estate or a portion of it equal in value to the mortgage debt. In this case as well as where an absolute fee is transferred, the trust is at an end the moment the conveyance is executed, so far as relates to any power over the estate. The trustee has no further office to perform but that of making the proper application of the money. There is no suspense of the power of alienation, and it would therefore be idle to provide any safeguard against perpetuity. Was the word *lease* in this connection used for the purpose of authorizing a trust of a different character? I think not. And we may here very fitly apply the maxim, *noscitur a sociis,* and hold that a trust " to *sell, mortgage* or *lease* lands," is a trust for the alienation of the estate, or some interest in it, and that it means nothing but alienation. If there is any possible way in which the power to lease can be exercised without suspending alienation, effect can be given to every word in the subdivision without contravening the manifest intent of the legislature. It is a power to make leases for the benefit of legatees, and I see no objection to demising the land directly to the legatee at a nominal rent for a period long enough to satisfy the legacy: or in the case of a charge on the land, leasing it directly to the person entitled

ALBANY,
Dec. 1836.

Hawley
v.
James.

to the debt for a term which will satisfy the charge. It may also, I think, be leased to a third person, reserving the rent to the legatee or person having the charge. I am aware of the rule of the common law that a rent cannot be reserved on a feoffment, gift or lease, to any person but the feoffor, donor or lessor, and that it cannot be reserved to a stranger. This rule was based on the doctrine that rent was a return or retribution for the use of the land, and consequently could only be reserved to the person from whom the land passed. There was nothing in the nature of the case which rendered it improper that the rent should be reserved to a stranger to the conveyance, if the parties so agreed. The statute authorizes a lease for the benefit of legatees, and persons having a charge, and I see no reason why the rent may not be so reserved that it will go directly to the persons beneficially interested in its payment, instead of first passing through the hands of the trustee. By inserting apt covenants and conditions in the lease, payment of the rent may be effectually secured. Then whether the trustee sell the whole estate as by a deed in fee, or only a part of it, as by a mortgage or lease, it is in every aspect a trust for alienation which does not tie up the estate. When once the alienation is made, the power of the trustee over the land is at an end. All that remains of his trust is a proper application of the money, where he has either sold or mortgaged. The land itself is as much in the market as though a trust had never existed. If a lease has been executed, the tenant can sell his term, the person to whom the rent is reserved may sell his interest, and the reversion or remainder, as the case may be, can be aliened by the person in whom it is vested.

There is also another mode in which the power to lease lands may be exercised without tying up the estate. The trustee may sell a term in the land for a gross sum to be paid on the execution of the lease. Although this is not the usual way of executing such a power, it is enough that the thing may be accomplished in that form. If the legislature did not intend that the power to lease should suspend alienation, then if there be any possible form in which the power

ALBANY,
Dec. 1836.

Hawley
v.
James.

may be exercised without working that consequence, we are, I think, bound to restrict it to that particular mode of execution. In this way we shall give effect to the will of the law-makers, and save those who devised the new system of uses and trusts from the imputation of wanting skill to accomplish the end which they had in view ; we shall moreover save the law itself from the reproach of containing inconsistent and contradictory provisions.

I conclude therefore that a trust cannot be created under the second subdivision, which shall necessarily suspend the power of alienation for any period whatever. It is a trust to sell land or some interest in it. The trustee does not hold for a term, and the property need only remain in his hands until a purchaser can be found who is willing to take it on reasonable terms.

In the closing argument on the part of the trustees, the ground was distinctly taken that trusts under the second subdivision do not suspend the power of alienation—that the authority to lease lands may be so exercised that it will not work that consequence. It was then said that although the trust declared by the testator may be void as to all the other purposes for which it was created, it is still valid under this subdivision, so far as it relates to the payment of legatees and annuitants ; and that the trustees may take and hold the estate until those objects are accomplished. I agree that trusts under this subdivision do not suspend alienation ; but I cannot yield to the argument that the testator has created such a trust. He not only used the very words which are descriptive of a trust of a different character, but the whole frame of the will plainly manifests his intention that alienation should be suspended until the end of the trust term. In trusts under the first or second subdivisions, there can be no term or prescribed period during which the estate is to remain in the hands of the trustees. They take the land, not to hold, but to alien ; not to receive rents and profits, but to " sell, mortgage or lease ;" and if they lease, it must be done in some mode which will leave the power of alienation wholly unfettered. The testator evidently acted on the supposition that a trust for any and all purposes might be

ALBANY,
Dec. 1836.

Hawley
v.
James.

created under the third subdivision, and he therefore charged debts and legacies, which belong exclusively to trusts under the first and second subdivisions, on the rents and profits of his estate. The directions in the will are the same in relation to the mode of satisfying debts and legacies as they are in relation to all the other purposes for which the trust was created. The testator clearly did not intend that the trustees should either sell or mortgage any part of his estate, nor did he design that they should lease it in such a way as would leave the land in the market. His purpose was plainly one of a different character. He designed that the trustees should receive rents and profits, and that the estate should remain inalienable until the end of the trust term. We cannot, against the declared intent of the testator, change the character of the trust for the purpose of obviating objections against its validity. It is either good as a trust to receive rents and profits under the third subdivision, or it is void because contrary to law. Those who wish to create trusts must follow the law, or their purpose cannot stand. I do not make this remark from any hostility to trusts, but because the legislature has abolished all express trusts, save those which are specially authorized by the statute.

The next inquiry is whether this trust for legatees and annuitants can be sustained under the 3d subdivision of the 55th section. That authorizes a trust " to receive the rents and profits of lands, and *apply them to the use* of any person, during the life of such person or for any shorter period." The trust which the testator has declared is, to receive the rents and profits of lands and *pay them over* in specified amounts to legatees, annuitants and others. In the case of *Coster* v. *Lorillard*, 14 Wendell, 265, the trust was like the one under consideration, and Chief Justice Savage came to the conclusion that there was a substantial difference between a trust to receive rents and profits and *apply them to the use* of another, and a trust to receive and *pay over*. Senators Maison and Young expressed similar opinions ; while Mr. Justice Nelson, though with some hesitancy, and senator Tracy took a different view of the question. Although all the members of the court agreed that the trust

in that case was void, yet as those who delivered written opinions assigned different reasons for their judgment, it cannot be affirmed that this is a decided question. Still I entertain the belief that a majority of the court acted upon the ground that such a trust, as we are now considering, was invalid.

If, however, this is to be regarded as an open question, I cannot resist the conclusion that a trust to receive and *pay over* rents and profits, is not authorized by the statute. I think the legislature only intended to sanction a trust under this subdivision where the trustee had a discretion in the application of the money and that an authority to receive and pay over rents and profits is among those passive or formal trusts which were expressly abolished. When we sanction such a trust, we give no force to the word *apply*. The trustee does not make the application—he exercises no discretion as to the disposition of the money, but leaves that matter wholly to the will of the *cestui que trust*. The legislature evidently intended to restrict the power of creating trusts, particularly those which suspend alienation, within very narrow limits. An accumulation of the rents and profits of lands is only allowed for the benefit of *minors*—not for adults of any description, § 55, sub. 4, and § 37. Under the 3d subdivision there may be a trust to receive rents and profits either for minors or adults ; but still it is evident that the legislature had in view a particular class or description of persons who were to be provided for by the trust. They were persons who, for some cause, could not be safely entrusted with the management of their own affairs, and for that reason a trustee was allowed to make the application for them. Although the class of persons are not named in the statute, yet they are sufficiently indicated by the very nature of the trust. The trustee is not only to receive but to *apply* the money. Minors, improvident and unfortunate sons, and daughters who have married drunkards and spendthrifts, need the protection of some friend or trustee to render them secure in the enjoyment of the bounty intended for their use. They cannot be safely entrusted with the estate itself, nor with the fruits which it yields. If the rents and profits were

ALBANY,
Dec. 1836.

Hawley
v.
James.

*paid over*, the bounty of the donor would soon find its way into the hands of gamblers and sharpers, or be wasted in dissipation, while the beneficiary was left to suffer hunger and want. Although the legislature was opposed to that artificial system which places the legal estate in one, while the beneficial interest is in another, they could not overlook the necessity of allowing a trust for the description of persons which I have mentioned. They, therefore, authorized a trust to receive the rents and profits of lands, and *apply them to the use* of another. The trustee is to exercise a fiduciary office—a kind of guardianship in the expenditure of the money. He is not to pay it over and suffer it to flow in the channels where inexperience, improvidence, or vice will carry it; but he is to see that the beneficiary actually enjoys the fruits of the donor's bounty—that his education, his support and his general welfare are promoted to the full extent of the fund committed to his charge. In short, the trustee is to *apply* the money *to the use* of the beneficiary.

If it was intended to authorize a mere formal trust, where the fiduciary was only a conduit to pass the money into the hands of the beneficiary, why was the word *apply* inserted? why was it not provided that a trust may be created to receive and *pay over*? I cannot believe that the legislature meant to sanction a mere passive trust, when they declared at the very outset that they meant to overthrow the whole system of trusts as it then existed, and only allow them to be created for certain specified purposes. The specified purposes are all either obviously necessary or highly conducive to the interests and conveniences of society. There may be trusts to alien lands or some interest in them for the payment of debts, legacies, and charges. There may also be trusts which suspend alienation where an accumulation is directed for the benefit of minors, or where the trustee is to receive and *apply* rents and profits. Beyond these the legislature has prohibited all express trusts which carry the estate to the trustee; and I think it quite clear that a trust to receive and pay over falls within the prohibition. I do not say that we should inquire into the character of the beneficiary for the purpose of deciding on the validity of trusts

under the third subdivision : but I do say that the trust cannot be valid unless the trustee is to apply as well as receive the rents and profits. It can make no difference whether the trust extends to all the rents and profits of an estate, or is confined to some specified sum of money. It is not necessary that the trustee should have a discretion as to the amount to be applied—the donor may settle that for himself. But whether it be a certain or uncertain sum, and whether great or small, the trust will only be valid where the trustee is himself to make the application of the money.

If it were proper in this place to consider that question, it might well be asked, why should a trust be permitted to receive and pay over the profits of real estate ? If the object be to give the fruits of the land to a particular individual, why not give him the land at once and let him take the profits directly, instead of first passing them through the hands of another ? There is no necessity for a trustee in such a case. He exercises no fiduciary office, and serves no purpose but that of aiding frauds and embarrassing estates, by vesting the legal title in one, while the beneficial interest is in another. It is in short a mere formal trust, which answers no better end in relation to the general interests of society, than that of deceiving the unlearned and the unwary, and occupying the courts with legal controversies.

It is worthy of remark that most of the judicial officers who have had occasion to pass upon this provision, seem, in the first instance at least, to have been strongly impressed with the opinion that the legislature did not intend to sanction such a trust as the testator has declared. In addition to the opinions which have already been noticed, those of the chancellor and the vice-chancellor in the case of *Coster* v. *Lorillard*, may also be mentioned. The chancellor remarks that " the object of the 3d subdivision of the 55th section of the title referred to, when taken in connection with the 63d section, was to enable the owner of property to create a trust therein for the benefit of an *unfortunate or improvident* child or relative ; *thereby to secure a support and maintenance* for life, or for any shorter period." He then goes on to remark that such a trust renders the estate inalienable

ALBANY,
Dec. 1836.

Hawley
v.
James.

during the term.  The vice-chancellor says, " *the great object of the statute* in allowing the creation of express trusts for the above purposes undoubtedly is, to enable persons to make provision by deed or devise *for the infirm and helpless, or those laboring under some disability, or who may be unfit to be entrusted with the management of property.*   Hence the propriety of vesting the trustee in such cases with the legal estate or interest in the lands."

By confining trusts under the 3d subdivision to those cases where the trustee is himself to apply the fund, we shall, in my opinion, accomplish the precise object which the legislature had in view, and render the system consistent and harmonious.   Under the first subdivision a trust may be created to sell lands for the benefit of creditors—under the second a trust to sell, mortgage, or lease lands for the benefit of legatees, or to satisfy any charge thereon.   The trustees can alien the land, because that would not be an act in contravention of the trust, § 65.   The beneficiary may assign his right, because the trust is for the payment of a sum in gross—the amount of the debt, legacy, judgment, or other charge as the case may be.   There is no necessary suspense of the power of alienation for a single moment.   But the 3d and 4th subdivisions provide for trusts to receive rents and profits—trusts which do suspend the power of alienation.   As this suspense was in itself regarded as an evil, the legislature not only took care to limit its continuance, but they particularly specified the purposes for which such a trust might be declared, and then it was provided that every valid trust of this description should vest the whole estate in the trustee, § 60 ; that he should not alien in contravention of the trust, § 65 ; and that the person beneficially interested, should not assign or in any manner dispose of his interest, § 63.   We have here a system skilfully adapted to the purpose which the legislature intended to accomplish ;   the different parts harmonize with each other; the estate is effectually protected against frauds on the part of the trustee ; and the young, the improvident, and the unfortunate persons for whose benefit alone such a trust is allowed, are rendered secure in the enjoyment of the bounty designed for their use.

ALBANY,
Dec. 1836.

Hawley
v.
James.

But the moment we say that a valid trust to receive and *pay over* rents and profits, can be created under the 3d subdivision, we not only revive formal trusts which the legislature intended to abolish, but the harmony of the system is at an end. If a man is absolutely entitled to receive from the trustee a legacy of one thousand dollars or an annual stipend of the same amount, and to dispose of the money as he pleases, what reason can be given why his interest should not be assignable? If he had not been competent to take proper care of the money, it is not to be presumed that the testator would have directed it *paid over*—he would rather have charged the trustee with the duty of *applying* the money to the use of the beneficiary. And again, why should a person entitled to a legacy of one thousand dollars, growing out of a trust under the 2d subdivision, be allowed to assign his interest, when if the same legacy depend on a trust under the 3d subdivision, his interest can in no manner be disposed of? It may be said that he can assign in either case, because it is a trust for the payment of a sum in gross. But I answer, if the legacy depends on a trust for the receipt of rents and profits, the beneficiary cannot assign. It is forbidden by the 63d section. The last clause of that section was not added for the purpose of qualifying the first; but for more abundant caution, so that no doubt should exist as to the right of the beneficiary to assign where the trusts were under the 1st or 2d subdivision. Those are trusts to raise and pay over money in gross sums; but under the 2d subdivision, the trust is to receive and *apply* rents and profits.

There is still another reason why a valid *trust to pay legacies* cannot be created under the 3d subdivision. Legatees are specially provided for by the second subdivision, and a testator cannot be allowed to select a trust from one specified class and direct its execution in the mode prescribed in relation to trusts of another class. The legislature has authorized trusts to pay debts, legacies, and charges, but it has also prescribed the means by which those trusts shall be executed—the sale of lands. But for this special authority no trust whatever in relation to debts, le-

gacies, or charges could be created; and I think it quite clear that the authority must be strictly pursued, or all will be void. The testator has created a trust to pay debts, not by the *sale of lands*, as the statute directs, but from *rents and profits*. That is not a trust authorized by law, and consequently cannot exist, § 45. The debts must be paid—not because the testator has so declared, but because the law requires it. It may be also that some of the legacies are valid, but I think that none of them can be paid under the trusts declared by the testator.

I have before examined the other trusts declared by the testator, and assigned some of the reasons why I think them invalid. But if the views that have been suggested in relation to a trust to receive and pay over rents and profits are correct, there is then another and a fatal objection to every trust which the testator has attempted to create. He has in no case and for no purpose, save that of *exchange and re-investment*, authorized the sale or other disposition of a single dollar of the capital of his estate during the term. On the contrary, the capital is to be kept entire until the final distribution, and all the trusts, whether for debts, legacies, annuities, advances, marriage portions or the like, are to be satisfied from *rents and profits*—and those too are all trusts to receive and *pay over*. There is no case where the trustees are directed to receive rents and profits and *apply* them to the use of the beneficiary. If I have not mistaken the law, then upon this ground alone, every trust declared in this will is utterly void.

5. Although the testator did not in terms, yet he did in effect, create a trust for the accumulation of the rents and profits of his estate; and if we look at the magnitude of the estate, and the probable amount of the annual charges on the fund, it cannot be doubted that the estate would at the least be doubled in value by the time assigned for the final distribution. This trust has already been declared void by the chancellor, and upon such satisfactory reasons that the trustees have not deemed it expedient to appeal from that part of the decree. As no attempt has been made to sus-

tain the provision for accumulation, it cannot be necessary to examine the question.

I shall dismiss this branch of the case with the single remark, that although there were several objects or purposes in the mind of the testator which would have authorized the creation of a valid express trust, yet in my opinion no such trust has been declared.

II. Is the power of alienation suspended during the trust term?

In the consideration of this question I shall assume what has just been denied—that the trust is valid in relation to some or all of the purposes for which it was created, and the manner in which it was declared; and then the inquiry is presented, whether it is not subject to objection on the ground that it amounts to a perpetuity.

The article of the statute which relates to the creation and division of estates, has not, like those concerning uses, trusts and powers, abrogated the whole structure of the common law on that particular subject; but it has nevertheless introduced many new provisions which materially modify the rules of the common law in relation to the creation and division of estates. We must trace those changes which have been made by the new code, and so construe the different provisions as may be best calculated to attain the end which the legislature had in view.

The case of *Coster* v. *Lorillard* has settled that the prohibition against suspending the absolute power of alienation contained in the 15th section of the statute applies as well to present as to future estates. "Such power of alienation is suspended when there are no persons in being by whom an absolute fee in possession can be conveyed." § 14. The whole estate is devised to the trustees. They are to manage it, receive the rents and profits, make certain payments and advances during the term, and then to partition the residue among designated individuals. They have no power to sell any part of the estate except for the purpose of making investments in other property or in different places. Clause 27. A power to exchange one piece of property for another, or to sell it for the purpose of investing the proceeds in a different man-

ner, is not a power to alien the estate within the meaning of the statute. The property newly acquired is as much a part of the estate as was that which was given for the purpose of effecting the exchange or making the new investment. As the question which was made on this subject by the counsel for one of the minors was distinctly abandoned by the counsel for the trustees, I do not think it necessary to pursue the inquiry any farther.

This, then was not a trust for alienation, but one of the opposite character. The predominent purpose of the testator was to preserve entire the capital of his estate until the end of the term. Indeed he intended to accomplish much more by way of accumulations. But it is enough for the present purpose that the testator studiously provided that not a single dollar should be abstracted from the capital until the end of the term. All payments and advances by the trustees, not excepting the debts of the testator, were to be made from the rents and profits of the estate.

The trust was for the receipt of the rents and profits of lands, and was expressed in the instrument creating the estate. The 65th section declares that " where the trust shall be expressed in the instrument creating the estate, every sale, conveyance or other act of the trustees in contravention of the trust shall be absolutely void." It should also be remembered, the whole legal and equitable estate is vested in the trustees, and that the beneficiaries take no estate or interest in the lands. § 60. To my mind nothing can be more clear than that the estate cannot be aliened during the continuance of the trust term. The trustees who have the whole legal and equitable estate, cannot convey, because it would be an act " in contravention of the trust." The consent of the beneficiary would not confer the right to sell. It would still be an act, not in accordance with, but in contravention of the trust. This view alone, disposes, I think, of the whole question. There is no ingenious contrivance by which we can get rid of the difficulty. We must say that the estate is inalienable during the term, or the statute is nothing but a dead letter.

But if we go beyond the trustees and inquire into the power of the beneficiaries, the difficulty will be increased. The beneficiaries have no estate or interest in the lands, but only a mere right to enforce the performance of the trust in equity. § 60. How then can they alien? They have nothing but a lawsuit to sell, and that can hardly be called a marketable commodity. But this is not all. The 63d section declares that "no person beneficially interested in a trust for the receipt of the rents and profits of lands can assign or in any manner dispose of such interest." This provision renders the question almost too plain for discussion. It is in vain to seek after devises which will enable the beneficiaries to sell, when the legislature has said they *cannot assign or in any manner dispose of their interest.* I have before remarked, that the latter clause of the 63d section does not qualify the first clause; it was added for greater caution, so that no doubt should exist as to the right of a person to assign who was interested in a trust for the payment of a sum in gross. Those are cases under the 1st and 2d subdivisions of the 55th section, where a trust is created to raise a gross sum for the payment of a debt, legacy or charge. They are trusts for the *sale* of lands—not such a trust as the testator has created, for the *receipt of rents and profits.* It should also be observed that the last clause of the 63d section does not, like the first, specify a trust " for the receipt of the rents and profits of land." As to such a trust the provision is without any qualification—the beneficiary cannot assign.

If I am mistaken in the construction of the 63d section, there is still an insuperable difficulty in the way of any sale by the beneficiaries. Some of them are to receive, not any sum in gross but an indefinite amount, which depends entirely on the discretion of the trustees. But if we look only to the annuities—the ground on which the trustees principally rely—the difficulty still remains. A life annuity is not " a sum in gross" within the meaning of the statute.

There are, I think, two insuperable objections in the way of any alienation of the estate during the continuance of the trust. *First,* the trustees who have the whole interest can-

ALBANY, Dec. 1836.

Hawley v. James.

not sell because it would be an act in contravention of the trust : and *second*, the beneficiaries cannot alien, for the reason that they have nothing to sell, and the further reason that the statute has forbidden it.  If there could be any doubt on this point, the question was expressly decided in the case of *Coster* v. *Lorillard ;* and the maxim, *stare decisis* ought to govern on the present occasion.   Litigation can never be repressed, nor can the rights of property ever be secure, if this court of the last resort departs from its own solemn adjudications.

III. As the power of alienation is suspended during the continuance of the trust, the next inquiry is whether the trust term is limited according to law.

" The absolute power of alienation shall not be suspended by any condition or limitation whatever for a longer period than during the continuance of not more than two lives in being at the creation of the estate." § 15.   There is a single exception to the rule, but it does not affect this question.   The death of the testator is the time when the estate was created. § 41.   The testator, after announcing his purpose of confiding the care and management of his estate to trustees, declares " that this trust shall continue, and that the final division of my estate shall not take place until the youngest of my children and grand-children living at the date of this my will, and attaining the age of twenty-one years, shall have attained that age."   He had at that time thirteen children and grand-children who were minors, the oldest of whom was his daughter, *Mrs. Barker*, who was of the age of eighteen years and ten months, and the youngest was his grand-child *William Augustus James,* who was eleven months and twenty days old when the testator died.   The other minors were of different ages between one and eighteen years.   If *William Augustus James* lives to attain the age of twenty-one, the term will continue twenty years and ten days.

It is said that the limitation of the term is void for uncertainty—that the period at which it can be ascertained that the term has ended may overrun the period at which it may in fact terminate.   The objection takes it for granted that

the term can only end with the minority of some one of the children and grand-children included in the class; and then it would be true that the term might terminate many years before the fact could be ascertained. For example: *Mrs. Barker* attained the age of 21 in the year 1835. If all the other minors but *William Augustus* should die under age, and then he should die just before he attained the age of 21, the trust term would, upon the hypothesis of the counsel, have ended when *Mrs. Barker* attained her full age, and yet that fact could not be ascertained until seventeen years after-wards on the death of *William Augustus*. But I think the term may end by death as well as the lapse of time, and that in the example already given, the term did not end when *Mrs. Barker* attained the age of 21, but will continue to and end on the death of *William Augustus*. In other words, the term will continue so long as any one of the class shall remain a minor, and will terminate when the last minority shall cease, whether that happen by death or the lapse of time. Upon this construction there is no such uncertainty about the limitation of the term as will render the trust void on that ground.

It has not been contended that this was an absolute term of twenty years and ten days, but it is argued that it may end before that time in case of the death of some or all of the minors before they attain the age of twenty-one years.

The term as limited by the testator and qualified by law, depended in part on time and in part on the continuance of life. It might continue twenty years and ten days if William Augustus, the youngest minor, so long lived, or it might end at any earlier period on the death of all or some portion of the persons named in the class. It might end with the death of all the minors before any of them attained the age of twenty-one years, or it might end after one, two, or more of the number attained the age of twenty-one, by the death of the remaining minors under that age. The term was limited by the continuance of minorities, but as those minorities might cease by death as well as the lapse of time, it necessarily depended in part on the continuance of life. It was a term which could not exceed twenty years and ten

days, but which might be determined at any earlier period on the death of one, two, three, or all of the minors. There is no possible form in which the case can be fairly stated without showing that the duration of the term depended on lives, and as there were thirteen minors in the class, it depended on more than two lives. This trust, then might continue and the power of alienation be suspended for a longer period than the statute allows.

I do not perceive that this difficulty can be obviated in any of the modes which were urged upon our consideration. The continuance of the trust does not depend upon the minorities of the youngest child and the youngest grand-child in the class; nor does it depend on the minority of the youngest person in the class. If it did, only two lives in the former case, and one in the latter, would be involved in the term. But the testator has directed that the trust shall continue " until the youngest of my children and grand-children, living at the date of this my will, *and attaining the age of twenty-one years*, shall have attained that age." There is but one class of minors, and the trust is to continue—not until the youngest in the class attains his full age, but until the youngest *attaining the age of twenty-one*, shall have attained that age. In other words, the term does not depend on the minority of the youngest in the class, but on the minority of the youngest *who shall attain the age of twenty-one years*. This may be rendered more plain by supposing that William Augustus, the youngest minor, had died immediately after the testator. The term would not have ended with his life, but would continue until the next longest minority should cease. And if the three youngest minors, which will include the youngest child and the youngest grand-child, were both to die the present year, the term would not end with their lives, but would continue until the next longest minority should be determined. The testator evidently intended that the trust should continue so long as any one of the class should remain a minor. And if this was his obvious intent, much as we may regret the consequences which must follow, I do not think that we can re-model the term for the purpose of

making it conformable to law. If the testator had created several estates, some of which were well limited and others not, the good might stand while the bad must fall. If there be an estate to A. for life, remainder to B. for life, remainder to C. for life, with a contingent remainder over in fee, the two first life estates would be good, notwithstanding the invalidity of the life estate of C. But the trustees have only one estate. If that is not well limited, we cannot cut it up into parcels, and declare it good in part and bad for the residue. No precedent for such a proceeding has fallen under my observation. The term is entire. If it suspends the power of alienation for too long a period, it is wholly void.

The argument most strongly urged in support of the term, was, that at the common law there were two rules in relation to perpetuities, and that the absolute power of alienation might be suspended either for a moderate term of years without reference to lives, or for a life or lives in being and twenty-one years and a fraction over; and then it was said that our statute had modified the last rule, without touching that in relation to a moderate term of years. I shall not go over with the cases referred to by the counsel in support of this doctrine, although I have read them with some attention. At one period of the English common law, the power of alienation was almost wholly unrestrained; and although perpetuities were afterwards introduced, and finally obtained a partial triumph, they were always regarded with jealousy by the courts, and the judges resorted to the most subtle constructions and artful devises to prevent the tying up of estates. When an estate was given to a man and the heirs of his body, thus creating what was afterwards denominated an estate tail, the courts held that this was an estate upon condition, and that as soon as the donee had any issue born, the condition was performed, and the estate might be aliened. This construction was attacked and overthrown by the statute of Westminster the second, which enacted that the will of the donor should be observed. By this statute the aristo-

cracy gained, for a time, a complete victory over the judges, and for nearly two centuries afterwards, alienation might be suspended to an almost unlimited extent. The evils which resulted from thus fettering inheritances finally induced the courts to sanction common recoveries—a kind of pious fraud —by which the estate was restored to its alienable quality, and the will of the donor as well as the statute of Westminster were defeated.

Executory devises are an innovation upon the ancient common law, and were not finally sanctioned without a struggle. At first it was held that an executory devise would be void which suspended the power of alienation for more than one life in being. Afterwards two or three lives were allowed, and finally it was settled that alienation might be suspended for any number of lives in being. To this was added an absolute term of twenty-one years and the usual period of gestation. It was while the courts were in doubt and uncertainty about the proper limitation, and the rule was fluctuating and unsettled, that some of the cases speak of a reasonable or moderate term of years. Since that period we find no trace in the books of this doctrine of a *moderate term of years*. It was once allowed, it is true, but it was while the courts were unsettled about what they would sanction and what they would reject. So too, at one period, the rule was a single life in being, and there would, in my judgment, be about as much propriety in saying that this formed a third rule of the common law in relation to perpetuities as there is in saying that there are two rules on that subject. There have been different rules at different periods. This, like other branches of the common law, has gone through many modifications; but at the time our statute was passed there was but one rule: alienation might be suspended for any number of lives in being and 21 years and a fraction over; and this rule the statute has modified.

But let it be granted that there were two or even twenty common law rules. The legislature has given one and only one rule on this subject, and every other or different rule is necessarily abrogated. Let it be granted that the common

law allows a term without reference to lives. Any absolute term, however moderate, may last through many lives. Then comes the statute and says the absolute power of alienation shall not be suspended for more than two lives, and this shall not be done *by any limitation or condition whatever*. What then becomes of the moderate term of years? It is abrogated. We cannot hold otherwise without repealing the statute.

ALBANY,
Dec. 1836.

Hawley
v.
James.

Another argument in support of the trust is, that alienation may be suspended upon any event which will certainly happen at a period within the ordinary duration of human life; and tables showing the probable value of life were referred to. This argument does not differ materially from the one which has just been considered. I think it a sufficient answer that it sets up a different rule from that which the legislature has prescribed. Whether the best method has been adopted for measuring the suspense of alienation is not the question to be decided. The statute has given lives as the measure, and nothing else. If we depart from that standard, we depart from the law, and instead of carrying into effect the declared will of the legislature, we put ourselves in their place, and make instead of administering the law.

It is also said that as the statute has given lives as the rule, and as the greater includes the less, we may, at all events, take any portion of human life as minority and suspend alienation during that period. If the testator had limited the trust upon *two* minorities, the argument would have been very satisfactory, for then the trust could not extend beyond *two* lives. But he has created a trust which is to continue through thirteen minorities, and that may amount to as many lives. The question is—not whether the trust probably will, but whether it can transgress the statute rule. It must be so limited in point of duration that it cannot in any event exceed two lives; otherwise it is void in its creation.

There is no way in which we can give effect to the statute but by adhering strictly to the measure of duration which it prescribes. The utmost limit for which alienation

may be suspended must be measured by lives, and there can be only two lives. The lives must be designated. This may be done, either by naming two persons in particular, or else by describing a class of persons and bounding the suspense of alienation by the lives of the two 'first who shall die out of the class. If the two last lives are taken, it is obvious that the suspense will continue for as many lives as there are persons in the class. The limitation 'may be for a shorter period than two lives; it may be for a single life. The estate may also be limited so as to depend on some event besides life; as an estate to A. for ten years if B. and C. or either of them shall so long live. Here the estate may determine either by the lapse of the ten years, or by the death of B. and C., but it can in no event exceed two designated lives. So an estate during the minority, widowhood or other stage of existence, through which two individuals may pass, would be good, because it could not by any possibility extend beyond two designated lives. But life must in some form enter into the limitation. No absolute term, however moderate or however short, can be maintained; and no uncertain term, the utmost limit of which is not bounded by lives, can be sustained. In short, the statute has said that alienation shall not be suspended beyond two lives, *by any limitation or condition whatever*, and any disposition which may work a larger suspense must be utterly void.

We cannot model this will for the purpose of obviating the difficulty. The testator has not said that the trust shall cease on the death under age, of one, two, three, or any other number of the minors; and we have no authority to say it for him. We know not which two of the class he would have selected, or whether indeed he would have rested the term on any two lives in the class. He might have created a trust for the lives of two other persons; and if the term had been for the longest of the thirteen minorities, provided A. and B. or either of them should so long live, it would have been a valid trust so far as relates to the suspense of alienation. It could in no event continue beyond the two designated lives, and might terminate sooner by the ceasing of

all the minorities. But the two lives which the testator might have selected may have fallen already. Those candles may have burnt out. I know of no legal principle upon which we can re-mould the work of the testator. If he has created a trust which may suspend the power of alienation for too long a period, we can do nothing but adopt the language of the statute and declare it " void in its creation." The same question in substance was before the court in the case of *Coster* v. *Lorillard.* There the trust was to continue for twelve lives, and the whole disposition was declared void.

Under this branch of the case, I must notice the argument that the trust to pay legacies and annuities is valid under the 2d subdivision of the 55th section; and inasmuch as trusts under that subdivision are not in terms subjected to the rules prescribed in the first article against perpetuities, it is no objection to this trust, so far as it relates to legacies and annuities, that the power of alienation may be suspended beyond two lives. This is a bold argument and one which fully meets the difficulty. It supposes that the legislature has failed in the effort to control perpetuities, and that by a trust for paying annuitants, the power of alienation may be suspended for an unlimited period.

Under another branch of the case I have already remarked that the testator did not attempt to create a trust under the 2d subdivision; but that he intended to create a trust to receive rents and profits, which if valid for any purpose, must fall under the third subdivision. I have also expressed the opinion that a valid trust to receive rents and profits cannot be created under the second subdivision. But if that opinion is not well founded, I think the ground assumed by the counsel cannot be maintained. The right to create a trust to receive rents and profits is not in terms conferred by the second subdivision, and if it can be made out by argument and inference, it will still be a trust falling within the very letter of the third subdivision, and which is expressly subjected to the rules prescribed in the first article against perpetuities. If the same description of trust may be created under two different branches of the statute, I think it enough that the legislature, when they treat in terms of a

trust to receive rents and profits, have expressly limited the period beyond which alienation shall not be suspended.

But there are other and I think conclusive answers to the argument. The legislature has spoken more than once on this subject, and there is no device by which a perpetuity can be maintained. The last clause to each of the third and fourth subdivisions of the 55th section was wholly unnecessary. It was added from an excess of caution, and to prevent the possible supposition that a perpetuity might be created by means of a trust. It was enough that the statute had once declared that the absolute power of alienation should not be suspended beyond a specified period, and that this should not be effected *by any limitation or condition whatever.* But this is not all. The 36th section expressly provides that dispositions of the rents and profits of lands shall be governed by the rules established in relation to future estates. This alone covers the whole ground. It extends to every disposition of rents and profits without any reference to the purpose to which they are to be applied, and it reaches every trust which the testator has attempted to create.

Having disposed of the first branch of the case, which relates to the validity of the trust, nothing remains but to inquire—

*Secondly.* Whether any part of the will can be carried into effect under the doctrine of powers.

The 58th section of the statute declares, that " where an express trust shall be created for any purpose not enumerated in the preceding sections, no estate shall vest in the trustees; but the trust, if directing or authorizing the performance of any act which may be lawfully performed under a power, shall be valid as a power in trust, subject to the provisions in relation to such powers contained in the third article of this title." It will be observed that an express trust can only be valid as a power in trust, where it is created for a purpose *not enumerated* in the preceding sections. Trusts to pay debts, legacies and charges, *had been previously enumerated.* So also had been trusts to receive the rents and profits of lands and apply them to the use of any person, and a like trust for the purpose of accu-

mulation. As to any and all of those trusts, they must stand or fall as express trusts under the 55th section, and cannot be carried into effect under the doctrine of powers. The language of the statute is, I think, too plain and explicit on this point to admit of any serious doubt. You may create express trusts *for certain specified purposes,* which shall be valid, and be carried into effect *as trusts*—not as powers in trust. But if you create an express trust for any *other* purpose, it may in certain cases be valid as a power in trust.

It is a matter of no moment that the testator has failed to create any valid trust for the payment of debts, legacies or charges, or for the receipt of rents and profits. It is enough that those are purposes for which a good trust might have been created, and no provision for those purposes can be valid as a power in trust. This covers all the objects for which the estate was devised to the trustees, except that of making partition at or near the end of the trust term. Is this valid as a power in trust? That inquiry, in my view of the subject, is all that remains of this case.

It cannot be necessary to go through with the new nomenclature of powers contained in the statute for the purpose of proving that a valid power may be granted to make partition. But the time when the power is to be executed may be very material to its validity. There are no means by which alienation can be suspended beyond the period prescribed in the first article ; and we shall find, I think, the same difficulty on that point, when the case is examined under the doctrine of powers, that was presented when considering it as an express trust under the 55th section, The power can only be executed at the time and in the manner prescribed by the testator. Although the trust falls to the ground, the time and manner of executing the power still remain. By the will, the final distribution is to be made and the conveyances executed " at the expiration of the period herein prescribed for the continuance of the trust." It can only be done when all the minorities shall have ceased ; and if no one can in the mean time convey an absolute fee in the land, then we have already seen that the power of alienation is suspended for a longer period than

the statute allows.  The inquiry then will be, who can alien during the term?  It should be observed that the power of alienation is suspended unless there are persons in being by whom an absolute fee in possession can be conveyed.  § 14. It must be an absolute, not a conditional fee, nor one which is liable to be defeated by any possible contingency,  It must not be an estate in expectancy, but an absolute fee in possession.   I think it quite clear that such an estate cannot be created in the lands of the testator, either at this time or at any other period during the term.  If all mankind were to unite in the conveyance, the object could not be effected.

The trust having failed, the estate descended to and vested in the heirs at law of the testator, subject to be divested by the execution of the power.  § 58, 59.  The heirs can alien their interest, but that is only an interest for a term of years, which will be divested on the ceasing of the minorities and the execution of the power.  Or if we suppose them technically seised of the fee, is not an absolute but a qualified fee, which will be defeated at the expiration of the term.  Who then can convey the residue of the estate ? Can the seven children and two grand-children who are to take the eight and a half shares on the final distribution? In the first place, I doubt whether they take any estate under the will until the actual execution of the power.  But if we may regard their interest under the power as an estate in the lands, they have then, I think, contingent remainders for life limited on a term of years.  If they were by the will to take absolutely under the power, the mere uncertainty as to their living until the time when it is to be executed, would not render the remainders contingent.   They would be vested in interest although they might never vest in possession.   But the persons who may take under the power have as yet no fixed interest.   It is not only undetermined what portion of the estate, if any, they will be entitled to receive— whether one-twelfth part each or a smaller quantity—but whether they will ever be entitled to any thing depends on a contingent event—the decision which the trustees shall make at the end of the term in relation to moral character. Until that decision is made, it is impossible to say that they

have any certain interests which must vest in possession if they live until the time prescribed for the execution of the power. It is not now certain, nor can it be during the term, that they will ever have a right to the future enjoyment of the estate.

But whether the remainders are vested or not, the nine children and grand-children can only convey such interest as they may possibly take under the power ; that is, only a life estate in each ; and the question still recurs, who can convey the residue of the fee ? The persons who are to take the ultimate fee may be, and many of them probably are, yet unborn. They may not be born during the term, nor until an indefinite period afterwards.

For the purpose of illustration, let us take the case of *Augustus James*. If he die during the term, his share is to be conveyed to his heirs at law. Clause 39. This will include not only his present children, but such as may be born before his death ; and if any of his children should die before him, leaving issue, will include such issue. Again : should *Augustus* die during the term, leaving no lineal descendant, his share would in that case go to his collateral relations, some of whom may be yet unborn. Another case may be put : If *Augustus* die during the term, leaving any child who was living at the death of the testator, such child is to take only a life estate under the power. Clause 39, 44. Then all the consequences may follow which I am about to mention as depending on the event that *Augustus* shall survive the term. I might stop here, and it would be impossible not to see that events may happen which would defeat any conveyance which could be made of the estate. But let us suppose that *Augustus* lives until the time prescribed for the execution of the power, and that he will then be entitled to take one share under it. He will have a life estate in the share with power to devise the same in fee to his lineal descendants, in such manner or proportions as he may think proper. Clause 44. This power of appointment not only includes all his children now living, but such as may be born during or after the end of the term ; and

it includes all his unborn grand-children or other more remote posterity that may be living at the time of his death. It follows beyond all room for question, that the fee in his share cannot be conveyed during the term, nor within any definite period afterwards. Again, suppose Augustus dies after partition made, without executing the power of appointment. His share is then to go to those who would take under the statute of descents. Clause 44. This will include all his posterity, however remote, that may be born during his life; and if he leave no lineal descendants, the share will then go to his collateral relations, which may include persons yet unborn, and who may not be born within fifty years.

Without proceeding further nothing can be more clear than that an absolute fee cannot now be conveyed in the share of Augustus. It could not be effected if all mankind were to join in the conveyance; and the estate is so limited that the same consequences will in all probability exist, not only during the term, but long after it is ended. Although it is in the highest degree probable that the power of alienation will be suspended beyond the term, yet the invalidity of the devise does not depend upon that probability. On the contrary, if the estate is so limited that by any possibility the power of alienation may be suspended beyond the statute rule, the limitation is void. In other words, the estate must be so limited that some person or persons in being can convey an absolute fee in possession within the duration of two lives—otherwise the limitation is void in its creation. § 14, 15.

We have already seen that the term is too long—that it depends on more than two, to wit, thirteen lives. If the trusts are void on that ground, so also must be the power in trust. The particular limitation or condition by which alienation is suspended—whether by a trust or a power—can be a matter of no moment. The statute says it shall not be done *by any limitation or condition whatever.* This is strong language, but it is the language of the law. We cannot avoid it by construction—we cannot pass it by un-

noticed—we must see, in this and all other cases, that it is carried into full effect.

The power in trust cannot properly be regarded as a mere incumbrance on the land. Where there is a judgment, mortgage, or other charge of the like nature, the incumbrance may be extinguished by payment or a release. The owner of the land, by uniting with the incumbrance creditor, may convey an absolute fee in possession; but the power under which the trustees are to make partition and convey, is a power to create an estate. The property of the testator goes to his heirs at law, as tenants in common in equal shares until the time arrives for making partition. Then by the execution of the power, the estate of the heirs will be divested, and such of the beneficiaries as have not forfeited their shares, will take new estates in severalty. What kind of fee can be conveyed so long as a power exists by which it may be utterly defeated? It surely is not an absolute fee.

The power by which the new estates are to be created cannot be released or in any way destroyed. It is imperative on the trustees. § 96, 97. All the persons now living, or who will probably be living at any time during the term cannot extinguish the power; nor would the death of all the trustees defeat its execution. § 100. It is an abuse of terms to call such a power a mere incumbrance on the estate.

But let it be supposed that the power can be extinguished. What will be the consequence? The estate is now vested in the heirs at law. Blot out the power, and their interest will immediately become absolute. There will then be no means by which their estate can be divested for the purpose of giving the property to others; and the will of the testator will be as completely overturned as it can be in any other possible mode.

Upon the best consideration which I have been able to give to this case, I am brought to the following conclusions:

I. The trust in relation to its objects and the manner in which it is declared, is contrary to law, and is consequently void.

II. If the trust is valid so far as relates to the purposes for which it was created, and the manner in which it was declared, it is, nevertheless, void on the ground that it is so limited as to create a perpetuity. In other words, the absolute power of alienation may be suspended for a longer period than the law allows. Upon both or either of these grounds, the devise was invalid as an express trust under the 55th section, and no estate vested in the trustees.

III. The will cannot, either in whole or in part, be carried into effect under the doctrine of powers, because this presents the same objection in relation to the suspense of alienation that arises when the case is considered as an express trust.

The consequences which result from the view I have taken of the case, may be briefly stated as follows:

1. The real estate of which the testator died seised, descended to his heirs at law in the same manner as though he had died intestate; and his personal property, subject to the payment of debts and legal charges, belongs to those who, at the death of the testator, were entitled to take as next of kin under the statute of distributions.

II. The annuities are inseparably connected with the trust, and must fall with it. Such was the opinion of the late chief justice in the case of Coster v. Lorillard; and although the rights of the annuitants were saved in the decree, it was for the reason that they were not before the court, and not, as I believe, from any doubt about their invalidity, I do not see how it is possible to uphold the annuities, when the trust on which they depend is overthrown. They are to be paid from rents and profits which will never accrue.

III. None of the directions in the will for making advances to sons and grand-sons, paying marriage-portions to daughters and grand-daughters, nor any of the contingent provisions for minors, widows, and children, can be maintained. The objections to them are fatal, whether they are regarded as trusts or as powers in trust. They are not distinct independent provisions, but evidently resulted from the necessity which the testator had created for guarding his

family against absolute want, after having devised his whole estate to trustees for a term of twenty years.

IV. The $10,000 directed to be paid to James King by the 38th clause of the will, is but a part of the general distribution, and must fail with other provisions of the same character; and besides, this portion is to be carved out of the share of his daughter which wholly fails. She will take as heir at law, and not under the will.

V. There may be more room for doubt in relation to the $50,000, given to the children of Augustus James, and the $20,000 each, given to Anna McBride James and Lydia James by the 36th clause of the will. Lydia James will take as heir at law, and cannot also take under the will. But independent of this consideration, these provisions all depend on the trust—the payments are to be made from rents and profits which will never arise. If they are to be regarded as a part of the trust, then they necessarily fall with it. If they constitute a part of the final distribution under the power in trust, then, like other provisions of the same character, they are objectionable on the ground that the power of alienation is suspended for a longer period than the law will permit. I should be glad to uphold the provision for those grand-children who will not take as heirs at law, because they seem to have been favorites with the testator; but I am unable to discover how it can be done consistently with the views which I entertain of the law of the case.

VI. The several legacies of $3000 to the children of Jeannette B. Gourley, $1000 to John James, and $2500 *to the society for the relief of orphan and destitute children,* I regard as valid. They are distinct independent provisions which do not necessarily depend on the trust which the testator attempted to create. The provision for orphan and destitute children is in the first instance given in the form of an annuity of $150, but that was only to continue until the trustees should find it convenient to invest the sum of $2500, in some public stock which was thereupon to be transferred to the managers of the society. I think this may properly be regarded as a legacy equal in amount to

the sum which the trustees were directed to invest; and as such it is valid. The debts of the testator and the three legacies should be paid out of the personal estate; and the residue of the fund, after all just allowances to the trustees and executors, should be distributed among the next of kin to the testator.

I have now gone through with all that I think it necessary to say in relation to this case. Although I came to the examination of it, strongly disposed to uphold the will, I am fully persuaded that it cannot be done consistently with the rules of law. If others entertain the opinion that the trust can stand, or if, in any other form, they can give effect to the intent of the testator, I shall not regret it. For myself, I have followed where the law seemed to point the way, and if I have not mistaken the path, the disposition made by the testator of his estate is contrary to law, and consequently void.

So much of the decree of the court of chancery as declares the trust or the powers in trust valid for any purpose, should, in my opinion be reversed, and a decree should be entered in accordance with the principles which I have mentioned. If payments or advances have been made to any of the beneficiaries, in part execution of the trust, they should account for and refund those moneys on the distribution of the personal estate. I presume no one has received more than will fall to his share as one of the next of kin to the testator.

The trustees have undoubtedly acted in good faith, and all their acts should be ratified and confirmed. For that purpose the court of chancery may direct releases and conveyances by the heirs at law, should it be deemed necessary. The trustees should render a full account, and should have all just allowances, including compensation for their services and all necessary expenses. The costs of all parties to be taxed should be paid out of the personal estate; and the court of chancery should be directed to carry the decree of this court into full effect.

By Mr. Justice COWEN. From the decree made by the
chancellor all the parties have appealed and urged upon us
arguments favorable to their various and conflicting interests.
In passing upon these appeals I am so unfortunate as to dif-
fer from my learned brethren of the supreme court. They
do not agree with the chancellor in sustaining the more im-
portant provisions of the will. Before hearing their opin-
ions, in a course of examining this decree and considering
the objections made to it, I had encountered little difficulty
in reaching the conclusion that the will should be maintained
at least in the full extent to which it was declared valid by
the court of chancery. It is certainly with diminished confi-
dence that I still adhere to the same opinion.

It is insisted by the heirs in the first place, that the trust
term and devises, if otherwise valid, are yet void as being
intended to subserve the illegal purpose of accumulation;
that this prominent object of the will being condemned by
the statute, and therefore invalid, the whole instrument is
destroyed. The case was likened on the argument to a
deed, one provision of which is intended to defraud creditors.
In such a case it is true, the whole deed is a nullity, and
even its honest provisions cannot be saved, 'The statute,
however, cuts down the whole as a punishment for the fraud;
and the courts give it a very liberal construction with a view
to remove every obstacle in the way of redress to the injured
party, There are similar statutes against usurious contracts
and gaming contracts, which are construed in the same way.

Such statutes declare the instrument itself, not any particu-
lar provision contained in it, to be void and of effect.
They are like the old act of 23 Hen. 6, c. 9, declaring a
bail bond to the sheriff void, if taken for any thing beside an
appearance at court. The reason given in *Norton* v. *Simmes*,
Hob. 14, is that " the letter of the statute is so." It needs
hardly be said, that a statute restricting the power to sell
or devise property stands on a widely different ground.
There is, however, an authority in point to show that this is
so. Both in England and in this country we have enactments
called statutes in mortmain, which declare conveyances of
land to corporations void. One of these statutes in England

declared conveyances for charitable uses absolutely void, unless made a year before the death of the donor, and attested and enrolled in a particular way. A deed of land for a charitable use was made in direct violation of the statute; but it also purported to convey other land which the deed would have clearly carried if for that only. The objection was made that all was void under the statute. The Lord Chief Justice Gibbs, in adverting to that objection, said it was admitted that if it were a case at common law, that would not be the consequence; for then it would be void as to so much only as falls within the objection, and good as to the rest. " The truth is, there is no difference between a transaction illegal at common law and by statute; and the objection being that this deed conveys property in a way that is prohibited whether by the common law or by statute, the construction is the same. Taking it to go no further than as I now state, it follows that that which conveys illegally is void, and that which conveys legally is valid. A statute, when it prohibits a thing, may go further, and say that the *deed* by which it is done shall be void, and then a court of law must decide that it is void to all intents and purposes, because the legislature has said so." In this opinion the court agreed. *Doe ex dem. Thompson* v. *Pitcher*, 2 Marsh. 61; 6 Taunt. 369, S. C. The cases of *Howe* v. *Singe*, 15 East, 440, and of *Adams & Lambert*, 4 Rep. 104, 111, are full to the same point. The chancellor has done in the case at bar precisely what was done by a court of law in *Doe* v. *Pitcher*. Instead of confining accumulation to his numerous infant devisees, the testator joined two or three adults with them. This the statute had forbidden, in the 37th section; and the 38th section declares all directions not in conformity to the previous one, to be void. It does not declare the will to be void, but only the illegal direction. The chancellor has done the same. He has acted in the conservative spirit of the common law, which maintains as far as possible all assurances and other acts intended to pass a title either in real or personal property. *Doe* v. *Pitcher* was the case of a *deed*, and I need not stop to show with

how much greater reason the same benign construction ap-
plies to *wills*, which are usually drawn up *in extremis* by the
hand of some unlearned person suddenly called in, and acting
without the aid of counsel. The same principle applies,
though the devise of the 3½ shares fails as being too remote
and uncertain in its objects. The devise to Mrs. James failed
for another reason, simply because she refused to accept it.
Other very common heads of partial failure are lapses,
ademption, satisfaction, uncertainty arising from mistake of
names, of title or description. These and the like may avoid
the will *pro tanto*, but never in those parts which are sound.
It is a new doctrine, that because a testator has mistaken his
powers in one particular, he thereby disables himself to make
a valid devise in all other respects. A man devises his own
farm, together with all his interest, as the heir of his father
who is yet alive. The latter *is void.* Does it follow that
the devise of his own farm *is also void?*

Let us pursue the argument a step farther. It is simply
that a failure in one part of a will defeats the whole, and
lets in the statute of descents. Those who think so are
certainly to be admired for great boldness and originality of
conception, and their happy escape from those legal maxims
which have heretofore allowed something to human frailty.
Formerly, though a man might commit a mistake in one
part of his will, he had some reason to hope for the salva-
tion of other parts. Suppose Mr. James had devised the
3½ shares to one of his sons by a wrong name; the devise
must have failed, but the mistake would not affect the de-
vises of the 8½ shares, where all the devisees were correctly
named. Suppose the trustees and executors had all been
misnamed so that the trust term had failed, the devises or
administration would not fail for want of form. If trustees
were necessary, the chancellor might appoint them; and
the surrogate could appoint an administrator *cum testamento
annexo.* When Mrs. James renounced the devise to her
and took one third of the real estate, the general residuary
devises were all impaired; yet it has not been contended
that such partial failure should destroy the will. Suppose

one half the devisees had died before the testator, one half the devises would have failed by lapse: yet such a circumstance was never holden to affect the residue. In any of these cases, whatever devise may fail, the subject takes the direction which the chancellor gave to the 3½ shares; it descends to the heirs. Suppose the testator had converted his whole estate into stocks of different banks, bequeathing the stock in one bank to his son John, in another to Edward, and so on to each legatee specifically, and before his death he had sold out all his stocks in one half the banks; one half the legacies would then have failed by ademption; yet the other stocks would pass to the legatees, while the proceeds of those which were adeemed would go to the next of kin under the statute of intestacy. I shall not stop to show that a partial failure from mistake in the creation of an estate or interest would be no more fatal than a failure from any other cause; nor am I aware of any middle ground, where we can select one valid distinct part and reject another. The same principle which would save the legacies even to the orphan asylum and to Mrs. Gourley's children, will save the valid devises; and the same principle which would repudiate the latter would reduce this whole will to a *tabula rasa*. These few rules and illustrations will, I apprehend, be found applicable to most of the objections raised against the decree.

It is insisted that the trust term is utterly void, as being illegal in duration, illegal in its objects, and uncertain in the clause of limitation. I shall have occasion by and by to insist that it is valid and yet innocent. But if it were void, it would only change the mode of doing the business under the will. If every thing relating to the express trust be void, that certainly cannot stand in the way of the principal devises. What is an express trust? It is in substance but a power. It carries no beneficial interest to the trustees. The main object of the will is to pass the estate to the devisees. If there be a valid express trust in the way, let it expire; if there be none, the interest either passes at once to the devisees, or that which was meant for the trustees descends to the heirs at law, until the time comes when the devises are to take effect. If the trust be out of the way,

then every thing is alienable subject to the devises, and these we shall see are not too remote. It would be somewhat strange if the failure of a mere form should avoid the substance. The trust term is not at all essential. It may be convenient, but surely both law and equity must be very weak if they cannot effectuate a plain intent to devise land, because the trust term is put out of the way. It seemed to me throughout the argument, that too much consequence was allowed to what is mere form. Take the worst side of the case for the will: suppose the term to stand, and suppose it to be inalienable, what is its amount? I confess I was hardly prepared, after the statute had nearly abolished uses and trusts, § 45, to find a trust term springing out of the 55th section, and taking its place among the primary provisions of a will such as this is. I was rather led to suppose it would come in collaterally, and, quietly ministering to creditors, legatees and pensioners, leave the rest of the estate free to pass under the principal devising clauses. It appears to me that the statute contemplated this effect. True, the relative importance of the trust must always depend upon the amount of the fund which it has in charge. The present, so far as it can stand for the purposes of a technical express trust, after having been despoiled by chancery of its power to accumulate, and tied down to the mere payment of charges, dwindles to a very slight incumbrance. Dismissing what are mere trust powers, in no way affecting the legal estate, and supposing the debts to be extinguished, the current charges would be so inconsiderable as to leave about a million yet remaining, and clearly devisable or descendible, subject to the execution of the trust. True, the statute declares that the interests both of trustee and *cestui que trust* are inalienable, § 63, 65; and that every valid creation of a trust shall vest the whole legal and equitable estate in the trustees, § 60; yet the legal consequences of this declaration can only be complete as between them. The 61st section enacts that any person creating the trust may still declare " to whom the land to which the trust relates shall belong, in the event of the failure or termination of the trust;" nor shall he be prevented from granting or

devising such lands subject to the execution of the trust. Every such grantee or devisee shall have a legal estate in the lands as against all persons except the trustees and those lawfully claiming under them." The 62d section provides that such land not being granted or devised, all the interest beyond the trust incumbrance shall revert to the grantor or descend to the heirs as a legal estate. Were this not so, the law would many times absolutely displace the owner of a large estate, or his heirs or devisees, by a creation of the most trifling trust. All the trustees ever want is a sufficiency to pay charges. They can have no more. The trust is like a mortgage or rent charge, and so long as the instalments are paid, the general owner retains the possession. If the trustees are met by him with the money in his hand, at pay day, is it possible that they still have a right to maintain themselves in possession for the sake of the possession? Would the law favor such officiousness? Suppose that in the case at bar, the heirs and devisees should pay off all debts and legacies from their own pockets, and stand ready and able to meet the current charges during the trust term; would this million estate be so strongly grappled by a trust for small annuities and contingent advances as to leave no room for the lawful proprietors of the residue? I speak not now of the powers in trust to sell and exchange, to invest, to receive and disburse for the benefit of the proprietors. These are mere agencies or liens holding no pretensions to legal ownership. If the testator choose to place able stewards, with trust powers, in the management of his estate, that will not prevent its alienation; but I speak of that small fraction of power which lies within the 55th section, that pigmy representative of the great civil law family of express and direct trusts. It will be seen to have maintained its ground with great difficulty in the court of chancery. Its main principle of validity in that court lay in the necessity, or rather the propriety of its service, in providing for the payment of legacies. By this time it has doubtless tapered down to the smaller office of paying a few pensions and waiting upon contingent advancements which will probably never arise. On the whole, I cannot bring myself to doubt

but that this trust will, in due time, come to be regarded by our courts as a mere lien, sometimes inalienable to be sure, from its supposed eleemosynary objects. These being answer or provided for, the owner of the body of the estate may enter upon the actual enjoyment of his property. The statute expressly declares, in the 67th section, that " when the purposes for which an express trust shall have been created shall have ceased, the estate of the trustees shall also cease." Why, may I not ask, shall it not be deemed to have ceased, if every thing be paid which is payable? why not, if an ample fund has been provided, charged with the payment from time to time, of what is not extinguishable for want of consent on the part of annuitants or pensioners? All that is technical and embarrassing in the trust, may thus be put out of the way of the 'devises, if it was ever in the way. That would substantially answer all the purposes of the trust, and it would *pro tanto* be at an end within the statutory provision. Is the court of chancery so impotent, that it must sit still and see the devises of an ample estate. which would be otherwise valid, crushed under the weight of form? If, in running over the diversified objects of this trust, some charitable provision may be found which the donee cannot alien, is it in keeping with the great principles by which that court governs itself, to let the substance flee before the shadow? What does that court profess? To correct the law in those respects wherein, by reason of its universality, it proves deficient; and above all to prevent forfeitures. I repeat, if there be any interest, in any one or more of these beneficiaries, which shall be thought inalienable, are the substantial limitations of the will for that reason to be subverted? I answer, no. Set apart an adequate fund for the security of the beneficiaries, and leave the body of the estate free to its lawful owners. It is the peculiar office of equity to deal with trusts ; to avert their mischievous consequences, and mould them to the purposes of convenience. If the limitation to a beneficiary be too remote in itself, that alone may be declared void ; so if it be bad for any other reason ; but though that may fall, it does not ne-

ALBANY, Dec. 1836.

Hawley v. James.

cessarily drag the other independent bequests and devises along with it.

But with great deference I deny that any thing pertaining to the trust term now in question is inalienable. I have no doubt, it may be retained for all the purposes ascribed to it in the decree, and yet not be in the least mischievous by way of perpetuity. If so, the question of perpetuity will be left entirely upon the devising clauses of the eight and a half shares; and a glance at these will, I think, show that the testator has not, in this respect, exceeded his powers. After creating the trust term, he has directed that by the time it shall expire, the nett amount of his estate which is to be converted into real property, shall be divided into twelve shares. Eight and a half of these are disposed of specifically and in severalty among nine devisees; and the remaining three and a half are to go according to the award of the trustees among all the various objects of his testamentary bounty. There are also several persons who are to take large but more definite portions of the estate. All are limited in nearly the same style of expression for lives or in fee upon contingencies, to be holden in severalty or in common according to the different stages of remainder. The chancellor, in declaring the legal frame of the estates, has placed the trust term in the centre; whence each of the devises, or separate interest, radiates from life to life in its own line, till it either ends in a fee, or fails from the remoteness of the object and sinks into the *residuum*. Looking along these several radii, we shall see that none of the limitations can exceed two lives in being before they end in a fee, excepting those of the three and a half shares. As to the eight and a half shares, the main body of the estate, and the special object of this appeal, I cannot perceive that here are contingent limitations depending on more than one life in being, if we exclude the substituted remainders. It is proper to observe that each twelfth constitutes an estate by itself in the contingent devisee, which must terminate in a fee on his death. Each of the nine devisees has an estate in severalty dependent on his own life, and that only under this decree.

Take the line which runs off with a twelfth share into the family of Augustus James. He takes for life, if he outlive the contingency; and the estate goes to his special heirs, if he do not control it by his allowed power of appointment. This limitation is a fee after one life in being. If he die before his estate shall vest, the substituted remainder being out of the way as involving too many expectants of a life estate, the land will descend to the general heirs of the testator in fee. We then have but one contingent life estate in the several eight and a half shares; which, if the trust term be disentangled from the restraint of inalienability, is indisputably warranted by the statute. We have but a single candle to burn out. The statute allows us two provided they have already passed the mould. The devises are all of them perfectly good. If bad, they must be vitiated by the trust term. If that be alienable, then *it* is good, and it is equally innocent. Now, on this question let us take it that the whole estate in this vast property is vested in the trustees, both in law and equity, and that the persons benefitted take no estate or interest in the lands, but can only enforce their right in equity. This is the language of the 60th section. Every sale by the trustees in contravention of the trust shall be absolutely void. § 65. These provisions extend to all the trusts of the 55th section, and all the express trusts allowed by law. The only trusts under that section, material to this discussion, are, 1. To sell, mortgage, or lease lands for the benefit of legatees, or for the purpose of satisfying any charge thereon; 2. To receive the rents and profits of lands, and apply them to the use of any person, during the life of any person, or for any shorter term. Now at common law and in common experience, all these interests can be sold out; not by the trustees. That never could be done honestly in violation of their trusts; but by joining with the *cestui que trusts*, a sale might be honestly effected. At common law all vested interests, legal or equitable, may be aliened. But the 63d section is, I admit, a restraint upon the common law right. My object is to inquire how far? That section is, " That no person beneficially interested in *a trust for the*

*receipt of the rents and profits of lands*, can assign or in any manner dispose of such interest; *but the rights and interest of every person, for whose benefit a trust for the payment of a sum in gross is created, are assignable."* Under this statute, a naked interest in a trust for the 'receipt of the rents and profits of land cannot be assigned; but any trust for the payment of a sum in gross creates no perpetuity. To disqualify the beneficiary, the trust must be simply to pay over rents and profits. Such was the case upon Lorillard's will. Had the trustees in that case been created with a sole view to raise money and pay charges on the estate, whether by way of debts, legacies, or annuities, it is quite plain that the will would have been sustained by this court. The annuities were perfectly legal in any view. They were an independent creation of the will; were mere legacies, and as much entitled to protection as the legacies to the churches. I will only premise, before looking more particularly at the provisions of Mr. James's will, that if the beneficiaries can alien, then the nature and frame of 'the estates allowed by the decree are not only valid, but common and familiar to the mind of every experienced conveyancer. Any one may, at a glance, see an almost exact model of this term with its remainders, in the case of *Stanley* v. *Stanley*, 16 Ves. 491, 505. What is there then in the case at bar which comes within the disqualifying clause of the statute? The trust for accumulation is gone. The rents and profits of the eight and a half shares never could belong to the express trust in any other way than as a part of the accumulating fund. When that was adjudged to be void, they were taken entirely out of it, and carried over to the eventual takers by operation of the statute. The 40th section declares in terms that if the trust for accumulation of moneys to arise from the suspended estate fail, the rents and profits (instead of descending as before to the heirs at law) shall belong to the next eventual taker or presumptive taker. There is then no trust in the matter. The persons presumptively entitled have a right to demand the rents of whomsoever may receive them, as money had and received to their use  If they happen to come into the hands of the

trustees, they are liable as any person would be, to pay over moneys received by him, belonging to another. They can be charged on the implied trust; or perhaps they may still retain a trust power. The testator alone could render the right to moneys inalienable, by himself creating a trust in a particular form. When the statute declares money arising from the income of real estate to belong to another, surely the 63d section never intended to disqualify the taker. The testator does it for reasons of his own. He has an unthrifty son, or an unfortunate daughter married to a man who runs in debt. He dare not give the land or money directly, and he, therefore, doles it out through trustees; or he does this for some other reasons satisfactory to himself; some prudential family considerations. He may do so to a certain extent, and the law will disqualify the taker. But this reason has no application where rents and profits are given by law to the person next in estate, or where they descend to the heirs at law. The three and a half shares are also out of the trust, and the whole, rents and all, have gone to the heirs. They are not within the 63d section.

We now come to what is within the express trust. Let us take it that there is an express trust in the will for the payment of debts. They are a charge upon the estate; and are directed to be paid out of rents and profits. I have no doubt it will be granted me that the creditors of this estate may all sell out, if they are not already paid off. Give them their money, and they will assign to you, or release their debts, and discharge the trust. They are not within the 63d section. Yet they are *cestuis que trust*, having an interest in a trust for raising and paying over rents and profits; a small interest; merely a collateral security. Their debts are safe without such a provision. The legacies, too are given entirely independent of rents and profits of land. They are, by the 4th section of the will, $3000 to the testator's wife for the benefit of Mrs. Gourley's children; by the 12th section, $1000 to John James; and by the 13th, $2500 to the orphan asylum. These are independent bequests and payable at all events. Will any one

say they cannot be sold out, if they are not already paid? They are secured by a general charge upon all the property of the estate, through an express trust; but that is only collateral. Give the legatees their money, and they will assign or discharge the trustees. All obstacle is thus removed. Certainly the alienation of land can no longer be impeded by a legacy when that is discharged. The only thing of any consequence which remains to the express trust, is the duty to raise money and pay the annuities. These, too, are independent legacies given by the early sections of the will. The 7th gives William $2000; the 8th to Henry $1250; 9th to Catharine Tillman $125; 10th to Charlotte James $100; 11th to Susan Duffy $200—in the whole, nearly $4000 in life annuities. These are legacies which were payable at all events out of the estate; and were directed by the chancellor to be finally charged upon the whole land. They are also doubtless charges upon all the estate of the testator, real and personal; and it is remarkable of all the legacies including annuities mentioned in the will, that they are not made payable out of rents and profits alone. All the moneys and personal property of the estate are charged as well as the rents and profits. They are all put upon the same footing with debts. By the 15th clause of the will, the testator declares that the specific legacies and annuities are not to be considered as charges upon his real estate. He proceeds immediately to declare that they shall be paid out of the rents and profits of his estate generally, without discriminating between real and personal estate, and all his debts are to be paid in the same way. If rents and profits should prove inadequate to the payment of all that he had charged upon the estate, he directs other funds to be resorted to, or temporary loans to be effected; but all encroachments on the capital are to be reimbursed by rents and profits. He nowhere confines the term rents and profits to his lands; but appears to group all the income, of his estate, real and personal, as the primary fund. No doubt the trustees had a right to take from the income of the personal property, if they choose, in the first instance,

to keep down the arrears of annuities. Thus the fund itself is not within the 63d section. That relates to rents and profits of lands alone; not the profits or income arising from personal estate, or that in connection with land. But this by the by. The annuities are sums in gross, created by the will; and are, therefore, assignable within the very words of the exception in the 63d section. In other words, they are disconnected and independent sums absolutely due, and in no way governed in amount by the rents and profits of land. The will bequeathes them out and out, and then afterwards creates a general fund to secure their payment. It is of the nature of an annuity, that it is grantable by the holder at common law. It is real estate, and not merely assignable in equity like choses in action. A deed of conveyance passes the legal right. Any or all of these annuitants might thus assign their interest; or they might release to the estate of the testator. What then that is inalienable remains of the trust? Nothing for the present. The debts and legacies, including annuities, are all assignable, and may be bought in by the owners of the land. So far then there is no perpetuity in the matter. What business has the express trust to do? When all its objects are gone, it ceases to exist by the express words of the statute. Thus the whole land is completely disentangled of every thing except the contingent life estates, and they are lawful. Every thing may now be aliened which the law requires should be alienable.

Certain contingent provisions and advancements, of an extremely remote and improbable character, remain to be considered; and the very circumstance that they are future and contingent takes them all out of the trust term. In this I understand both my learned brethren to agree with me. A more distinct attention to them will show that they cannot in any sense be brought to subserve the argument based on the ground of perpetuity. The power given by the 43d section of the will, to settle annuities for life on such persons as the trustees should pronounce unworthy to share in the devises, has not been supposed by any one to come within the express trust, as limited and defined by the

55th section of the statute. It is at·most a mere power in trust, to fix the amount of annuities and charge the estate in respect to the actual wants of such, among the living expectants of the eight and a half shares, as may be adjudged too improvident, or too vicious, to deserve a share in the testator's bounty; and such annuities are to be charged on the particular share which would otherwise have gone to the annuitant. Such is the limitation fixed by the chancellor, and it accords with the principle upon which the estates in the shares themselves were limited. These annuities cannot come into existence until the trust shall have gone by the lapse of time. In no sense do they constitute an interest in the rents and profits which are inalienable within any objection raised here. The contingent advances to sons or grand-sons for the purposes of settlement in business, and to daughters and grand-daughters as marriage portions authorized by the 31st, 32d, and 33d sections of the will, if valid, would have been sums in gross, alienable like other property and extinguishable by payment or release. They are, however, struck out of existence by the decree, with two or three exceptions. It is enough that all such rights are, in their own nature, clearly extinguishable by purchase at any time. The hand and seal of the legatee would at once free the estate from all embarrassment so far as his claim is concerned.

What yet remains to bar all access of this vast estate into the world of commerce? It is answered, that by the 29th and 30th clauses of the will, and the 21st section of the decree the trust is still reserved ,to provide for the testator's minor children, if his·wife should die, and the widows and children of any of his sons, and the children of his daughters, who may die during the term, if the latter provisions should become necessary. Will, § 29, 30. Decree, § 21. These stand secured under the decree, by a charge on all the income of the trust property, real and personal. Decree, § 21. For the testator's children, the will directs a provision during minority out of the rents and profits of the estate, for education and support, according to their several ages and exigencies.

I have already noticed that the rents and profits of the whole estate include income from personal as well as real property. The provision does not, therefore, in point of subject matter, come within the disqualifying clause of the 63d section. That relates to an income measured by and coming from rents and profits of land only. It never could have intended a provision from an estate at large to be advanced, as here, by guardians for the sustenance of their wards. Nor does the case come within the office of an express trust as defined in any part of the 55th section. The tuition and custody of the minor children are, in a certain event, given to the trustees; that is to say, they are appointed guardians *quoad hoc*, and then incidentally they are to cause a suitable provision to be made out of the rents and profits. The case in the 55th section is a simple trust to receive and disburse rents and profits, and apply them for the benefit of the *cestui que trust* during life or a shorter time. But all the other branches of the trust being disposed of or disposable, even were we to admit that this trust for minors comes within the disqualifying clause, it will not, even when joined with the life estate in remainder, exceed the term allowed by the statute. Each child is interested in the provision for his own benefit, as a property in severalty, only during his minority, which cannot exceed a life in being. It must cease with his minority; then the estate goes over for but another life in the remainder-man. Both together cannot exceed the two subsisting lives allowed by the 15th section of the statute. I am clear, however, that the case is no more than the ordinary one of general guardianship, and is neither within the words nor the spirit of the restriction in the 63d section. The incapacity to alien arises from the mere incidental circumstance of infancy. The right to such a provision by an adult might be released or assigned. In the 30th clause of the will, which provides for widows and children, rents and profits are neither mentioned nor alluded to. A gross provision is to be made out of the estate, by allowing a sum not exceeding $1500 per annum to a widow and children, or the children of a deceased daughter. I will only say the construction must be entirely gratuitous which

should include such a provision within the disqualifying clause of the 63d section of the statute. All these provisions in favor of widows and children are entirely contingent, and the latter remotely so. Looking at the ample support afforded by the shares of this estate which have already come to the hands of the children, by descent and distribution under the decree and in various other ways, it must be the extreme of improvidence or misfortune which, during the trust term, shall reduce the widows or children of any of the recipients to a state of dependence upon the general fund. On the whole, neither of these contingent provisions are in any view the subject of an express trust within the 55th section of the statute; but they are not for that reason invalid. The 58th section declares, that when power is in terms sought to be annexed to an express trust which is not authorized by the preceding sections, it may still be valid as a power in trust. The trustees standing also in the character of guardians and executors, ample authority may be found in the law, under which they can carry out these provisions, without a resort to the shelter of the express trust. It is proper to observe that this will enures in various ways. It devises an express trust, with remainders in the real estate under the limitations fixed by the decree. It confers very extensive powers in trust, and superadds all the other authority implied in the office of executors. I have already noticed the contingent guardianship of the minor children. In fixing a construction and directing the execution of the will, it was not necessary, in the view which the chancellor took of the trust term, to examine with much minuteness in what character the power was to be executed. For him it was sufficient that it pertained to the trustees, either in one capacity or another. So far as any duty is to be performed by these trustees, in respect to the real estate, the more important portion will be found to range within the statute concerning powers in trust, § 94, 95.

But it is objected that a power in trust suspends alienation. The law is clearly otherwise. Section 58 declares that no estate shall vest in the trustees; and section 107 declares it to be a lien or charge on the land, after being duly

ALBANY,
Dec. 1836.

Hawley
v.
James.

recorded. The land is completely in market, subject to the lien; and the *cestuis que trust* can, by transferring or releasing their interest and joining the trustees, alien the whole estate, subject to the life contingency; but if otherwise, the only power in trust which is open to the objection of perpetuity, is that for awarding, distributing and conveying the several interests devised. It must therefore be measured by them, and cannot exceed a single life in being, in respect to each estate. When shall a suspension of alienation be said to arise? It is when land is so clogged that if all the world should join in the most apt conveyances, yet the fee could not be sold. I have shown that the whole of the estate devised may be sold, by proper instruments of conveyance, except those parts which are severally hung up on the contingency of a single life in each taker; and that the law allows. The statute gives more; a suspension may run through two subsisting lives. I deny that there can be a technical suspension of interest in a vested estate, coming within the notion of perpetuity, except in the single instance under the 63d section; and that is to my mind entirely out of this case. Are we to be told that a mere lien tends to create a perpetuity? What is to become of mortgages and judgments and rents and annuities charged on lands, payable at remote periods, in long instalments, and some of them running out into a fee? All these are liens, but they can be sold out. By joining with the general owner, the whole land can be sold. If we depart from the meaning of the word perpetuity, in the technical sense of the term, I know not what it may not be made to signify. Infancy or lunacy may by and by be objected, because they prevent the owner from aliening for a period more than two lives in being. Any temporary disability to sell, will next be brought in, and counted in the line of perpetuity.

But it is supposed that the trustees are so firmly fixed in their seats, that after all the interest of the legatees, annuitants and other expectants are bought out, and their rights released tó the general owners of the estate, the express trust is not yet ended; that the trustees still retain all their legal rights, deeply rooted as ever, and flourishing to the end of

the term. Surely that must be a singular trust, which can exist after the rights of its beneficiaries are all extinct. It is said the trustees cannot alien in contravention of their trust. There is another reason now why they cannot alien; they have nothing left. The 67th section of the statute provides, as mentioned before, " that when the purposes for which an express trust shall have been created shall have ceased, the estate of the trustees shall also cease." Such, too is the common law, and such is the reason of the case. They never had any interest for their own sakes; they cannot hold a sinecure in the land, after that is discharged of all they had to pay.

We were admonished at the close of the argument, that unless we so construe the 63d section as to prevent the alienation of all interest in rents and profits which may arise out of an express trust in any form and for any purpose. that branch of the section which takes away the power of assigning may be evaded. I certainly entertain no fear of such a consequence. People are sufficiently fond of tying up their property in the hands of their donees. There is no need to countenance them in this, either by statutory provisions or judicial construction. It is enough that they have power, in a particular form, to prevent alienation for two lives in being. Their fondness for doing that and even more is evinced in Lorillard's case. This court certainly went far enough when they held that a man may arbitrarily, and without the reason which influenced the passage of the 55th section in its original form, withdraw all his land from market by a vested estate for two lives in being. If our large landed estates are to be locked up and secured at the pleasure of the owner, he ought to be holden with great strictness to the forms of the trust. If he depart from that form the grantee or donee should have the suspending power to alien. That such an extensive power exists at all to suspend alienation, is owing to mere inadvertence in legislation. It was the enlargement of the 55th section, without a corresponding alteration in the 63d section and 'other collateral provisions. That was shown in the history of this branch of the statute as given by the present chief justice

in the case of Lorillard. Beside, that statute is in derogation of the right which every man has at common law to alien his property. Upon every principle it should be construed with great strictness. It places the fund, to a certain extent, beyond the reach of creditors.

I have not entered upon the inquiry whether 20 years and 10 days, the limitation of the trust term by the chancellor, be in contemplation of law, more than two lives in being; whether that be so or not is immaterial, if the term work no suspension of alienation. I have felt no doubt that the chancellor's construction, upon the words of the clause limiting the duration of this term, is the sensible one, and that there is no such uncertainty as to render it void for that reason.

In conclusion, I have not been able to satisfy myself that the first remainders for life in the $8\frac{1}{2}$ shares are vested; nor, consequently, that the substituted remainders are valid. The trust term is valid, and the limitations of the $8\frac{1}{2}$ shares are valid as contingent remainders. Each remainder in fee must vest, if at all, during or at the termination of the single life in being of a person who is exactly named and described. On the death of such person previous to the contingency, the whole interest of that person fails as to the share which would otherwise vest in him, and the share descends in fee to the testator's general heirs, and thus becomes alienable. If the person survive till the remainder in that share vests, there is a contingent remainder over in fee to his special heirs, which must also vest at the termination of the life of the first taker. Thus alienation is suspended but for a single life at the utmost. Looking at either event, the life or the death of the several devisees named, the estate of each must become alienable within the compass of his single life. That life began to run on the death of the testator. In the mean time, all the interests connected with the trust term remain mere incumbrances, extinguishable in various ways; at least there are none of them within the disability imposed by the 63d section of the statute. Any circumstances of suspense arising from infancy or temporary con-

tingency are but incidental, and tend no farther towards the creation of a perpetuity than the like inability of any other incumbrancer.

On the other hand, if the express trust be void as such, and the term for that reason, expunged, the same consequences must follow in another form. All the authority of the trustees would still be maintainable as trust powers, or in their character as executors or guardians. If the term be gone, then there is nothing left which can suspend alienation beyond the single life in each estate. That still begins to run at the death of the testator, and all the estates revolve in the same compass of time and contingency. If the term be gone, there is no legal estate immediately vested by the will. The life estate and the estate in fee which follows it are more properly executory devises; but the suspense of alienation is exactly the same, being measured out by a single life in being. Such a devise is unquestionably valid. There never was need of a precedent estate to sustain an executory devise, and the statute, § 10, seems to have extended the same doctrine to a deed. The trustees may still perform the same office of awarding, and of conveying at the expiration of the time of 20 years and 10 days. The land, in the mean time, would formally descend to the heirs until the expiration of that time, for it has now ceased to be a technical term; but the whole is a subject of dealing in the market, except what hangs on the single life. If that falls in before the time expires, the share is gone to the general heirs, and so becomes alienable. If the life holds out, it takes its own vested estate, which at the death, goes over in remainder to the special heirs in fee.

The difference in the result is merely formal. If the term be void, the devises for life of the eight and a half shares to the nine devisees named are most clearly valid. If the term be maintained, as I feel satisfied it may and perform all its offices without a violation of the statute, the devises are also good in the form allowed by the decree.

A single remark is due to the imperfect and obscure manner in which I may have expressed some of the arguments by which I have attempted to sustain the decree. Although

the attorney general of the United States devoted the last day of his argument to showing that the *cestuis que trust* could alien, yet the idea was comparatively new to the cause. He remarked that in the multiplicity of points originally introduced, that ground was inadvertently omitted in the discussion before the chancellor. I sincerely regret that this was so. Looking at the great power of arrangement and elucidation displayed by the chancellor in the primary examination of this will, I cannot but see how much more readily the mind would have been led to the adoption of a position so conclusive in its results, when presented, enforced and illustrated by the same master hand. My regret is increased, because it has been with me a favorite maxim, that wills and deeds should be sustained wherever they can be, and as far as they can be, not only against cavil, but against doubt ; and especially where I think doubts may be removed by a more clear and full view of the case.

I am for affirming the chancellor's decree throughout.

By Senator MACK. An examination of those portions of the revised statutes which treat of real property, in connection with the notes of the revisers thereon, is calculated to convince even those who are unacquainted with their history, that they were designed to embrace all the rules of law which should thereafter govern and control the *title*, the *possession*, the *alienation* and *inheritance* of real estate. The preamble to this portion of the statutes, 1 R. S., 717, declares it to be " expedient that the several statutes of this state relative to the acquisition, the enjoyment and transmission of property, both real and personal, the domestic relations and certain matters connected with private rights, should be consolidated and arranged in appropriate chapters, titles, and articles ; that the language thereof should be simplified ; and that omissions and other defects should be supplied and amended." Previous to the revision, the legislature had commenced the important duty of endeavoring to extricate this branch of the law from confusion and uncertainty. One object of the legislature, so far as they

ALBANY,
Dec. 1836.

Hawley
v.
James.

had gone, (say the revisers,) " was to destroy perpetuities—in other words, to prevent the fee from being rendered inalienable beyond a certain period." This was also a prominent object aimed at by the revisers; and they express a confident belief, that the adoption of the provisions which they recommend in relation to expectant estates, (the pendants upon which alienation hangs,) " will extricate this branch of the law from the perplexity and obscurity in which it is now involved, and render a system simple, which, in its present state, is various, complicated, and abstruse." " The interests of society," (they observe,) " require, that the power of the owner to fetter the alienation and suspend the ownership of an estate by future limitations, should be confined within certain limits." They speak in emphatic and reprehensive language of the then existing state of the law in England, of the " multitude of rules," the distinctions of which are " so nice and difficult of apprehension," and from which " have arisen the evils of which the nation is now complaining and which their wisest statesmen are seeking to redress, the complexity of their titles, the great hazard and expense of alienation, and the frequent and ruinous litigation in which estates are involved." These evils they apprehend, though not yet extensively felt in this state, " will not fail to extend themselves, as property advances in value, capital is accumulated, and the rich become anxious to secure their possessions to a distant posterity." " The remedy" seemed to the revisers " obvious and effectual." It was, " to abolish all technical rules and distinctions, having no relation to the essential nature of property and the means of its beneficial enjoyment, but which, derived from the feudal system, rest solely upon feudal reasons ; to define with precision the limits within which the power of alienation may be suspended by the creation of contingent estates, and to reduce all expectant estates substantially to the same class and apply to them the same rules, whether created by deed or by devise." In a previous note on another branch of the subject, the revisers speak of the decisions of the judges as having been sometimes made " without regard to former authorities and maxims, supposed to

ALBANY,
Dec. 1836.

Hawley
v.
James.

be established," as " only a proof how strongly it was felt that those maxims and authorities were repugnant to common sense and foreign to the state of society and habits of thought that now prevail;" and they emphatically ask, " Would it not be better that the obnoxious rules should be swept away at once by legislative enactment, than to be slowly undermined and subverted by the subtleties of judicial interpretations, at the expense, perhaps to the ruin, of a succession of suitors, and at the hazard of plunging the whole law on the subject into *endless uncertainty.*"

It is thus apparent, that the object and intention of the revisers and of the legislature were, to abolish the existing system, if system it might be called, to abrogate the uncertain and complex rules and precedents of the English courts and of the common law, in relation to real estate, and to embody in the revised statutes a new and entire system, comprising clear, definite, and certain rules, which should be applicable and conclusive in all cases likely to occur within the courts of this state. They intended also that these rules should harmonize with the spirit of the age, and with our civil institutions and policy. How far they have succeeded in these objects—to what extent they have rendered " simple, uniform, and intelligible" that which before was " various, complicated, and abstruse," were we to be guided by the numerous commentaries which have been written and made upon the results of their labors, it would perplex the most ingenious mind and the maturest judgment to determine. But the position may be safely assumed, that no instrument, whether of conveyance or devise, which, compared with the revised statutes as the standard, cannot, by the legal and common sense rules of construction, be clearly interpreted and legally sustained, can be regarded as a legitimate offspring; and that, in deciding upon the legal construction and validity of such instrument, it is no longer necessary or competent for any court of this state to depart from the rules of the statute, and recur for light to the labyrinths of black letter decisions and the wandering mazes of the common law. In considering, then, the present appeal, the will of the testator is

to be subjected to this standard. The recent decision in the *Lorillard case*, however, and the able and lucid exposition of the provisions and policy of the revised statutes, by the late chief justice and other members of this court on that occasion, appear to leave but one prominent point to be decided in the case before us. This point is, the *validity of the trust term*. Here is the distinguishing feature between the two cases.

Is the trust term of the will valid? Does it suspend the alienation of the testator's real property in a mode prohibited or not authorized by the statute? By the 17th clause of the will, the trust term is directed to continue, and the estate is to vest in the trustees until the youngest of the testator's children and grand-children living at the date of his will, and attaining the age of 21 years, shall have attained that age. For that period, then, whatever might prove to be its duration, the estate, according to the intent of the testator, must be and remain inalienable. 1 R. S. 730, § 63, 65. There were thirteen children and grand-children of the testator under 21 years of age, the youngest of whom living at the date of the will, was one year old lacking ten days when the testator died. In considering and deciding this point, the chancellor, in 5 Paige, 460, observes : " Although such a trust term might be inalienable, under the restrictions contained in the 63d and 65th sections of the title just referred to, it could in no event suspend the power of alienation for a longer time than 21 years, and the usual period of gestation if there was a posthumous child. This is much less than the probable continuance of the longest of any two lives under the age of 21, according to the ordinary duration of human life ; and even less than the probable duration of any one life under that age, in any part of this state according to the tables of mortality. See Meyer on Life Ins. 85, Table 17. , The principle of permitting a reasonable suspense of the power of alienation, in case of the actual minorities of persons contingently interested in an estate is also recognized by the legislature in the recent revision. The 63d section of the articles relative to uses and trusts presents the only legal obstacle which can render a trust

term determinable at the expiration of any number of minorities in being, inalienable. And as the 15th section of the revised statutes, before referred to, does not prohibit the creation of a trust term, which is not made absolutely determinable upon the death of any two specified persons, I conclude, *although with some hesitation,* that such a trust term, if it is so limited that it can in no event continue longer than the actual minority of two or more infants in being at the creation of such estate, and who have an interest therein either vested or contingent, *is not necessarily invalid.*" Had his honor the chancellor been more positive and decided in this conclusion, I should hesitate long, and labor long, before I permitted myself to entertain a contrary opinion. But, while cherishing the highest respect for the extensive legal acquirements, the mature and discriminating judgment of this eminent jurist, my understanding fails to be convinced by the process of reasoning and illustration through which he arrived at his conclusion upon this essential point of the case. This conclusion seems to have rested upon the *reasonableness* and the *moral necessity* of such a trust term for the support of large families of minors, dependent upon small estates, &c. rather than upon its conformity with the strict letter of the statute, its clear and undoubted legality. The *reasonableness* of such a term I am not disposed to question. Its *necessity,* for the purposes specified, has not been made apparent by any defects of the statute which have been pointed out, or which I have been able to discover. Its *legality,* which the chancellor admits with "hesitation," is the point for this court to determine. The 14th section of the statute, 1 R. S. 723, declares, that "Every future estate shall be void in its creation which shall suspend the absolute power of alienation for a longer period than is prescribed in this article." Section 15 prescribes this "period," and declares, generally and specifically, that "the absolute power of alienation shall not be suspended by *any limitation* or *condition whatever,* for a longer period than *during the continuance of not more than two lives in being* at the creation of the estate; except in the *single case* mentioned in the next section." This "*single case,*"

§ 16, authorizes " a contingent remainder in fee" to be " created on a *prior remainder in fee*, to take effect in the event that the person to whom the first remainder is limited, *shall die under the age of twenty-one years*, or upon *any other contingency* upon which the estate of such persons may be determined *before they attain their full age ;*" an exception in favor of *actual minorities*, within which the present case is not embraced. This, then, is the rule, and the only rule, recommended by the revisers and adopted by the legislature, " to define with precision the limits within which the power of alienation may be suspended, by the creation of contingent estates, and to reduce all expectant estates substantially to the same class, and apply to them the same rules, whether created by deed or by devise ;" and to this rule all uses and trusts, and powers for the disposition of lands and the income thereof, are referred and subjected. Ch. 1, § 55, sub. 3, 4. Ch. 4, tit. 4, § 1, 2, 3, &c. " The *absolute* (not the contingent, possible or implied) power of alienation, shall not be suspended by *any* limitation or *condition* whatever," (by deed, by devise, by express trust, or by power in trust,) " for a longer period than *during the continuance* of not *more* than *two lives* in being," &c. The term here authorized is not an absolute term ; it is not a term for years ; it is not. a term embracing the *average duration* of human life. The phraseology is peculiar, but in my opinion explicit ; " During the continuance of "—not for a period equal to—" two lives," " not more." The provision of the statute in respect to the title to *personal property*, 1 R. S. 773, § 1, is analogous : " The absolute ownership of personal property shall not be suspended by any limitation or condition whatever, for a longer period than during the continuance and until the termination of not more than. two lives in being," &c. What is the obvious meaning and interpretation of the terms " during the continuance of," " not more than," and " in being," when applied to " life" or " lives" ? There can be no " lives *in being*" without persons : they must be substantive—corporeal, and not spiritual ; real, and not hypothetical ; and these persons must be named or designated, or some certain means of identity specified, or

how can " the *continuance*," or more explicitly " the termination"—(not the *probable duration*)—of their lives be known and ascertained ? In other words, the alienation of an estate cannot be suspended upon *the lives* of *more than* two persons who shall be living at the creation of the estate ; and the " continuance" or " termination" of the lives of one or two persons designated, must measure the legal " period" of suspended alienation, in all cases.

ALBANY,
Dec. 1836.

Hawley
v.
James.

The chancellor declares in his opinion, p. 462, that " the estate devised to the executors and trustees in this case, was a *term of years* in the testator's real property of which he was seised at the time of his death, and in the real property into which he directed this personalty to be converted, for the term of *twenty years and ten days ;* the youngest grandchild who was living at the date of the will, being one year old ten days after the death of the testator." But its character, he supposes, may be changed by contingencies, and according to the manifest intention of the testator ; " and," (he says,) " the trust estate will cease at the death of the last who shall die under age, after the survivors have all attained their majority. It is, therefore, *not an estate for years* determinable *on lives*, or an *absolute term ;* but it is *an estate for years ; for twenty years and ten days ; determinable sooner, if the minorities shall cease* before the expiration of that time." " *If the minorities shall cease !*" To what conclusion does this phrase, this contingent proposition, lead the understanding ? How can we admit its obvious definition, and reject the conclusion, that this *is* a term, or an estate, dependent upon, or determinable on lives ? For how can the estate determine—how can " minorities cease" sooner than the ultimate term of twenty years and ten days, but by the death of the minors? And is not the term prolonged or shortened by the " continuance" or " termination" of their respective lives ? In this case twelve lives may cease, and yet the ultimate term of suspended alienation be accomplished ; for the youngest of the thirteen may reach the age of twenty-one years. while all the others, after having arrived successively to years of maturity, and some of

them to more than middle age, may all have gone to their eternal inheritance, leaving a new race of minor children behind them.

Can, then, a testator, according to the provisions and policy of the revised statutes, be permitted to suspend the alienation of an estate upon *minorities?* Or, if upon minorities, upon those of more than two persons in being at the creation of the estate? Are not minorities, within the spirit, intent and meaning of the statute, when employed for the purpose of suspending alienation, synonymous with lives? Treating of the directions for accumulation, the chancellor, p. 481, observes, "Judging from the peculiar form of the clause in this will by which the trust term is devised, I am inclined to think the testator has acted upon the *erroneous supposition* that *an accumulation* of the rents and profits would be valid if *one or more infants in being* at the making of the will were to be benefitted thereby, *provided* such accumulation was not continued beyond the *minorities* of *all such infants*, and without reference to the extent of the beneficial interests which such infants were to take in the accumulated fund. It is evident, however, that *such could not have been the intention of the legislature.* For if *such a construction* should be put upon the statute, the *accumulation* of an estate *for twenty years* could *always be secured* by selecting *several infants* upon *whose minorities* the trust term should be limited, and giving them mere nominal limited interests in the accumulated fund. The only way to prevent this, is to give that construction to the statute which, from the notes of the revisers, it is evident they intended should be given to the language employed to convey the meaning of the legislature." How forcibly do these illustrations and arguments apply to the alienation of an estate suspended upon minorities! and how strong are the analogies, furnished both by reason and the law, between the two cases; and singular it is, that they should have escaped the comprehensive and penetrating mind of the chancellor! In the present case, was not the intention of the testator to prolong, by the same means, the inalienability of the estate, as apparent as that for the *accumulation* thereof? Was

not his supposition equally erroneous? And will not the same mode of reasoning and the same principles apply to the one object, and the method by which it was sought to be acomplished, as to the other? If a testator can suspend the alienability of his estate upon the minorities of *three* persons, or of thirteen, as in this case, may he not upon the minorities of twenty or more; and thus by selecting infants of the tenderest age, " and giving them mere nominal limited interests," if that be necessary, secure for twenty years the *inalienability* " *of an estate ?*" Were this permitted, the way would be opened to a succession of minorities, and it would require some skill in the doctrine of chances to determine for · how long a period portions of a large estate might thus be rendered virtually inalienable. In the language of the chancellor, " The only way to prevent this, is to give that construction to the statute which, from the notes of the revisers, it is evident they intended should be given to the language employed to convey the meaning of the legislature." It is as clearly and explicitly the intent and policy of the statute to prevent perpetuity or " protracted alienation " as to prevent unreasonable accumulation. *Partibility* is stamped on every page and section of the revised statutes which relate to real property. A suspension of alienation upon *minorities*, is nowhere authorized. An *absolute term*, or *term of years*, is nowhere specified; and that vague and indefinite period, the average duration of life which, like the shadow of the dial, varying with every sun and every latitude, has not a shadow of existence in any portion of the revised statutes.

The *minority term*, as it formerly existed, is abolished; and the views of the revisers, in reference to such a term, as is now attempted to be established, may be drawn, from analogy, by referring to those sections of the statute which relate to *accumulations ;* where all directions for accumulation are made to terminate at the *expiration of the minority* of the person for whose benefit they are intended. 1 R. S. 726, § 37, 38. Id. 773, § 3. The rule established, and the objects supposed to have been attained, are thus stated by the revisers—Note to § 14 to 22: " 1. Aliena-

ALBANY,
Dec. 1836.

Hawley
v.
James.

tion cannot be protracted by means of mere nominees un-connected with the estate, beyond the period of two lives. 2. No more than two successive estates for life can be created. 3. The period of twenty-one years, after a life or lives in being, is no longer allowed as an absolute term; but the rule is restored to its original object, by being confined to the case of *actual infancy*, which is directly provided for, by rendering the disposition defensible by allowing another to be substituted during that period." It is clear, then, to my mind, that the revisers and the legislature never anticipated or designed, that the alienation of an estate should be suspended upon a *series of minorities*, beyond the *actual infancy* of a numerous class of persons beneficially interested therein. They never intended that those of mature years, capable of managing their own affairs, and of performing the active and useful duties of life, should be held in guardianship through the non-age of others, for the purpose of perpetuity or accumulation; but, on the contrary, that upon the termination of their minorities they should respectively come into the possession of the estates to which they might be entitled, whatever the quality thereof, with the power of alienation limited and controlled only by the definite and single rule prescribed in the 15th section of the statute. A series of *minorities* involves a series of *lives*, within the spirit and meaning of the statute legally and logically considered. If there is a doubt as to the literal construction of its language, that doubt should yield to the well known considerations of public policy upon which the law was founded. By such a conclusion, the reason and policy of the statute are vindicated, and no injustice can result therefrom. Testators and their legal advisers will be admonished that professional ingenuity and skill are not to be exercised in devising methods to evade the laws, or in attempting to establish, from motives however laudable, " by the subtleties of judicial interpretation" rules, which are not clearly recognized and established in the statutes. If it is desired for any purpose to suspend the power of alienating an estate, the rule is given, single, plain, and explicit; whether good or bad;

ALBANY,
Dec. 1836.

Hawley
v.
James.

reasonable or unreasonable, it is " the rule of the law," which every citizen is bound to obey. It is but to name or designate one person or two persons, " not more," then " in being." " during the continuance," of whose life or lives alienation is intended to be suspended, and the object, if legitimate, will be effected.

My judgment, is, therefore, convinced, that the trust term in this case and the estates limited thereon are in violation of the statute, and consequently void ; and that the trust itself, being created for the primary purposes of accumulation, and rendering the estate inalienable, both of which have proved to be illegal, is in no respect, nor for any purpose, valid. Upon this head and the connected points of the case, I concur generally with the opinion of Justice Bronson submitted yesterday. I have, however, been of the impression that the annuities and legacies to persons other than the heirs at law, did not necessarily fall with the trust, but that they might be sustained as separate and distinct intents of the testator—although directed to be carried into effect through the agency of the trustees, in connection with the trust term and powers in trust, under the testator's erroneous supposition that the trust he was creating was in all respects legal and valid. On a re-examination of this branch of the case, although some difficulties have presented themselves to my mind, that impression has not been materially changed. I have heard much, since I came into this court, of the doctrine of *cy pres;* and I cannot conceive of any case in which it could, in my opinion, be so appropriately applied, as to the devise in this will to the children of Augustus James. It was clearly the intention of the testator, aside from all other dispositions of his property, that they should receive $50,000 out of the bulk of his estate; and what matters it, as regards every other interest, whether it comes from the personalties, the rents and profits, or is taken from the real property? Where an intent is undoubted and *legal*, is it not the duty of the court to give it effect, where it can be done by legal means? And may not this be done by making this amount chargeable on the entire estate, payable by the executors or heirs

at law? The same principle applies to the other legacies and annuities; and I cannot draw the distinction between them which seems to have been drawn by others better skilled in the subtleties of legal interpretation.

By Senator MAISON. The two great questions presented in this case relate, *first*, to the validity of the trust term, and *second*, to the devise of the remainder of the estate, after the termination of the trust term. The disposition of these two questions will decide the cause; the other questions arising in it being mostly connected with and dependent on them.

In the examination of these questions, reference will be had almost exclusively to the revised statutes, as furnishing the rules of construction which should govern the case. On the subject of trusts, it is admitted that the statute furnishes the only guide, as all other trusts than those expressly authorized, are abolished. And on the subject of estates in land, it seems to require only a careful perusal of the second title of chapter one of the second part, and particularly of the first article of that title " of the creation and division of estates," to be entirely satisfied that the legislature intended to cover the whole subject—by enumerating the different estates, defining and describing them with great care, introducing new rules and principles directly repugnant to many of those in the common law, and indirectly in conflict with the whole system of common law estates; abolishing executory devises and all other expectant estates not enumerated and defined; providing new regulations against perpetuities and accumulations; abolishing the rule in *Shelly's case,* and changing the nature and destroying the distinctions between expectant estates, by declaring them all to be descendible, devisable and alienable. It is impossible to contemplate the immediate and the remote consequences of these fundamental innovations, without perceiving that the legislature intended an entire substitute on the subject of estates for the previous system, as fully as in the case of trusts and powers. It is quite obvious, then, that we can derive but little aid from the common law writers and de-

cisions, and the most that can be expected from them, are definitions, where none are given by our own statutes, and the general understanding of the law previous to those statutes. This is always useful and sometimes necessary to enable us to comprehend precisely the force and bearing of a new provision; but no further. If our own system is a substitute for another, it is worse than idle to look to that other for principles to guide us.

The trust term being the first subject of inquiry, we must ascertain precisely what it is, before we can advance a single step in the case. On this point I fully concur with the chancellor, that it is a term to continue until the youngest child or grand-child arrives at the age of twenty-one years, determinable sooner by their deaths. The language of the will " until the youngest of my children and grandchildren, living at the date of the will, and attaining the age of twenty-one years, shall have attained that age," clearly constitutes two conditions, viz. 1st, the living to attain twenty-one, of some one of the thirteen persons, and 2nd, that the person who shall so live, is to be the youngest of a class of thirteen persons attaining twenty-one, that is, he is not to be the youngest of the class, but is to be the *youngest attaining twenty-one.* These two contingencies must unite to terminate the estate, and the same contingencies must occur to vest the remainder after the trust term. In this latter view they become conditions precedent, and all the authorities adduced on both sides in the elaborate arguments before us, concur in the rule that they must be strictly and fully performed. Having applied such a rule for one of the purposes of the case, it is impossible to depart from it, when considering the same expressions for any other purpose But it is scarcely necessary to resort to any strict or arbitrary rule in construing expressions so plain and unequivocal. They define the duration of the trust term, and nothing but ordinary common sense seems requisite to understand that that term must continue until the period provided for its termination ; that here the doctrine of *cy pres,* or any other equitable doctrine upon the construction of conditions subsequent, can have no application. While on the one

hand, no court can abridge the term if it be valid, so on the other, no court can by equitable construction extend it beyond the period fixed for its expiration. If then, the plain and natural import of these expressions is to govern, there can be no doubt that the trust term is to continue so long as there is one of the thirteen minors in being who has not attained twenty-one. The ingenious suggestions to give a different interpretation to this limitation of the trust term, are all met by the inflexible rule which forbids us to alter or mutilate in any manner the testator's words, when those words convey a clear, distinct and unambiguous meaning. This will is the law of the case, and to that law we are bound to con form by the most imperative obligations. If its expressions are vague and doubtful, then, but not until then, may we resort to expedients to supply its defects. To my mind there is not the least room for doubt ; the whole will is obviously drawn up with great care and skill, and by one who understood the force of language ; the expressions in the limitation consist of the most plain and simple words, announced with great distinctness and precision ; and if they cannot be understood, then there is *no* part of this will capable of comprehension. The most plausible of the suggestions referred to, is that which supposes an ellipsis in the sentence quoted, and that the testator intended to say " until the youngest of my children *and the youngest of* my grand-children living, &c., and attaining the age of twenty-one years, shall have attained that age." But the addition of the words " *and the youngest of,*" would not help the matter or alter the construction already given, so long as the words " attaining the age of twenty-one years" are supposed to remain, for it is by the operation of these words that the persons are rendered indefinite. These words prevent our designating those who were merely the youngest in point of age, for they add another particular, and point out the youngest attaining twenty-one, who may be the oldest of the whole thirteen. The other suggestion, that the testator referred to William Augustus, the youngest of the whole, and made the trust term terminate on his becoming twenty-one, is attended with the same insuperable difficulty, that the

testator has added to the word " youngest," the words " attaining twenty-one," and thus precluded the designation of William Augustus, as the only one, upon whose death or majority the term shall cease. The suggestion now noticed requires us to strike out these important words. I know of no authority this or any other court possesses for doing so. With respect to the suggestion of the power of the court to model, in other words to make a new and different term, this is not the place to examine it, because at present we are endeavoring only to understand what duration the testator himself has given this term. I leave this point having arrived at the conclusion entirely satisfactorily to my own mind, that the trust term is to continue so long as any one of the thirteen minors shall live and continue a minor.

To this trust term with such a duration it is objected on the part of the heirs at law, that it suspends the power of alienation for more than two lives in being, of an absolute fee in possession, and is thus contrary to the existing statute. This point has strictly no relation to the powers of the trustees. They are dependent on the purposes for which the trust is created; if those purposes are legal, the trust must continue until they are accomplished, unless the testator has prescribed a shorter period; and if the purposes of the trust are illegal or have become inoperative, then it cannot continue for one moment, notwithstanding any attempt by the testator to give it duration. The law has said that when the purposes of the trust have ceased, the trust itself shall cease. 1 R. S. 730, § 67. The purposes of the trust term, and whether the trustees have any powers under it; and what, and how and when they are to be exercised, therefore, form a distinct subject of inquiry after another question shall have been disposed of. That question relates to the validity of the devise of the trust term, and the estate in remainder, considered as a whole or in its parts; and the great objection is that already stated, that this devise suspends the power of alienation longer or for a different time than is allowed by the statute. It is contended on the part of the heirs at law, that a suspension of

ALBANY
Dec. 1836.
〰〰
Hawley
v.
James.

the power of alienation is produced by the trust term and the remainder. They urge that neither a present nor a future estate can be conveyed during the trust term. It is very certain that under the 65th section, 1 R. S. 730, no conveyance can be executed by the trustees if the legal estate is vested in them ; and it is equally certain that the *cestuis que trust*, the persons beneficially interested cannot convey any legal estate in the lands, whatever they may do with respect to their beneficial interest, which will be a subject of future inquiry. It is very evident then, that no present estate whatever can be conveyed, so long as the trust continues ; much less can an absolute *fee in possession* be conveyed by the trustees.

With respect to the future estate, (the remainder,) without at present discussing minutely the question whether it is contingent, as that will presently be considered more at large, it seems for the present sufficient to observe what is conceded by the counsel on all sides, that the estate in remainder after the trust term is an alternative estate depending for its character and quantity upon the character of those who are to take it. If they are persons who were in being at the death of the testator, they take a life estate ; if not in being, then they take a fee, and those who take a life estate in any share, are to appoint the persons who are to take the fee, so that even if the life estates be deemed vested, the fee is not, and cannot be vested until the appointment is made, or the lands have descended in case of default in the appointment, or of there being no descendants to take under the will. It is very obvious then, that until *a fee* has vested in some one under this will, *an absolute fee* cannot be conveyed. The proposition is, therefore, abundantly maintained that during the trust term no conveyance can be made, which will pass at once the present legal estate of the trustees, in possession, and also the remainder in absolute fee.

The result, then, of the two conclusions to which I have arrived, or rather their combination, is that the power of alienating an absolute fee in possession, is suspended until the youngest attaining twenty-one, out of thirteen minors,

shall attain that age. The expression "attaining twenty-one" being a description of a person, necessarily implies living until that time, so that the trust term is made dependent on some indefinite one out of the thirteen, surviving that period, and the testator has, therefore, taken the chance of thirteen persons, living until the age of majority. The same idea is conveyed by the chancellor, when he speaks of the trust term being determinable by the death of all the thirteen under twenty-one. In either mode of describing it, it is obvious that the trust term is dependent on the deaths, and *e converso* on the lives of more than two persons in being. It is not believed that this point can be made any clearer by any argument or illustration, than it is made by the plain words of the limitation. It is not perceived how the result can be altered by considering the term as limited to continue only a definite period of time, but determinable sooner by the deaths of more than two persons. Suppose by way of illustration, that it was limited to continue twenty-one years, if any one of the thirteen minors, naming them, should so long live? Is it not evident, that it may continue during more than two lives in being? and is not this the very limitation in this case? It is claimed that it cannot continue more than twenty years and ten days, and yet it is admitted on all hands, that it must cease on the death of all the thirteen minors under twenty-one, and that it will continue, if any one out of the thirteen shall live until he attains his majority. If it be stated thus, if any one out of the thirteen shall live twenty years and ten days, it would be precisely like the illustration given, and according to every case which has ever been decided in England or in this country, would be an estate for life, because it would terminate with the deaths of all the thirteen. Now, whether the limitation be, that the estate shall continue, if any one out of the thirteen shall live twenty years and ten days, or if any one out of the thirteen shall live to attain his majority, can make no sort of difference in the principle. One may be a fluctuating period, the other fixed ; but *in* both the contingency is life. Whether, therefore, the trust term is considered as being limited to

continue a definite period determinable on lives, or whether it is to be regarded as extendible from one minor attaining majority, until the next in age attains twenty-one, and so on throughout the series can make no difference ; they are substantially the same, and each expresses the same condition, the continuance of lives ; the latter expresses it affirmatively, the former negatively. As then this trust term may continue for more than during two lives in being, to wit for thirteen, and as during its continuance, the alienation of the fee is suspended, it comes within the words of the provision of the revised statutes forbidding such suspension for more than two lives in being.

But it is urged on the part of the trustees that the revised statutes do not intend to prescribe the lives of any two persons in being as the duration of the power of suspension, but that they mean some portion of time within the compass of two lives in being, or in other words, a portion of time which will not exceed the ordinary average of the lives of two persons; that previous to the revised statutes such a period of suspension was known to and recognized by the common law, and that it has not been superseded by those statutes. The first impression made by such a suggestion is rather startling to those who have been in the habit of considering the revised statutes as a work of great care and labor, evincing as well the skill, learning, and talent of those engaged in its preparation, as the wisdom and intelligence of the legistature, who spent so much time in maturing and adopting it. That a code of laws professing to give precise, positive, and plain rules, particularly on the subject of estates and interests in land, to reduce to certainty the vague and fluctuating decisions which had arisen at the common law, to simplify the law of real estate so that every intelligent citizen might understand it, and which on the subject of the power of suspending the alienation of real estate evinces so much care, caution, and precision ; that such a code should be so defective on that particular subject which of all others was calculated to arrest, and did arrest the greatest attention, as to have omitted any provision whatever, either affirmatively or negatively, re-

lating to a well known principle of the common law, which
is treated of and discussed by all the ordinary elementary
writers, so shakes our confidence in those whose business it
was to guard against such a fatal omission and so entirely
unsettles our confidence in the accuracy and precision of the
whole work, that it cannot be received without the most
conclusive proofs. So far from that being the case, to my
mind, the evidence to the contrary from the language of
the statute itself is of the most satisfactory and convincing
character. " Lives in being" and " persons in being," are
used throughout the whole of chapter one, of the second
part as of equivalent meaning. The object of the legisla-
ture being to reduce the time allowed at common law, du-
ring which alienation might be suspended, and to correct
some fanciful and vicious expositions of the original rule,
which had confined the period to a single life in being, but
which had been extended by metaphysical subtlety to mean
the survivor of any number of lives in being, and also to
give a precise and definite rule : the absolute period of
twenty-one years was cut off, and the number of lives was
fixed to two. Thus the whole subject was covered, as
much and as fully as it could be by human legislation The
attention of the legislature had been called to the *Thellusson
case*, in which, as well as in every other case, where perpe-
tuities had been attempted, the names of persons in being
had been inserted in the limitations, during whose lives the
suspension was to be continued ; and I can have no doubt
from this circumstance as well as from the reading of va-
rious sections of the same chapter and title, that the expres-
sion "lives in being" in the 15th section, 1 R. S. 723,
means what it does in various others—certain specified and
designated persons living at the time of the creation of the
estate. The very next section, the 16th, which is an excep-
tion to the 15th, speaks of the *persons* to whom the first
remainder is limited ; the 17th section requires successive
estates for life to be limited to *persons* in being; the 19th,
which is intended merely to carry out the great principle of
the 15th in order to guard against its violation by a remain-
der limited upon more than two lives, declares that it shall

take effect upon the death of the two *persons* first named, and in like manner the 40th section evidently supposes persons named who are to take contingent estates. To this it may be added that there is not an elementary writer who does not use the terms " life in being," " persons in being," and " persons living," as equivalent and convertible terms. My conclusion on this point is therefore, that no suspension of the power of alienation can be created under the revised statutes, unless it be during the life of one person, or during the life of two persons, to be named and designated, or for a portion of the life of such designated persons; and a suspension that has no reference to the life of a designated person, is utterly void, for the simple reason, that it *may* prevent the power of alienation for a longer period than that prescribed by law. I therefore, reject the very foundation of the argument I have been considering, and deny that the statute means a portion of astronomical time, within the compass of what would ordinarily be two lives in being. As was said by the counsel for Augustus James, the statute marks the period of suspension by *events*, and not by the *almanac;* and the introduction of such a principle of construction of our revised statutes, would open the door to a latitude of interpretation, pregnant with the most imminent danger to all our rights.

Having come to the conclusion that our statute furnishes a plain and precise affirmative rule which is in its nature exclusive of all others, it might seem superfluous to pursue the other steps in the argument. But deeming it a subject of the greatest importance, and conceiving that there is one view, which has not been distinctly presented, respecting the supposed common law rule of suspension for a moderate period, I will devote a few moments to it. I think it has been satisfactorily shown, that the supposed rule in question was the embryo of that which ultimately settled down to the absolute period of twenty-one years and became merged in it, and that the rule fixing an absolute period having been abolished by us, it has necessarily ceased in all its stages of existence. Still it is to be remarked that late elementary writers in England, since the fixing of the absolute period of

ALBANY,
Dec. 1836.

Hawley
v.
James.

twenty-one years, have referred to the old cases on the subject of moderate terms as being yet recognized in that country to some extent and for certain purposes. It will be useful to see whether they are so recognized as furnishing a rule for the suspension of the power of alienation or for a very different purpose. Mr. Fearne in the beginning of the fourth section of his first chapter on contingent remainders, p. 21, 2, 6th ed. treats of three cases. His third class of contingent remainders is founded on the common law rule, that a remainder must vest in interest during the continuance of the precedent estate, or at the very instant of its termination ; and the third class is where the condition upon which the remainder is limited is certain in event, but the determination of the particular estate may happen before it, that is, before the condition ; so that there might be a lapse between the determination of the particular estate and the vesting of the remainder. In the part of the work referred to, Mr. Fearne is treating of the exceptions to this class of remainders, and among them he notices the cases that have been cited, respecting long terms and short terms, as connected with lives. He states this case ; a limitation to A. for eighty years, if B. so long live, with remainder over after the death of B. to C. in fee, the remainder will not vest until after the death of B. This possibly may not happen until after the expiration of the eighty years, and then there might be a lapse between the precedent estate and the remainder. Yet as the chance of B.'s living more than eighty years is very small, the remainder shall be deemed vested, and the mere possibility that a life in being may exceed eighty years, is not a sufficient *uncertainty* to constitute a contingent remainder. But when the question is, whether it is probable a life in being will exceed twenty-one years, the probability is so great that it will, that it is sufficient to constitute a contingent remainder. And this is his summary of all the cases. Now can any thing be more evident, than that Mr. Fearne has not the slightest allusion to any question respecting the suspense of the power of alienation ? He is discussing the question, whether these are vested or contingent remainders ; *not* whether they are lawful in them-

selves as suspending the power of alienation. Indeed the legality of the longest term of eighty years, so far from being questioned, is affirmed, by its being made to operate so as to render the remainder vested. An effectual answer then to this whole matter, so far as the authority of the modern writers is concerned, is found in the 34th section of the second title of chapter one, 1 R. S. 725, which expressly abrogates the common law principle, on which the third class of remainders and the exceptions to it are founded, by declaring that " no remainder, valid in its creation, shall be defeated by the determination of the precedent estate before the happening of the contingency on which the remainder is limited to take effect;" so that Mr. Fearne's third class of contingent remainders can no longer exist here, and of course there can be no exception to it. Mr. Preston, in the 1st volume of his essay on estates, p. 81, also notices the foregoing exceptions to that class of remainders, and the construction of limitations as to the probability of a life continuing beyond a specified term, and adds the following remarks ; " No authority can be adduced to warrant the specification of any particular period as equally applicable to all cases, for raising this construction. Every case must, it is admitted, depend on the age of the person whose life is named." Even for the narrow purpose of ascertaining whether a remainder be contingent or vested, it would seem from this, that there is no such thing known, even to the law of England, as a moderate term of years, which shall be deemed to be the compass of a life in being, as applicable to all cases. And it is therefore still less applicable to the question of the power of suspending the alienation of land, to which it has never been applied by any elementary writer, even in England, since the absolute period of twenty-one years has become fixed. I therefore dismiss the whole of this argument, because I do not believe there has been for more than a century any such rule in England, as allowed a suspension of the power of alienation for any indefinite period, supposed to be within the compass of a life ; and because, i here was such a rule, it is abrogated by our statutes. I am thus saved from the necessity of examining the

remarks on the subject of the tables of annuities ; but I cannot forbear to observe that nothing could be more lamentable than such a condition of the law, as should require a testator to examine the tables and calculate the chances of life, before he could determine upon the period during which he could suspend alienation. Nor could any thing be more disastrous to the administration of justice, than the recognition of a principle so vague and indefinite as "a moderate term of years, about twenty or thirty," to be applied in the settlement of questions concerning the title to real property.

Another view is presented by counsel which claims notice. It is urged, that although the statute has prescribed *lives* as the measure of the period of suspension, yet it has also recognized *minorities* as such measure, and hence that this trust term may be supported. This view is founded upon the provisions of the 16th section of the second title, 1 R. S. 723, which is declared, by the preceding section, to be the single case in which any exception is to be allowed from the universality of the rule limiting the period of suspension to two lives in being. It is certainly very extraordinary that the exception should be pressed upon us as furnishing the rule, and not only so, but over riding and controlling the rule itself in other cases, for which it had expressly provided. Nor can any aid be derived from the 37th section which authorizes an accumulation of rents and profits during a minority. It is not pretended by any one, that there is any valid trust in this will for any such purpose. The chancellor has decided it to be utterly void, and from that part of the decree no appeal has been taken. To apply a provision which authorizes a trust for a special and defined purpose, to the support of trusts of a wholly different nature, or to convert such a provision into a rule for regulating the period of the suspension of the alienation of lands, so wholly foreign to its purpose, especially where that rule has already been distinctly furnished, would be a strange and unheard of perversion of the legislative will ; and if these provisions cannot be brought directly to supersede a positive enactment, still more futile must be the attempt to

ALBANY,
Dec. 1836.

Hawley
v.
James.

make them accomplish that purpose indirectly, as furnishing an argument by way of analogy. Of all arguments, this is the most fallacious, and never should be resorted to in the construction of a statute, unless the will of the legislature is so ambiguous, that it cannot be otherwise ascertained.

Nor is this a case for any equitable construction of the statute. The rule on that subject is as inflexible as it is just and wise. "If the meaning of a statute is doubtful, the consequences are to be considered in the construction; but where the meaning is plain, no consequences can be regarded, for this would be assuming a legislative authority." Bacon's Abr. tit. statute 1. 10. In a government where the functions of the different departments are distinctly marked, and where a strict adherence to the lines of demarcation is so absolutely essential to civil liberty, this fundamental maxim is of vital importance. A departure from it by the judicial department, in the usurpation of the powers of the legislature, will be sure to bring on legislative encroachments upon the functions of the judiciary, and to provoke contests and collision which must inevitably terminate in the injury of the weakest. If there be any one principle of our government that more than any other may be called conservative one—calculated and intended more than any other to preserve our institutions in their fullest vigor and purity, and to hand them down unimpaired to the latest posterity, it is that which demands a scrupulous adherence to the well defined limits of the authority given to the different departments. For one, I dare not violate it. Where the legislature has spoken clearly and distinctly upon a subject within its constitutional limits, my judicial duty is to obey its voice, be the consequences what they may. A judge is the minister and servant of the law, not its master. In such a case, and this I believe to be clearly one of the description mentioned, I will not trust myself in the trackless ocean of equitable construction, where there are neither soundings nor compass, and which is environed with shoals and rocks. I will not, therefore, make the effort to show what, I think, might be very easily demonstrated, that, in this case, there is no occasion for equitable construction; that the legisla-

ture has wisely and prudently provided for all cases where the suspension of the power of disposing of real estate ought to be allowed, and that the objections to the wisdom and justice of the statutory provision are utterly unfounded; and that the difficulty lies not in the law, but in those who refuse to conform to its mandates. I abstain from this effort because I choose to put my refusal to fritter away a plain statute, upon more elevated ground, upon the ground that I will not usurp an authority that does not belong to me. I have now examined all the arguments which have been offered to obviate the application of the statute to this trust term, and have satisfied my own mind, that they have wholly failed, and that the term created by the will is obnoxious to the plain letter of the law, as well as its spirit. It gives the chance of suspending the power of alienating an absolute fee in possession during any one out of thirteen minorites; it takes the chance of thirteen lives instead of two as prescribed by the statute, and it does not specify any two certain lives during which this suspension is to continue. It is hardly necessary to say, that if by the terms of a limitation a suspension *may be* produced for a longer period than allowed by law, it is necessarily void, and that it need not appear that it must inevitably have that effect. This is the doctrine even of the common law, which, it is said, allows a greater relaxation than the stern rigor of a statute; and cases have occurred in England, where it was physically next to impossible that a suspension could be produced beyond the prescribed period, and yet the limitation was held void on account of a mere possibility. Indeed, no principle is better settled, and it requires but a moment's reflection to see that it must be so, or the statute becomes nugatory, and instead of having a clear and defined rule, we should wander in the region of probabilities, possibilities and remote possibilities, from which we have reason to be thankful we are delivered. The consequence of the conclusions to which I have thus far arrived, is that the trust term and the contingent remainder created by this will, are void as violating the statute regulating the power of alienation of an absolute fee in possession.

Nor can the remainder be made good by the trust term being declared void. They together constitute the whole provision on the subject, and if it were permitted to take out a part of a limitation, so as to render the residue valid, there would be no case in which the statute could operate, which avoids the whole limitation. The difficulty of giving effect to the remainder in this case, without the trust term, is the same in principle, although different in degree, as that which existed in the *Lorillard* case. There a trust term was created, which was to continue during the life of the survivor of eleven persons, and at its expiration the remainder in fee was to vest in the grand nephews and nieces of the testator who should then be living. There the court not only declared the trust term void as violating the statute against perpetuities, but also refused to sustain the remainder, for the reason that it was dependent on the trust term which was invalid. The present case is precisely the same. The remainder cannot vest in possession, and that portion of it which was to vest in fee cannot vest in interest, until the time appointed by the testator, to wit, until the youngest of his children and grand-children attaining twenty-one, shall attain that age. Of course until that time, no absolute fee in possession can be conveyed, and thus a suspense of the power of alienation would be produced by declaring the remainder valid, as effectually, as by maintaining the trust term. The 32d section of the second title of chapter one, 1 R. S. 725, has been referred to for the purpose of showing that the remainder cannot be defeated by the destruction of the precedent estate. That section provides that "no expectant estate can be defeated by any act of the owner of the precedent estate, nor by any destruction of such precedent estate by disseisin, forfeiture, surrender, merger, or otherwise." But this section obviously speaks of a valid expectant estate, of one that would be good if the precedent estate continued, and it is one of the numerous instances of the correction of a vicious principle of the common law. It does not make an expectant estate any better in consequence of the destruction of the precedent estate, than it would have been if such precedent estate continued. In this case, the re-

mainder would have been clearly bad, if the trust term continued as created by the testator; and the destruction of the trust term cannot make it good. It cannot accelerate the time of the remainder's vesting. Again; the section supposes a valid and legal precedent estate, which is destroyed by some of the acts mentioned; for the very term *destruction* implies something capable of being destroyed. In this case, the trust term cannot be said to be destroyed by the judgment of this court; such judgment, if it declares that term invalid, merely declares that it never existed—that it was a nullity.

But another argument has been pressed upon our consideration, that by this will there are three remainders, one for life, in the seven children and the two grand-children named; another for life in any of their heirs, who, by the provisions of the will, are to be substituted for them in case of their death, in case the persons so substituted were living at the death of the testator; and another in fee, in case any of the persons so substituted shall have been born after the testator's death, and also where any of the seven children and two grand-children have descendants to whom the fee may be appointed; and it is urged, that this remainder for life to the seven children and two grand-children is vested. Admitting for a moment the correctness of this view of the will, it is obvious that by it these remainders are thus made successive estates, to follow each other, in the order mentioned. Now, nothing can be more fatal to this will than such a view, for it then suspends the power of the alienation of the fee during three different life estates, and also during the trust term; for, until the lives are all exhausted, the fee cannot vest, and of course cannot be conveyed; and here, although one of the counsel who supported the will called them successive estates, yet another, who forsaw the consequence, very properly called them alternative estates, as they in truth are, the one set being substitutes for the other, in case of its not vesting. But considering them as alternative, it is yet urged that the first named, the life estate to the seven children and two grand-children, has vested, while it is expressly conceded, and indeed is too

palpable to be denied, that not one share in the estate *in fee* has vested or can vest until after the expiration of the trust term, and that the shares which, any, of the seven children, and two grand-children, who may be alive at the expiration of the trust term, may take, cannot become estates in fee, until after their death. In the view, therefore, of the will, now under consideration, it is wholly immaterial whether the first life estate to the seven children and two grand-children are vested or not; for if they are vested, they are but life estates, and the tenants for life can convey only their interest, and can by no possibility convey the fee, so that the absolute fee in possession cannot be conveyed, even if the trustees could join the tenants for life in a conveyance. In truth, since by the 35th section of the second title of chapter one, p. 725, expectant estates are declared to be descendible, devisable, and alienable in the same manner as an estate in possession, this expectant life estate of the seven children and two grand-children may be conveyed, even if it be not vested, as well as if it were, and the effect would be the same; no fee in possession could be transferred. In fact, this question respecting the vesting of the first life estate, as it has been called, belongs to another part of this case. The objection against this remainder and the trust term, viz. that they violate the statute against perpetuties, remains untouched and unaffected by the vesting of the life estate.

Still another question returns, whether the first life estate given to the seven children and two grand-children, if it be vested, does not take effect in possession at once, if the precedent estate, the trust term fails? This has already been answered in substance. The testator has provided in his will, *when* it shall take effect in possession, viz. when the youngest of his children and grand-children, attaining twenty-one, shall attain that age. It is not in the power of this or any other court to anticipate that period. Those only of the children and grand-children who shall *then* be living, can go into possession of the shares allotted to them; and how can this court say, which of them will be living at that time? But of what possible consequence would it be

to give them possession, as tenants for life, of lands to which they are already entitled as heirs at law, or to the greater part of which they are so entitled? I have now examined every view that has been presented, or that occurred to my mind, on this point, and my deliberate convictions are, that the trust term created by the will, and the remainder in the real estate of the testator, are wholly void, and that no part of the remainder can be sustained, and of course that the heirs at law of the testator are entitled to inherit his real estate according to the statute of descents. A consequence of this conclusion is, that the directions in the will to convert personal property into real estate, for the purposes of the devises therein, also fail; for it is conceded on all hands that such conversion cannot take place for an illegal purpose, and as the chancellor declared the personal property contained in the three and a half shares to be undisposed of by the will, because those shares were not legally devised, so must this court declare the whole personal estate of the testator to be undisposed of by his will, except certain specific bequests hereafter to be considered, in case the court comes to the conclusion that the devises of the real estate to the trustees and in remainder are invalid; and the decree should direct the distribution of this personal estate subject to charges, to the widow and next of kin to the testator.

The view already taken of the invalidity of the remainder created by this will, viewed as a whole, might be sufficient to excuse from a consideration of the special objection made to what are called the life estates to the seven children and two grand-children, which objection is founded on section 20 of the same second title, and is, that the contingency on which they are limited to take effect, is not such that those remainders for life must vest in interest during the continuance of two lives in being at the creation of the remainder, or at the expiration of such lives. If that remainder be invalid, as I think it is, because it suspends the alienation of a fee in possession beyond the period prescribed by law, then it is not very important to inquire whether it be not also bad for another reason. But as there are some considera-

tions arising upon this point, which are corroborative of the views already presented, and as it involves the interesting question of a contingent or vested remainder, I shall proceed to examine it. It was correctly observed that this section, the 20th, introduced a new rule; that by the common law no remainder could be limited upon a term of years, and that, therefore, such a remainder must conform to the provisions of the statute, or it would be void. Now, the section under consideration provides two essential conditions to the validity of any remainder upon a term of years. *First.* That the contingency by which the remainder is to *become vested* in interest, must from its nature happen during the continuance of two lives in being, or at their expiration ; and this relates to the *time* when the contingency is to happen. *Secondly.* That there must be persons capable of taking the remainder at the .time the contingency happens within the period of two lives in being. Although the latter is the only view taken by the chancellor, yet it is manifest from the language of the section that the first condition is equally indispensable. Suppose a remainder to A. B. now in life to vest in interest upon the death of the survivor of three persons named ; here the second condition would be complied with, but the very words of the section would be violated, because the nature of the contingency is not such, that the remainder must vest in interest during *two* lives in being; the contingency which gives validity to the remainder, by the supposed limitation, must happen at a more remote period, viz. after *three* lives in being. If we have only to refer to the taker of the remainder, and finding him in being at its creation, hold that to be sufficient, then the legislature should have said simply that a remainder shall not be limited on a term for years unless to a person in being ; and all that is said about the nature of the contingency, and the period of two lives is unnecessary verbiage—it is worse—it absolutely misleads. That is precisely what the legislature have said, and what the revisers recommended in the next section, the 21st, in relation to a remainder for life, that " it cannot be limited except to a person in being at the creation of such estate."

It is obvious, that by this section an additional restriction was intended to be added to those contained in the 20th, which related to all remainders. It cannot be substituted for the 20th, for that was not its purpose. Both must be read together, and effect must be given to each. The 20th contains provisions applicable to all remainders, including those for life, and the 21st adds a restriction peculiar to such a remainder. But the construction of the chancellor adopts the 21st as the only rule applicable to a remainder for life, and wholly rejects the 20th. "For," he says, "the life estate in the share of each must necessarily vest in interest, during one specified life in being at the death of the testator, to wit, the life of the child or grand-child to whom the remainder in such share is given;" that is, if the taker of the remainder is in being at the creation of the estate, the statute is complied with. True, the 21st section is complied with; but the 20th is wholly disregarded. Although the counsel on both sides admitted that, in this construction, the chancellor was wrong, yet principles ought not to be settled upon the admission of counsel, however eminent, and hence it has been deemed proper to show why the chancellor's construction cannot be admitted. In this, I trust, I shall not be deemed as arrogating too much to myself; I must view this matter upon my own responsibility. It is undoubtedly one of the conditions imposed by the legislature, that the person to whom the remainder for life is limited upon a term of years, should be in being at the creation of the remainder, but it is not the only one, as the chancellor supposed. One objection, then, to this remainder, considered as a whole, is that it is not limited to vest upon a contingency which must happen during the continuance of two lives in being. The contingency is to happen, according to the will, when the youngest of the testator's children and grand-children attaining twenty-one shall attain that age. The conclusion to which I have arrived, under another point in this case already discussed, is that this period exceeds two lives in being. The reasoning which led to that result, of course it is unnecessary to re-

peat.  If that result be correct, the objection is decisive, and *no one of the alternatives in this remainder*—neither that of an estate for life or that of an estate in fee, can vest in interest during the continuance of two lives in being, or at their expiration, and of course the remainder is void. Another objection to it, which comes under this point, is, that the contingency is not to happen during two specified lives.  For reasons already given in the discussion of another branch of this case, I cannot entertain a doubt that the legislature, in the 20th section as well as in the 15th, by the phrase " lives in being," intended " persons in life or in being."  A limitation by deed or will during a life in being, or during lives in being, without reference to some particular ·persons either by name or description, whose lives were intended as the measure of the duration of the estate, was never heard of in England or in this country. Where a lease has been " for life," the courts have said that it meant for the life of the grantee, unless the grantor had an estate only for life, and then it meant the life for which the estate was held.  Now this phrase " lives in being" was not new in the revised statutes or peculiar to them.  It occurs in all the elementary writers and in all the opinions of judges in England and this country; and the practical meaning which has been given to it in all legal instruments, by connecting it with the name or description of some particular person, is the most decisive proof of the *norma loquendi*, of the universally received meaning of the term.  Indeed no lawyer can hesitate a moment respecting its acceptation, and it is not seriously contested even here.  The chancellor assumes it as being too plain to require exposition, and throughout his opinion construes this 20th section as requiring that the remainder must vest, if ever, " during or at the expiration of not more than two *specified* or *ascertained* lives."  If then the former conclusion was correct, that the contingency by which the remainder is to vest, must happen within two lives in being, it is equally certain that those must be specified lives.  In this limitation there were no two specified lives; nor one specified life.  It is wholly indefinite ; the contingency may

arise by the death of the eldest of the thirteen minors or by the death of the youngest in age, or by the death of some intermediate minor. The suggestion that by reading this limitation, so as to suppose an ellipsis, and that the testator meant the youngest of his children and the youngest of his grand-children, living at the date of his will, we have two designated persons, and therefore two specified lives, has already been in part considered so far as it bore on another point. But in reference to this point, it is to be remembered, that the testator had six minor children at the date of his will and seven minor grand-children; and that he has added the qualification to the description of the youngest " attaining twenty-one." Now adopting the suggestion for a moment, how will the whole clause read? Until the youngest of my six minor children attaining twenty-one, and the youngest of my seven minor grand-children attaining twenty-one, shall have attained that age. Is it not pal-pable that the indefiniteness which before ranged between thirteen persons, now ranges in one case between six persons, and in the other between seven? Which of the six children shall attain twenty-one, is just as uncertain as it was before. The suggestion, therefore, it will be seen, does not help the matter; the lives are still indefinite; there are no two specified lives. I consider this objection also fatal to this remainder, that the contingency on which it is to vest, is not to happen within or at the expiration of two specified lives.

Thus far it will be perceived, that I have assumed that this remainder is *contingent* and not *vested.* A part of it only is claimed to be vested. It is conceded that the alternative estate in fee is contingent, because by the very terms of the will, it is to vest in those who are to be born after the testator's death, or in the appointees of the tenants for life among their descendants. It cannot be questioned for a moment, that there was no person in being at the testator's death, (which was the creation of the remainder,) who took an estate in fee. As to that, there can be no dispute that it was contingent. What are called the substi-tuted remainders for life, stand on the same footing; for

ALBANY,
Dec. 1836.

Hawley
v.
James.

those who are to take shares, in the event of the death of any of the seven children and two grand-children named, cannot be ascertained until that event happens. There are two contingencies, it will be perceived, on which these substituted remainders for life are to vest; *first,* the contingency of the youngest of the testator's children and grand-children attaining twenty-one, arriving at that age; and *second,* the contingency of one of the seven children and two grand-children named, dying, so that the substitutes may come in. It is obvious, then, that the remainder in fee, and the substituted remainders for life, come within the description in the 20th section, of contingent remainders; and if the conclusions to which I have before arrived are correct, that the contingencies on which they are to vest, will not by the terms of the limitations happen within two specified lives in being, then these remainders are clearly void; and if they are to be regarded as alternative remainders with those limited to the seven children and two grand-children, and thus constituting one whole remainder, and not successive and distinct remainders—then this additional objection arises, how a part of a remainder can be void and the residue maintained? I confess it seems an entire departure from the will, thus to give effect to a part only of what appears a whole intent. But waiving the further discussion of this view, I proceed to consider whether the devise of the shares to each of the seven children and two grand-children named are *contingent,* or whether they are *vested* in interest, before the termination of the trust term. If they are vested, they become so at the very instant of the testator's death, and do not come within the 20th section, for that speaks only of contingent remainders. The proposition on the part of the trustees is, that they are vested remainders limited on a term of years, although it is admitted they may be divested by the death of the children or grand-children named, before the expiration of the trust term.

It has been correctly stated that there is but one remainder, which is to take its character, in regard to the quantity of the estate given by it, from the character of the persons

ALBANY,
Dec. 1836.

Hawley
v.
James.

who are to take it. If they are persons who are living at the testator's decease, they take a life estate ; and if they are persons who were not living at the testator's death and were born afterwards, then they are to take a fee. There are no successive estates in this remainder, and counsel on both sides have properly conceded that they are alternative estates ; that the remainder will vest in one person *or* in another, according to the event, of such person surviving the duration of the trust term, or not. If Mrs. Barker is living at the expiration of the trust term, she will take a life estate ; if she is not then living, and her child, born since the testator's death, should then be alive, he will take, according to the will, an estate in fee. The same remark applies to each of the eight and a half shares ; and the case of Mrs. Barker is selected merely because it more simply and directly illustrates the nature of the remainder than that of any other child. This single view of the subject—that the remainder is fluctuating, that it alternates, and does not become fixed, either as to the person who is to take, or as to the estate to be taken, until the survivorship of that person is ascertained, seems to me entirely conclusive of the question. If a vested remainder be what all the writers call it, an *executed* remainder by which a present interest passes to a party, though to be enjoyed in future, and by which the estate is *invariably* fixed to remain to a *determinate* person, after the particular estate is spent, 2 Cruise, 264, nothing can be more unlike it than the remainder in this case. Here the estate is not fixed to a determinate person ; for the person may be Mrs. Barker or it may be her child ; and least of all, is it *invariably* fixed to Mrs. Barker ; it is not so limited that Mrs. Barker must *at all events* take any present interest. It can never become *executed* in interest, until it is ascertained whether Mrs. Barker survives, so as to take at all. It may be safely affirmed, that whenever an estate is limited to the *survivors* of several, that alone renders it contingent, because survivorship is in its nature uncertain. If there be any one universally acknowledged principle, running through all the cases on this subject, it is this. I do not propose to give them all, but I have thought a useful·

service might be performed by a reference to some of the most important, and by an effort to reconcile the principle on which they stand with others that are apparently, but not really, in conflict. In Cro. Car. 102, it is held that where an estate is limited to two persons during their joint lives, remainder to the survivor of them in fee, such remainder is contingent, because it is uncertain which of them will survive. Lord Coke in his 1 Institutes, 378, *a*, says, if a lease for life be made to A., B. and C., and if B. survive C. then the remainder to B. and his heirs in fee, the remainder is contingent. In the case of *Denn* v. *Bagshaw*, 6 T. R. 512, there was a devise to Margaret for life, remainder to the first son of her body, if living at the time of her death; Margaret had one son who died in her lifetime, leaving a son; it was held that Margaret took an estate for life, and that neither her son or grandson took any estate; that the interest of the son was contingent and never vested. In *Doe* v. *Scudamore*, 2 Bos. & Pul. 289, there was a devise to G. L. the testator's heir at law for life, and from and after his death to G. B. his heirs and assigns, in case she shall survive and outlive the said G. L. but not otherwise, and in case she shall die in the lifetime of G. L., then to G. L. his heirs and assigns forever. It was held by the court, (who stopped the counsel who was to argue in favor of what was decided) that it was a contingent remainder, both to G. B. and G. L. Rooke, J., says, " It was the intent of the testator that G. Lane should take an estate for life, and that after his decease, G. Benger should take an estate in fee if she survived him, (Lane,) but if she did not survive him, that G. Lane should take an estate in fee." In that case is presented the identical question under consideration, that of alternate remainders, depending on survivorship to determine who should take. The case of *Doe ex dem. Bernard and others* v. *Provost and others*, 4 Johns. R. 61, to which we have been referred as sustaining a contrary doctrine, appears to me the strongest case that can well be adduced in support of the proposition, that wherever *survivorship* is the condition of taking an estate, it invariably makes the remainders contingent. *Peter Praa* devised to his daughter,

*Christina Provost,* " the dwelling house and ground she now lives on, to hold the said house and ground for and during the term of her life; and immediately after her death I give the same unto and among all and every such child, as the said Christina shall have lawfully begotten at the time of her death, in fee simple; equally to be divided between them, share and share alike." Christina Provost had four children at the death of the testator, all of whom, excepting one, died before their mother, and the question was, whether the remainder in fee was vested in all her children, or only in the one living at her death. The court gave such a construction to the peculiar words of the will, as enabled them to hold, that it was the intention of the testator to give the remainder in fee absolutely to all the children which Christina should have lawfully borne in her lifetime. Spencer, J., dissented from this construction of the will, and held that the remainder was given to such legitimate children of Christina as should be living at the time of her death, and that therefore it was contingent. This was the ground taken by the counsel for the defendants, and Van Ness, J., who delivered the opinion of the court, thus notices it: "To give effect to the construction set up on the part of the defendants, we are compelled to add to the devise the word 'surviving,' and to read it thus : ' such surviving child or children as she may have, lawfully begotten at the time of her death.' This would make the remainder contingent, because of the uncertainty of the person who is to take; as it was unknown *which,* or whether any of the children of Christina would survive her." A more clear, explicit and precise recognition nad statement of the principle contended for, could not be conveyed by English words. The whole court agreed in the principle, that if the will was to be construed to apply only to the surviving children, then the remainder was contingent; but the majority held that such was not the fair construction of the words used by the testator. The case of *Stanley* v. *Stanley,* 16 Ves. 489, which has also been referred to, was so exceedingly complicated that it is extremely difficult to extract any general principle from it. There was a devise to trustees to receive the rents and profits of

the estate until *Thomas Massey* should attain the age of twenty-one years, and upon further trust that they shall, immediately after the said *Thomas Massey* shall have attained his age of twenty-one years, convey and assign the said estate to the said Thomas Massey for his natural life ; and this was held by the master of the rolls to be a vested estate for life, after an estate in the trustees for so many years as his minority might last. It was not a direct but a collateral question in the cause, and the master of the rolls did not think the question so material as it was contended to be. These considerations would be sufficient to prevent our allowing a single case, under such circumstances, to overthrow a series of adjudications to the contrary. But in truth there is no conflict between this and the other cases. Here *Thomas Massey* was designated and certain ; the estate was invariably fixed to him as a determinate person ; the interest in that estate was consequently vested in him, although he might not enjoy its fruits by coming into possession. In all cases of remainders, the law regards the right to the estate as a realty, entirely distinct from the possession or enjoyment of the fruits of it. If it did not, there could be no such thing as a remainder. " It is not the uncertainty of *enjoyment* in future, [says Mr. Preston on Estates, vol. 1, p. 74, and repeated by Chancellor Kent, in 4 Com. 206,] but the uncertainty of the *right* to that enjoyment, which marks the difference between an interest which is vested and one which is contingent." Now in the case of Thomas Massey, there was no uncertainty whatever as to his *right* to the life estate, but there was an uncertainty whether he would enjoy it. His right was rendered certain by the absolute gift to him—absolute, so far as respected the person ; but had the devise been that the trustees should convey a life estate either to Thomas Massey or to John Massey or to William Massey, whichever of them should be living at a certain period, then the estate would not have been invariably fixed in any determinate person, until the event arrived to ascertain which of them survived. This would be sufficient to show the inapplicability of this case to the question under consideration. But still it should be further re-

marked, that in *Stanley* v. *Stanley*, the master of the rolls gives his opinion, as he says, " upon the authority of a great number of decisions, from *Boraston's case* downwards." Now *Boraston's case*, 3 Co. 20, and all the other cases referred to, turned upon the construction of the testators' wills, where adverbs of time, such as *when, then, until,* &c. were used, and the questions before the court were, whether such words were clear and unequivocal indications of the testator's intent, that the event thus designated by adverbs of time, should be a condition precedent; and it was held in that class of cases, where there were other expressions to warrant it, that those adverbs did not constitute conditions precedent; but it never was questioned in any of them, that if there was a condition precedent, no estate could vest until it was complied with. All these cases are collected by *Watkin's*, in his treatise on conveyancing, p. 140, (edition by Merryfield,) and are placed by him on this ground of construction of particular adverbs of time in a will. It will be seen at once, that this class of cases can have no possible application to a will, where there is no question respecting any adverbs of time; and where, in language the most clear, unequivocal and undisputed, it is provided that the remainder shall go to persons surviving the trust term, and making survivorship the condition precedent to the right to take at all. The remark of Lord Kenyon, in *Denn* v. *Bagshaw*, before cited, is exceedingly applicable: " All the cases," says he, " cited on behalf of the plaintiff, proceeded not on the formal and technical words, but on informal words in the wills, where the courts were left to collect the intention of the devisor, as well as they could, from the different parts of the wills; whereas here, correct and technical expressions are used throughout, and no lawyer would have introduced more formal words, in the limitations in this will, than the devisor has used." I have not understood any one of the counsel who argued this cause to contend, that there is the least ambiguity in the 37th and 39th clauses of the testator's will, which provide that the eight and a half shares shall go to the children and grand-children named, in the event

of their being in life at the expiration of the trust term : and in the event of their dying before that period, then to their heirs at law ; and consequently I cannot perceive the utility of examining cases of construction of wills, to ascertain the intent of the testator, in a cause where there is no dispute about the intent.

There is still another class of cases, supposed to be in conflict with the proposition that *survivorship* creates contingency. They are thus stated by Mr. *Cruise* in his Digest, tit. 16, Remainders, ch. 1. § 8, and I prefer to give them in his own words, because in the statement itself he furnishes the reason why they are vested: "Vested remainders," says he, "or remainders executed, are those by which a present interest passes to the party, though to be enjoyed in future ; and by which the estate is invariably fixed, to remain to a determinate person, after the particular estate is spent. As if A. be tenant for years, remainder to B. in fee ; hereby B.'s remainder is vested, which nothing can defeat or set aside. So, where an estate is conveyed to A. for life, remainder to B. in tail, remainder to C. in tail, with twenty other remainders over in tail, to persons *in esse*, all these remainders are vested." In all these instances, it will be perceived that the remainder-men are *in esse*—are named ; they are thus determinate persons ascertained at the time of the limitation, and the estate is invariably fixed to them, that is, there can be no variation, no alteration between them and other persons. These illustrations of the principle are too plain to be mistaken. There are others that are not at first sight quite so plain; but a very little examination will show that they are on the same foundation. I again quote from the same title of Mr. Cruise, § 40: "There is a very material difference between that kind of uncertainty which makes a remainder contingent, and an uncertainty of another kind, namely, the uncertainty of a remainder's ever taking effect *in possession ;* for wherever there is a particular estate, the determination of which does *not* depend on any uncertain event, and a remainder thereon is *absolutely* limited to a person *in esse* and *ascertained*, in that case, notwithstanding the nature and direction of the estate limited in remain-

der, may be such as that it may not endure beyond the particular estate, and may therefore never take effect or vest *in possession*, yet it is not contingent but a vested remainder. As if a lease to A. for life, remainder to B. for life or in tail; here, notwithstanding B. may possibly die without issue in the lifetime of A., and consequently never come *into possession*, yet is his remainder vested *in interest*, and by no means comprised in the legal notion of a contingent estate." Now the illustrative case, put by Mr. Cruise, is the one supposed to be in conflict with the doctrine of survivorship creating a contingency ; because it is said that B. cannot possibly enjoy his life estate unless he survives A., and therefore *his* right must be contingent, if the doctrine contended for be sound. The argument proceeds on a fallacy, which consists in confounding the settled distinction between an interest or right, and the actual enjoyment of the fruits of that right. Mr. Cruise has answered it by the very remarks which the case is adduced to illustrate. The estate, that portion which is measured by B.'s life, is carved out by the original instrument ; it is itself a right, a right in action, not in possession or enjoyment ; this right is limited to a person *in esse*, B., who is thus ascertained, invariably ; it is *absolutely* limited to him, there is no contingency or condition precedent to his having his right in action, and it therefore vests at once in him, at the moment of its creation, and it is wholly immaterial whether he ever receives its *fruits* or not. I hold the sealed note of A., which I sell and absolutely transfer to B. His right to the debt is fixed invariably, although he may never recover a cent from A. In the case put by Mr. Cruise, he says B.'s remainder for his life is vested in interest, although he may never come into possession. How entirely different is the case before us, where all right to the estate depends on the person surviving at a particular period, where the person is not determinate, and therefore not ascertained until the event happens ; and where the estate is given, not absolutely but conditionally, and where it is not invariably fixed on any person, but is to vary according to events, and to alternate between different persons. In illustration of these views, I will, in ad-

dition to what has already been said, only refer to two cases in this court. In *Jackson* v. *Waldron*, 13 Wendell, 178, the question arose upon a devise of a portion of the estate to a son named *Joseph*, and of another portion to a son named *Medcef*, and the will then ordered that if either of the sons should die without issue, the portion of that son should go to the survivor ; and although the question was, whether the interest of the survivor was a possibility that was assignable, or not, yet collaterally the doctrine of survivorship generally was discussed, and in the course of the opinion given by Senator Tracy, p. 218, he remarks, " But I am bound to say, the authorities are explicit and positive, that a grant to a *survivor* of two or more, gives to neither any thing more than a mere naked possibility before the contingency occurs." The difference between a person surviving another, or surviving a prescribed period of time in the determination of a contingency, is beyond my comprehension. The other case is that upon *Lorillard's will*, where this very question was distinctly and directly presented, under circumstances precisely similar to those in the present case. There the testator had devised to trustees to pay over the rents and profits during the lives of twelve persons, and at the expiration of the trust term to convey in fee to his grand-nephews and neices (of whom fifteen were living at his death) who should be living at the expiration of the trust term, and to the descendants of those who should have died. It was contended that the fifteen grand-nephews and nieces took a vested remainder, which would open and let in after-born grand-nephews and nieces. Chief Justice Savage examined the subject at great length and with his usual ability and clearness, and came to the following conclusion : " They (the grand-nephews and nieces now in existence) are indeed persons answering the description in the devise as owners of the remainder ; they may be said to stand in the character of heirs presumptive ; whether they will ever enjoy the remainder of the estate, depends upon a contingency, it depends upon the fact of their *surviving* all the twelve nephews and neices." " The truth is, as I have already stated, that the present fifteen grand-nephews and neices have no

present estate, they have a possibility." No other member of the court expressed an opinion on that point, but throughout every opinion that was delivered, it is manifest that the remainder in fee was held by all to be contingent. With such a train of authorities, so clearly settling and recognizing the rule, and without one single case impeaching the principle, that *survivorship* is an uncertain event, and prevents the person who is to take, from being determinate and ascertained, and especially where there is an alternative as to the persons, depending on their being *in esse* at a given period of time, I cannot allow myself to entertain a moment's doubt, that the remainder in this case is contingent, and that it cannot vest in interest until the persons who are to take are ascertained by the fact of their being in life at the expiration of the trust term. Having arrived at this conclusion, the result is, that these first life estates being contingent remainders, and not being so limited that the contingency on which they are to vest in interest, must happen if at all, within two specified lives in being or at their expiration, they are not such as are authorized by the 20th section, and not being authorized in any form by the common law, are void. The chancellor rests his opinion of the *contingency of the whole remainder*, not only on the grounds now stated, but also on the ground that there is a power of selection given to the trustees, by which they are authorized to withhold the share directed to be allotted to any one of the seven children and two grandchildren, in case of their leading immoral lives, &c. Having come to a conclusion, very satisfactory to my own mind, that these life estates are contingent, and do not vest in interest until the expiration of the trust term, for the reasons already given, I have not deemed it expedient to discuss the effect of the power given to the trustees to withhold any of these shares. Still it is proper to express my concurrence in the opinion delivered by the chancellor on this point; and chiefly for the reason, that the partition of the estate into shares, the allotment to the different devisees and the conveyance of the property so allotted, are made by the will, essential to a designation of the particular lands which each

devisee is to have, and are in their nature conditions prece-
dent to the acquisition of title by each devisee; and as in the
very act of conveyance the trustees must execute this power
of selection, it seems impossible to say that any estate in any
particular lands has vested until the selection and conveyance
be made.

Although entertaining these views of the *several parts* of
this remainder, that each of them in detail is contingent, yet I
should do injustice to myself if I did not state that I deem it
erroneous thus to view them *in detail,* as in my judgment they
incontrovertibly constitute one *whole* remainder, being in
themselves mere alternations, and to be regarded as a whole,
and that the true question is, whether this whole remainder
after the trust term is vested or contingent? And it seems
impossible to me to read the 37th and 39th clauses of this will
in connection, without perceiving that the question, whether
the remainder has vested in interest, can never be determined
until the nature of the estate which is to vest be ascertained,
and which cannot be done, until the period prescribed for the
expiration of the trust term.

Before dismissing this point, it is proper to make a re-
mark which could not well have been made before, without
interrupting the course of the discussion. It is this: that
by adopting the construction given by the chancellor to the
20th section and referring only to the taker of the remain-
der for life, without considering at all the time when the
contingency is to happen, we shall in effect render the 20th
section a mere repetition of the 15th. That section had al-
ready required remainders to vest within two lives in be-
ing, except in one single instance which has no relation to
the present question. Now, the construction given by the
chancellor to the 20th section makes it nothing more than
this, for, according to that construction, a contingent re-
mainder in fee limited on a term of years to the survivor of
A. and B., would be good, if they were both living at the
time of its creation. This idea was probably taken from the
argument of one of the counsel before him, which has
been circulated among the members of this court, in which
it is said " the rule therefore as declared in sections 15 and

20 is the same," and the reason given was, that the legislature could not have meant to perplex the law by introducing a new and arbitrary distinction, as fanciful and unreasonable as any of those which they sought to abolish. To my mind this is entirely unsatisfactory, and if it were otherwise, it would much diminish my estimation of the order and perspicuity of the revised statutes. The cases for which these sections were created, are not the same. The 15th was framed to abridge an existing common law rule; the 20th to provide for a new case unknown to the common law. Had the intention been, that it should be governed wholly by section 15, we should expect the usual phraseology in such cases, " subject to the provisions in section 15, a contingent remainder may be limited on a term of years." It is a little remarkable that this very provision is contained in § 24 which says " subject to the rules established in the preceding sections of this article (among other things) a remainder of a freehold, or chattel real, either contingent or vested may be created expectant on the determination of a term of years," the very case under consideration. Now it is incredible that section 20 was framed merely to repeat this, and that the careful and precise expressions respecting the nature of the contingency and the time when it should happen, were mere verbiage; but I will pursue this subject no further, as the counsel on both sides, on the argument here, agreed that the chancellor was wrong in referring exclusively to the life of the taker of the remainder. Still, I agree with the chancellor, that this may be one test, and in the case put by one of the counsel for the heirs at law, of an estate to A. and B. for twenty years, if they or either of them should so long live, remainder to C. when he should return from Rome, there might be a lapse after the death of A. and B., before C.'s return, so that the remainder would not vest, either during the two lives or at their expiration, as he might not return by that time. So, if there be a term of years limited to A. for ten years if he shall so long live, remainder in fee to the eldest son of B., who shall be born two years after the death of A. here it would not vest during the continuance of a life not in being

at the creation of the remainder, and the objection of the chancellor would be fatal to such a limitation. It is admitted that the devise to the seven children and two grand-children does not fall within this objection, because they are in being. The objection as clearly stated, arises under the other clause of the 20th section. But the objection would lie to the devise of the contingent fee to the descendants of such of the seven children and two grand-children, as should die before the expiration of the trust term, for most clearly, such descendants would not become vested with the estate, during the continuance of any two lives in being at the creation of the remainder, and that part of the devise is a most palpable violation of the 20th section.

I am inclined to think that the addition by the legislature of the words, " at the creation of such remainder" after the words " two lives in being," in the 20th section, did not vary its construction, as the 15th section had already prohibited the suspense of the power of alienation, for more than two lives in being " at the creation of the estate," while I agree that the addition of these words was proper, to render the two provisions harmonious. But I cannot agree, that the addition of these words rendered the 21st section of no avail ; for I can conceive a mode by which a contingent fee might be limited to a person not in being, and where the 21st section would apply to prevent a contingent life estate being so limited. Suppose a limitation to A. and B. for twenty years, if they should so long live, with a contingent remainder in fee to such son of B., as should be first born, during the lives of A. and B. Here the contingency would happen within two specified lives in being, and the 20th section would be complied with. But the 21st would prevent a limitation for life to the son of B., born during those lives ; and the reason is obvious, for upon that life estate a fee might be limited, and thus there might be a suspense of the power of alienation for three lives, to wit, A. and B. and the son of B. It was, therefore, in my judgment, expedient to retain the 21st section, as it would reach cases not provided for. But this distinction does not help the devise in this case to the descendants of

the seven children and the two grand-children in fee ; because there is no limitation in the devise, by which it *must* vest in interest, in the language of the 20th section, within two lives in being, if at all. On the contrary, it cannot by its terms so vest ; for previous to those descendants taking, (in default of an appointment,) there must have preceded first, the trust term, and then, the life estate of the ancestor of such descendants.

There is another objection to this devise of a life interest in the shares to be allotted to the seven children and two grand-children, at the expiration of the term, which arises from the state of the case. By the 15th clause of the decree it is declared, that if the several remainders for life limited to the seven children and two grand-children, shall vest in interest and possession at the expiration of the trust term, (that is, if any of the seven children and two grand-children shall receive conveyances from the trustees of any shares,) then the respective remainders limited thereon, (that is, on those life estates,) to the descendants or special heirs of the first remainder-man for life, are also valid, subject to the execution of the power of appointment, but that the power in trust given to the remainder-men to devise the ultimate remainder in fee, or otherwise, to any of their descendants who shall not be in existence at the time of the death of the remainder-man, is illegal and void ; and the decree also declares void the power to devise an estate other than a fee, except in the case of the death during minority of the first appointee. This part of the decree is not appealed from by any party, except William A. Barker, who has appealed from the whole, and he has no interest in it, and has no right to ask for its reversal. Indeed his counsel has abandoned all objections to the decree, except those which are enumerated in his points, or which are consequent to or dependant upon them; and if it were appealed from, the case probably would not be altered. Now, here are two very important qualifications of the devise of the testator, which this court cannot touch. The testator says, that the first remainder-men for life, if they take any shares,

shall have power to devise the same to, and among any of their descendants ; by which children and grand-children are described. " No," says the chancellor, " you must confine the exercise of this power, to such of your descendants as shall be born before you die. Although the testator intended to give you the option of withholding from a worthless prodigal son who should be in being, the shares allotted to you, and to make provision for his unfortunate children, and thus guard them against the consequences of his profligacy, yet that intention is illegal and void ;" and this is now the law of the case. By the 44th clause of the will, this power to devise to descendants is to be included in the conveyance of the trustees to the remainder-men for life. They can no longer obey the directions of the testator, by inserting the power he has directed, but must introduce that prescribed by the chancellor ; or, if the remainder-men for life are to take without a conveyance, then the devise to them by the will is essentially altered, and an important part of it is declared void. So with respect to the other exception ; the testator authorizes the remainder-men to devise in fee, in such manner as they may think proper, clearly comprehending contingent and conditional fees ; so that the remainder-men for life, taking example from the will of the testator, might impose similar terms. But this is also declared illegal and void, and they are to devise nothing, according to the decree of the chancellor, but an absolute and unconditional fee, except in case of a minority, &c.

I will now proceed to inquire if it is possible that a devise that is thus illegal and void, on the ground of violating the statute against perpetuities, in such essential particulars as have been stated in this case, can be maintained for any purpose ? That an executory devise confessedly bad in part, on the ground of remoteness, is wholly bad ; that it cannot be executed by fractions, and cannot be moulded by the courts into a legal form, seems to be a doctrine as well settled as any other in the books. In *Ware* v. *Polhill,* 11 Vesey, 257, a power of sale was held to be bad, because it might travel through a longer period of time than that al-

lowed by the common law for the suspension of alienations; and the lord chancellor remarks, "If it is bad to the extent to which it is given, you cannot model it to make it good." This case came under consideration in that of *Lord Southampton v. Marquis of Hertford* in 2 Vesey and Beame, 54. The will directed an accumulation of rents and profits during minority, until there should be a tenant in possession of the age of twenty-one. It was a will not within the English act on the subject of accumulations; and it was admitted on all sides that an accumulation might be directed, so long as an estate could by law be kept from vesting, and this was beyond that period. The counsel for the defendants urged that it was void only for the excess, but the master of the rolls held that it was wholly void, and enters into an elaborate discussion of the question. He remarks, " I do not see how any part of such a trust can be executed. As to the possibility that Lord Southampton may attain twenty-one, that never can be held to be an answer to the objection, that the trust as originally created was too remote." In *Seaward v. Willock*, 5 East, 205, Lord Ellenborrough remarks, "His meaning was to give estates for life to his grand-son, and after him to his sons, and after them to their sons down to the tenth generation, &c. But this he could not do by law, inasmuch as the law will not allow of successive limitations for life, to persons unborn. Can we then make another will for the testator, giving to his devisees different estates, than those he meant to give them, because the estates he intended, cannot by the rules of law, take effect?" "This, I conceive," (he adds,) "would be assuming a power not belonging to us." In *Jee v. Audley*, 1 Cox, 324, there was a limitation that was too remote, but events had happened, which would bring it within the rules of law. The master of the rolls remarks, "another thing pressed upon me is, to decide on the events which have happened; but I cannot do this, without overturning very many cases. The single question before me is, not whether the limitation is good in the events which have happened, but whether it was good in its creation; and if it were not, I cannot make it so." These are cases

ALBANY,
Dec. 1836.

Hawley
v.
James.

which have arisen at the common law, and others might be added, but it is not deemed necessary. The case at bar arises under a statute, where the rule is extremely rigid, that whatever is prohibited, is wholly void. It cannot be necessary to refer to the cases which have been cited on this point, as the rule is familiar to every lawyer. The common law is said to be a nursing mother, and to save where it can, while statutes are inexorable and unrelenting ; upon the principle, I presume, before adverted to, that where the legislature has spoken, the courts have nothing to do with consequences. But as common law rules are made by the courts, they claim the right to model them, and the cases that have been cited from the common law reporters, in themselves sufficiently contradictory, and extremely difficult to reconcile so as to extract any settled principles of executions of wills in part, have no application to a case falling within the prohibition of a statute. Our statute declares, that every limitation by which certain results may be produced, shall be void. It speaks of the whole, it allows of no separation of parts. Where it intends to make a separation, and make a part only void, it says so in terms, as in the 38th section, p. 726, respecting accumulations. 1 do not feel that I have any authority to interpolate a qualification which the legislature has refused to insert. Upon this single ground, then, if there were no other, that the devise to these first remainder-men for life is confessedly bad in essential particulars as being contrary to the statute against perpetuities, I should hold it to be altogether void.

An incidental question has been raised, or rather intimated, viz. whether if the trust term as limited by the will is held void, and the remainder in fee is also held void, so that the estate in fee has descended to the heirs at law, the seven children and two grand-children named in the will may not take a life estate in the shares directed to be allotted to them, either now, or at the period described for the vesting of those life estates ? In respect to which it may be remarked that it has already been shown, that they cannot take that estate *now:* to which, however, I would add the

decision of the master of the rolls in *Routledge* v. *Dowell*, 2 Ves. Jr., 356, that " preceding limitations, under an appointment, being void, subsequent limitations, though within the power, cannot be accelerated and are void also," which would seem to dispose of the whole question, as well in reference to their taking the estate now, as at any time hereafter. There is, however, another answer furnished by the discussion which has just been concluded, that the remainder for life to the first-named remainder-men, is in itself void, for the reasons applicable to that particular estate under section 20.

Having now finished the examination of the questions relating to the estates created by this will, and having come to the conclusion that they are wholly void, it remains to consider whether the trust term can be maintained for any other period than that prescribed by the will. This inquiry becomes indispensable, because, although the term specified for its continuance, absolutely may be too remote, yet, if there are any valid purposes of an express trust, the trustees must hold the estate until those purposes are executed ; and to determine this, a minute examination of each of the supposed purposes of the trust is necessary. They may, however, be so classed as to shorten the examination.

*First.* There are a number of the duties devolved on the trustees, which if valid are clearly powers, and are not express trusts. Of this description are the directions in the 36th clause of the will to convey to the children of Augustus James, and to Anna M'Bride James and Lydia James certain land, and the direction by the 38th clause to pay to James King ten thousand dollars or convey to him land of equal value. The authority to sell lands for the purpose of investment and to invest their proceeds, is also, if valid, a mere power. But as the purpose for which such investments are to be made is accumulation and to furnish the means of fulfiling the devises of the will, and as these devises and the directions for accumulation are void, these powers are also void. Besides, not being enumerated among the powers authorized by law, they are void for that reason also.

ALBANY,
Dec. 1836.

Hawley
v.
James.

*Second.* There are many of the duties of the trustees which have ceased in consequence either of direct decisions of the chancellor which are not appealed from, or because those decisions render it inequitable and improper to perform them. Of this class is the direction to pay $3,000 to Mrs. James for the benefit of herself and her children. This legacy has lapsed in consequence of its being rejected by Mrs. James. Of the same class are the directions' in the 29th, 30th, 31st, 32d, and 33d clauses of the will; by the 29th, provision is made for the support of minor children during their non-age; by the 30th, provision is made for the widows and children of sons who should die during the trust term, and for the children of daughters who should so die, (and which fails of course with the trust term;) by the 31st and 32d, advances are directed to sons and grand-sons; by the 33d clause, advances are to be made to the daughters. Many of these clauses are objectionable for reasons peculiar to each; but there is one general view which embraces the whole, and shows that they are no longer to be considered as within the will and intent of the testator. By the decree of the chancellor, the persons who are the objects of these directions, will receive their portions of the three and a half shares of the testator's whole real and personal estate, which are declared to be undisposed of by the will, and will also receive the income of eight and a half shares, which was directed to be accumulated, and which directions are void. No principle is better settled, than that a person cannot take as heir at law, contrary to a will duly executed, and also take any provision under the will for the manifest reason that the intention of the testator is frustrated. The ordinary course is to put the heir to his election. *Blunt* v. *Clecheron*, 10 Ves. 589. *Welley* v. *Welley*, 2 Ves. & Bea. 187. *Cary* v. *Askew*, 1 Cox, 241. As to infants, the court makes the election for them. 1 Swanst. 409. And as in this case it is perfectly evident that the election must be, it should be considered as made. Besides, there is another principle, that a party cannot take a charge upon a fund, where the principal of that fund is given to him. It is upon these principles, that if the

devises in this will are declared void, the *annuities* to William James and Henry James are extinguished. *Mr. Powell* in his essay on devises, p. 294, sums up the doctrine thus ; " It is a conclusion in equity, that wherever any person having a claim upon a man's estate independent of him, and also a claim thereupon under his will, which claims are repugnant to each other, pursue the former, the latter is thereby waived or abandoned ; for it being against the intention of the will that the devisee should have both, equity will consider such devise to be upon the implied condition that the devisee shall abandon his original title, or shall waive his title by devise." And this doctrine has always been applied to an heir at law, who takes by a title independent of the testator, that is, by descent. I conceive therefore there can be no question, that these provisions of the will being repugnant to the interest taken by the parties as heir at law, must be deemed abandoned, and no longer form any of the purposes for which this trust may be maintained.

*Third.* The direction to pay debts is not an express trust, because no authority is given to " sell lands" for that purpose, which is the only trust for that object permitted by the 1st subdivision of section 55, 1 R. S. 728. And in this case, the directions are to the contrary, to pay the debts out of the income of the property.

*Fourth.* There is another class of duties devolved on the trustees, which are undoubtedly legitimate objects of an express trust. In this class, are the directions to pay $3,000 for the benefit of Mrs. Gourlay's children, and $1,000 to John James. As it is admitted on all hands, that the personal estate of the testator undisposed of, is the primary fund for the payment of these legacies, the trustees are to pay them as executors, out of the personal assets in their hands, and of course they take no estate in land for that purpose. In this same class may be included the directions in the 13th clause of the will to pay the orphan asylum an annuity of one hundred and fifty dollars until the trustees shall find it convenient to invest the sum of two thousand five hundred dollars, when they are directed to do so, and transfer the same to the asylum. From the evidence be-

fore us, in the master's report of the property in the hands of the trustees, it is evident that it is convenient now to make such investment. And as in this mode, the legacy is perfectly legal, while the validity of a perpetual annuity charged upon lands is more than questionable, the trustees should be directed to pursue that mode which will effectuate the intent of the testator, is in exact conformity to his will, and avoids all hazard of depriving such a meritorious charity of the intended benefaction. This, then, is also to be regarded as a sum in gross, which the executors can immediately pay, and for the purpose of which, there is no reason for maintaining the trust term.

All the purposes which have been or could be claimed as objects of a legal trust, have now been examined, except the directions to pay the *annuities* to Catharine Tillman, Charlotte James and Susan Duffy, and those to the testator's two sons, William and Henry. Waiving for the present the consideration of the latter, the annuities to the three first named persons constitute the *fifth* class of persons of the trust term. It may be remarked, in the first place, that nothing is more evident than that the testator did not intend that the trust term should continue for the mere purpose of paying these annuities; for, in the 16th clause of his will, he has directed that at the final partition of his estate, (when the youngest of his children and grand-children attaining 21, shall attain that age) " such of the said annuities as shall not then have ceased, shall be effectually secured to the respective legatees." The trust to pay these annuities was therefore a mere incident to the main purpose of the trust term, and he did not create that term for the purpose of paying them; but having created it for other purposes, he found it more convenient to direct, that during the time he intended its continuance, his trustees should pay the annuities also. To maintain the term for the sole purpose of paying them, would then, it seems to me, be a very evident violation of the testator's intent. This is the most charitable conclusion respecting his intentions; for if we suppose that these small annuities were inserted, merely for the purpose of keeping up a trust term which would otherwise be illegal, we should

then impute an intent to commit a fraud on the law, and to pervert a wise and merciful provision into the means of evading some of the most important principles of the statute. I am by no means certain that the argument which has been urged, that the intent, if not the words of the statute, permitting an express trust to receive rents and profits, and apply them to the use of any person during his life, must be, to authorize such a trust of such an amount of rents and profits only, as would be necessary for that purpose, and that as to all rents and profits not so applied, there was no trust, and could be none. Indeed, I am of the opinion that the argument is sound; but at present I am disposed to rest this point on the evident intent of the testator; and as he has authorized this "effectual securing" of these rents and profits, in an event which I think has occurred, (the ceasing of the trust term,) I am of opinion we shall comply with his will by directing that those annuities be now effectually secured. This conforming to the will of the testator, steers clear of the objection to the court's divesting any interest that has been devised.

But the question returns, whether the testator could himself provide any means for securing *annuities?* I think the statute, in the 2d subdivision of the 55th section, which authorizes a trust to *sell, mortgage or lease lands for the benefit of legatees,* has conferred such power. Conceding that annuities are legacies, how can this provision be executed without violating the 15th section against perpetuities? While I have no doubt that this section, and all other provisions in this title, are subject to the prohibition of section 15, yet I agree that if there is any mode by which they can be reconciled and effect given to each, it should be adopted. Thus, it will be perceived, I partly concur in the views of the counsel for the trustees; the points of difference and the grounds of such difference will presently be seen. It has been assumed that "leasing lands" necessarily implied the receiving of an annual or periodical rent. This may be, and probably is, the usual mode of leasing; but the expression is by no means confined to that mode. It is a mat-

ALBANY,
Dec. 1386.

Hawley
v.
James.

ter of common experience that leases are made for a gross sum, paid at the commencement of the term ; and in this case, the trustees might lease lands of the testator, sufficient in amount to raise a sum with which to purchase an annuity for Susan Duffy ; and so for the other annuitants. The remainder in the lands so leased would descend to the heirs at law, and they, uniting with the tenants, could at any time convey an absolute fee in possession. This, it will be seen, avoids entirely the difficulty of the trustees leasing lands and receiving the rents annually, for they can never unite in a conveyance that would be in contravention of their trust. There is still another mode in which I conceive this object can be accomplished ; by the trustees leasing a specific portion of the testator's real estate upon a ground rent— that is, a rent irrespective of any buildings or improvements—during the life of the annuitant Catharine Tillman, for a sum payable annually to her, equal to the annuity ; and in the same manner for each of the annuitants. Assuming that Catharine Tillman could not alien her interest in the annuity or in such a rent, yet there would be a suspension of the power of alienation of that specific portion of land for only one life in being, and the statute would be obeyed, and this is the only ground on which it could be exempted from the operation of the statute ; for, supposing such a lease to be made for the lives of *three* annuitants, and assuming that the annuitants cannot assign or extinguish their interest, it would be impossible to convey an absolute fee in possession during those three lives. If the reversion in fee has descended, and the heirs at law were to join the lessee in a conveyance, although a fee in possession would pass, yet it would not be absolute, for it would be subject to the rent, and the term of the possession would depend on the payment of the rent. This is the insuperable difficulty of a general charge upon lands by means of a trust term to pay annuities to *three* persons during life or for more than two lives. It becomes a joint charge of the three, and it is, in effect, a joint tenancy of the three to continue during their lives. And this is precisely the same difficulty which existed under the *Lorillard will,* where there was a joint interest of twelve

*cestuis que trust ;* and it was in vain that counsel endeavored to turn them into tenancies in common. The point has been most solemnly adjudicated by this court, that a joint interest of more than two *cestuis que trust,* which is a charge upon land and is inalienable, is a violation of the statute. In that case the whole rents and profits, after certain deductions, were to be divided annually, and paid over to the twelve nephews and nieces, and this was held a suspension of the power of conveying the lands, out of which those rents issued. What difference can it make, in principle, whether it is a specific sum thus directed to be paid over as an annuity, or the general balance after deducting certain charges ? I agree then, that it is difficult to distinguish this case from that of *Lorillard,* so as to save these annuities ; but in the direction given in this will to the trustees, " effectually to secure" the annuities, I think I see a power implied to secure them, in such a manner as the law will permit. If this is not sufficient to distinguish the cases, then there can be no difference in the results. But believing that there is a power in this will which may be considered to include that allowed by law, of leasing lands for the benefit of legatees, I am willing to sanction its execution in the manner suggested.

A few words more, however, on the point whether, if these three annuities are a charge on the whole real estate of the testator, they necessarily prevent the alienation of a fee in possession. This charge has been compared to a mortgage which the annuitants hold, and by virtue of which they could compel the sale of the property charged, to satisfy arrears. An ordinary mortgage does not suspend the power of alienation a moment, because the mortgagor and mortgagee, by uniting in a conveyance, may convey the absolute fee. But if, by the limitations of an estate, or the provisions of law, the mortgagee, in any given case, is disabled from assigning or releasing his interest during his life, then it is obvious an absolute fee in possession cannot be transferred during his life ; it could not be absolute, it would be conditional, subject to the mortgage. And if there were three mortgagees for life, who were disabled from

parting with their interest, then an absolute fee in possession could not be conveyed during the three lives, and thus the statute would be violated. Such would be precisely the case with three annuitants for life, whose annuities were charged upon the same land, if their interest is inalienable —and that is the question next to be considered as briefly as possible. The first provision on the subject which I shall consider, although not the first as to the time of the enactment, is the 38th section of the act relating to the court of chancery, 2 R. S. 173, by which the power of the court is declared to reach rights in action to satisfy a judgment at law, after a return of an execution unsatisfied. Among other things, the court is authorized to decree satisfaction of such judgment " out of any property or thing in action held in trust for the defendant," " except where such trust has been created by, or the fund so held in trust has proceeded from some other person than the defendant himself." It is to be remarked, that this applies to a compulsory and not to a voluntary transfer of the interest in trust. But the principle would be fraught with injustice, which would permit an individual to enjoy millions which he could dispose of at his pleasure, and on the strength of that power of disposition, obtain credit, and yet, when a creditor came to invoke the aid of the law to reach this apparent pledge, would deny him all assistance. On the contrary, it is believed to be a universal principle, running through the whole system of written and unwritten law, that any interest or property, which a debtor may himself dispose of, the law can reach and dispose of in his behalf, for the satisfaction of his debts. It becomes important, then to examine carefully the existing statutory provisions, to see whether there is any conflict in this respect between them, so that there is any property which an individual may dispose of, but which his creditors cannot touch. It will be observed that the 38th section, already quoted, subjects to the power of a court of equity " any property or thing in action *held* in trust for the defendant," and then the exception relates to *such trusts* created by some person other than the defendant himself. Strictly speaking, a trustee does not

hold any *property* in trust *for* the *cestui que trust;* for the statute declares that " the person for whose benefit the trust is created, shall take no estate or interest in the lands, but may enforce the performance of the trust in equity." 1 R. S. 729, § 60. Thus in the case of an *annuity* charged on lands, those lands are not held for the annuitant, but the rents and profits, after they have been received by the trustee, and before they are paid over, are held in trust, and come within the description of the exception, which therefore clearly protects it from the power of the court of chancery. Another provision relating to assignments, partly voluntary and partly compulsory, is found in the act, 2 R. S. 21 §, 28, respecting assignments by insolvent debtors, on their application in conjunction with two thirds of their creditors, by which it is declared that "such assignment shall vest in the assignees all the *interest* of such insolvent, at the time of executing the same, in any estate or property real or personal, whether such interest be legal or equitable." A corresponding provision will be found in the act to compel assignments by debtors in execution, 2 R. S. 27, § 19. But by the 60th section of the act relating to uses and trusts, 1 R. S. 729, already quoted, it is enacted that the person for whose benefit a *trust* is declared, shall have no interest in the property; so that an assignment of an insolvent debtor would pass no other *interest* than that which the debtor had in money actually received by his trustee, and which was then due and payable. By section 104 of the act relating to powers, p. 735, it is provided that " every beneficial power, and the interest of every person entitled to compel the execution of a trust power, shall pass to the assignees of the estate and effects of the person in whom such power or interest is vested, under any assignment authorized by the provisions of the fifth chapter of this act." Now, if the chancellor means in the case of *Hallett* v. *Thompson,* 5 Paige, 585, that under this provision the interest held in *trust* would pass under an assignment by the *cestui que trust,* I must dissent from him. The legislature has made a wide and marked distinction between trusts and powers, and between the interests of persons claiming under the one or the other; and

the section quoted relates to *powers*, and is wholly confined to them, and cannot by any construction be extended to trusts. We now come to the 63d section of the act relating to uses and trusts, 1 R. S. 730, which declares that " no person beneficially interested in a trust for the receipt of the rents and profits of lands, can assign or in any manner dispose of such interest ; but the rights and interest of every person for whose benefit a trust for the payment of a sum in gross is created, are assignable." Before this section can be understood, the terms which it employs must be thoroughly comprehended. It excepts a " sum in gross" from the prohibition against assignments. What is a sum in gross ? The definition given by Dr. Johnson of the word *gross*, applicable to the sense in which it is here used, is " the bulk, the whole, not divided into its several parts." He derives the word from the same word in the French, which is defined in the latest edition of Boyer's French dictionary, to mean " the biggest part," and en gros" to mean by wholesale. Dr. Webster's definition is, " whole, entire ; as the gross sum or gross amount as opposed to a sum consisting of separate or specified parts." And the terms " in the gross," " in gross," he defines thus : " in the bulk or the whole undivided ; all parts taken together." Mr. Tomlins, in his law dictionary, thus defines it : " in gross, absolute, entire, not depending on another." This concurrence of all authorities would seem to leave no doubt that the expression " sum in gross" could apply only to one single, entire sum, and not several sums. If it was otherwise intended, the expression would have been " but the rights and interest of every person for whose benefit a trust for the payment, *annually*, of a sum in gross is created are assignable." But the word annually is not in the section. If this is not the meaning of the section, it is beyond my power to point out the difference, intended to be established by the section, between a sum in gross and other sums. If this be the corrrect view, these annuities, payable annually, are not a " *a sum in gross ;*" they are several sums. The result is, that by § 63, the interest of an annuitant, in a trust created for his benefit, is inalienable. Thus far, the statutory provisions in relation to such a trust

are in harmony; they can neither be reached by a court of
equity, nor assigned under the insolvent laws, nor volun-
tarily assigned. Nor is the 57th section, p. 729, in conflict
with this view. That section provides, that where a trust
is created to receive rents and profits, and no valid direc-
tions for accumulation are given, the surplus of such rents
and profits, not necessary for the education and support of
the person for whose benefit the trust is created, may be
reached by a court of equity, to satisfy judgments. This
section has no reference to an express trust to apply rents,
or to pay them over, or to lease lands for the benefit of lega-
tees. It provides for a case, where the object for which
the rents and profits were to be received has failed—where
the directions for accumulation are invalid. The 40th sec-
tion, p. 726, had provided that where there is a suspense of
the power of alienation, during the continuance of which
the rents and profits are undisposed of, and there were no
valid directions for their accumulation, they should belong
to the persons presumptively entitled to the next eventual
estate. Thus a trust would be created for their benefit; and
in this and in all other cases, where there is no direction
given for the application of the rents and profits, or where
such directions are illegal, and those rents become subject
to the disposition of the law, the 57th section secures the
rights of creditors to a certain extent. These are all the
provisions in the statutes that bear on the subject, and the
result seems very satisfactorily established, that no part of
the interest of a person in a legal trust for his benefit can be
reached by the courts, or assigned by the individual where
it is not a trust for the payment of a sum in gross; and as
annuities are not "a sum in gross," the annuitants cannot
assign their interest. It will be perceived that this exami-
nation has been confined to the very point presented by this
case. When the question arises, whether a trust for "a
sum in gross" can be reached in equity, it will be in time
to decide it. There may be a difficulty in reconciling the 38th
section of the article relating to the court of chancery, with
the exception in the 63d section of the article respecting trusts;
but that difficulty does not arise in this case, because it is

not within the exception, and because the general qualification against assigning the interest of annuitants in the 63d section is in perfect harmony with the 38th section above mentioned.

One other point which has been made in reference to this part of the subject, remains to be considered. It is alleged that the first and second subdivisions of the 55th section of the article relating to trusts: which are, 1. To *sell lands* for the benefit of *creditors*, 2. To *sell, mortgage,* or *lease lands* for the benefit of *legatees,* or for the purpose of satisfying any *charge* thereon, are not subject to the provisions of the 15th section against suspending the power of alienation ; and two principal reasons are urged in support of this position. It is said, first, that the legislature never contemplated any suspension whatever under this subdivision. If this be correct these annuities for more than two lives, to be paid out of the rents and profits of the same lands, cannot be created under those subdivisions, for that such annuities suspend the power of alienation has already been abundantly shown. If the position then be correct, it amounts to this, that a trust cannot be created under those subdivisions for any thing but the payment of a sum in gross ; and as annuities are not of that description, there is an end of the question, and so far as this second subdivision is concerned, the annuities in this case must be declared illegal and wholly void. But I think they may be saved in the manner already suggested and in conformity with the very letter of the second subdivision of the 55th section and of the 15th section. The second reason is, assuming that annuities do produce suspension, yet as they are authorized by the second subdivision, and as that is not declared in express terms to be subject to the rules in the first article, as is the case in the third subdivision, the trusts created under it are exempt from the 15th section. I am unwilling to believe that the legislature, after having taken so much pains to reduce, limit, and prescribe the period, during which alienation of lands may be suspended, upon great reasons of a public, social, and political nature, should have expressly authorized such a suspension, for the sake of paying annui-

ALBANY,
Dec. 1836.

Hawley
v.
James.

ties for an unlimited period of time and that, too, when there was not the least occasion for conferring such authority. If the position which I am examining be correct, a suspension may be produced now as long as it was by Mr. *Thellusson's will* or by the *Humberson will;* for the testator has only to grant annuities of small sums to twenty-seven or any other number of persons, and charge them upon his real estate, and all attempts to dispose of an absolute fee in such estate, during the lives of those persons, or of the survivor, will be utterly vain; and this, too, without any occasion for such an authority; for a testator may direct a lease to be made to raise an annuity for the life of one person, and if each annuity is charged on its own specific portion of land, there will be no violation of the rule against perpetuities; for then there will be a suspense only during one life. Still, notwithstanding these consequences, and the want of any occasion for such a provision, if the law is explicit, it must be obeyed. Although I can perceive no good reason for inserting in the third subdivision of the 55th section, the words "subject to the rules prescribed in the first article of this title," yet I can imagine that it may have been supposed useful, in a case where the rule against suspensions would be most likely to be disregarded, to call attention to it. However that may be, I cannot admit that the insertion of these words in that subdivision, necessarily repealed prior and paramount provisions, that would otherwise apply to the 2d subdivision. The 15th section is universal in its language, and it is made more emphatically so, by the circumstance that one single case only is declared to be excepted from its operation. Can it be supposed, that such a declaration would be allowed to stand, when there was a very numerous class of cases also excepted? Again, the 36th section of the first article, 1 R. S. 725, seems designed to reach the very case. It says, "Dispositions of the rents and profits of lands, to accrue and be received at any time subsequent to the execution of the instrument creating such disposition, shall be governed by the rules established in this article, in relation to future

estates in lands." The rents and profits that are to be applied to the payment of these annuities, are to accrue and be received subsequent to the execution of the testator's will, and therefore come within the very words of this provision. I feel satisfied, therefore, that the *legislature has not been guilty* of the absurdity of undoing its own work, but has left trusts of all descriptions to receive rents and profits, under the salutary restrictions of the 15th section. If, then, these annuities are to be supported under the second subdivision, it must be in such a mode, as to prevent their suspending the power of alienation. But if the trustees take the legal estate in the testator's real property, for the purpose of paying them, and if, after the expiration of the trust term, they are to be a charge on the whole of his real property during the lives of the annuitants, then a suspension is produced in violation of the statute. That mode, therefore, cannot be sanctioned, and the trustees cannot take the legal estate for any such purpose. Of course, these annuities furnish no objects of a valid trust further than has been already explained, to authorize the trustees to lease for a gross sum, or *to lease* a specific portion of land for each annuitant, and when that is done, their trust is ended, so far as these annuities are concerned.

It will be seen, that no attempt has been made to examine the validity of this trust to *pay over* annuities under the 3d subdivision of the 55th section, which authorizes a trust to receive rents and profits, and *apply them to the use* of any person. The reason is, that no attempt was made on the argument to sustain the trust under that clause ; but still it may be proper to state the grounds on which such an attempt must fail. First, a trust to *apply to the use of,* cannot well sustain one to *pay over.* Without, however, pressing this point, the second reason is conclusive. The trusts under this clause are made expressly subject to the fifteenth section which the trust in this case palpably violates, by producing a suspension of the power of alienation of an *absolute* fee in possession, as to the whole of the testator's real property.

There are some incidental questions presented, on which I will endeavor briefly to express the views I entertain. But before doing so, and to preserve distinctness I will recapitulate the conclusions to which I have come on the great questions in this case.

I. That the trust term as created by the will, and the remainder after the expiration of that term, are void, because they are so limited as to produce a suspense of the power of alienation of an absolute fee in possession for more than two lives in being. 1. The trust term itself as created by the will *may* continue for more than two lives. 2. There are no valid purposes of a legal trust to justify its continuance, and as a trust must cease when its purposes cease, § 67, this trust must terminate with the execution of a few duties already particularly specified. 3. That the preceding limitation being void, the remainder on which it is limited, cannot be accelerated, and it cannot be permitted to take effect at the period prescribed, because that would in itself produce the same suspension, as if the trust term were maintained.

II. The whole remainder is contingent, and the first alternative estate, that for life to the seven children and two grand-children, is also contingent; and the contingency on which it is limited to vest in interest not being such that from its nature it must happen within two lives in being or at their expiration, it is void.

III. That the real estate of the testator has, therefore, descended to his heirs at law, and that his personal estate is also undisposed of by his will, because the devises of the land, into which it is directed to be converted are void, and that such estate is to be distributed to his widow and next of kin; excepting, however, certain specific devises and bequests already mentioned.

IV. That the executors and trustees, after paying debts and charges, the specific legacies, gross sums before mentioned, and conveying land to Anna McBride James, and securing the payment of the legacy to the orphan asylum and to the three annuitants, have no farther right, estate, or interest in the real or personal property of the testator.

ALBANY,
Dec. 1836.

Hawley
v.
James.

The incidental subjects referred to are, *first*, the question respecting the authority of the trustees under the directions of the will, *considered as powers*. Inasmuch as lands are subject to the execution of powers, and they thus produce suspension in the same manner as trusts, all that has been said on that subject is applicable to powers, and they may, therefore, be summarily dismissed.

Next, upon the doctrine of a *cy pres* execution of the will, or of moulding it, so as to conform parts of it to the law, or abridge or extend those parts that are not conformable to the statute, I can only say, that so far as the doctrine is applicable to any essential part of the will, to the fatal part of it which produces suspension, I have nothing to add to what has been already said; and that as to the other parts of the will, it is in vain to make them good, while that radical vice exists.

Next, I consider the annuities to William James and Henry James necessarily merged, waived and abandoned, if they take, as heirs at law and next of kin to the testator full and equal shares in his real and personal estate. For the same reason, the directions to convey to Lydia James, daughter of the testator's son Robert, productive property to the value of $20,000, have become inoperative, and are to be deemed waived, if she elects to take as heir at law of the testator, and receives a portion of his personal estate as next of kin. The directions to pay James King ten thousand dollars, or to convey to him land equal in value, appear to me to be a specific bequest, in consideration of the services to be performed by him. It is in no manner dependant upon the trust for its payment, nor is it dependant on the devise to his daughter Mary Ann King; and yet as the testator intended that the share of Mary Ann King should be diminished to the extent of the bequest to her father in the distribution of the testator's estate, she should be charged with that amount.

The question respecting the validity of the devise to the children of Augustus James and Elizabeth his wife has been distinctly raised here, by the appeal of Lydia James by her guardian, and her counsel has submitted a point to that

effect. I regret extremely that it was not argued. From the best examination I have been able to bestow on the subject, it appears to me so doubtful that I cannot sanction the decree in that respect. The decree proceeds upon the idea that the trust term, is to continue, and that the estate is to remain in the hands of the trustees during the time prescribed by the will: and the 32d clause of the decree directs the trustees to raise the sum necessary to fulfil those devises, out of the rents and profits of the current year in which they may be wanted, or by anticipating future rents and profits and income, and that the sum be raised near the probable termination of the trust term. This is wholly inconsistent with the views above expressed in relation to the trust term, and its continuance; and yet it is in conformity with the will of the testator. By the 36th clause of the will he directs the trustees, as near the termination of the trust term as may be found convenient, out of the rents and profits which shall have accrued out of his estate, to purchase real estate to the amount of $50,000 and convey it to the children of Augustus James and Elizabeth his wife. I cannot discover any authority in the statute for this direction. It is not a trust to sell lands for the benefit of creditors; it is not a trust to sell, mortgage or lease lands for the benefit of legatees, or to satisfy any charge thereon; for the trustees are not to sell, mortgage or lease any land. It cannot come under the 3d subdivision of the 55th section; for although the trustes are to receive the rents and profits of the land, they are *not* to apply them to the use of any person, during the life of such person or for a shorter term. It is the same as if they were directed to receive the rents and profits accruing near the expiration of the term, and pay them over to the children named, for they are to be paid over in land. Nor is it to be paid over to any defined person. The language of the statute, " to apply to the use of any person during the life of such person," obviously supposes that the person is to be designated. Nor can I conceive of a trust to purchase lands. For all these reasons, I am constrained to say, that this cannot be regarded as a valid trust. Nor do I perceive how it can be deemed a power in trust under

the statute. There are two general division of powers—general and special. A power is general, when it authorizes the alienation of lands in fee, and to any alienee whatever; it is special, when it authorizes an alienation to designated persons, or when it authorizes the alienation of an estate less than a fee. These definitions include all powers, and they relate to the alienation of lands owned by the grantor of the power at the time: for the general definition of all powers is, by § 74, p. 732, an authority to do some act in relation to lands, and which the owner granting such power might himself perform. He must therefore be the owner of the land, of which he authorizes the alienation by virtue of a power. But here the testator is not the owner of the land which he directs to be conveyed; on the contrary, he directs the land to be purchased. Since, then, all powers, other than those enumerated in the statute, are expressly abolished, and as I do not find any power enumerated to receive rents and profits to lay them out in lands, and then convey such lands, I am constrained with all the reluctance which in my judicial character I may be permitted to feel, to declare that I consider the devise wholly void. And if it could be executed at all, I know not how the time of doing so could be accelerated, without violating the principle quoted before from the case of *Routledge* v. *Dorrill*, 2 Ves. 357, " that preceding limitations under an appointment being void, subsequent limitations, though within the former, cannot be accelerated, and are void also." The testator has here made the trust term a preceding limitation—the power is not to be exercised until near the termination of that term, and that being void, certainly for the length of time for which it is directed, the subsequent limitation, that is, the conveyance to be made to the children, must be void; and being void, it is as though the devise had never been made. There seems another vital objection to this devise. It is a direction for an accumulation of rents and profits for the benefit of persons not in being, and it does not necessarily commence during the minority of the persons for whose benefit it is directed. If the trust terminates upon the arriving at 21 of the testator's youngest grand-child, William

Augustus James, (the son of Augustus,) and the rents and profits of the preceding year or years are taken to make up the fifty thousand dollars, the accumulation may commence after the other children of Augustus, older than William Augustus, shall have attained their majority, and yet the whole fund may be appointed to them; which is in direct violation of the 2d subdivision of the 37th section of title 2, chapter 1, relating to accumulations, 1. R, S. 726.

The difference between the devise just treated of and that to Anna McBride James 'is this; that the last clause of that portion of the will designated as the 36th, which contains the devise in question to Anna McBride James, is independant of that to the children of Augustus James, and directs the trustees positively to " set off and convey so much other productive real property belonging to my estate" as shall be worth $20,000. Here is no direction to purchase land with rents and profits; on the contrary, the expression " belonging to my estate" has reference to the testator's property at the time the will takes effect. This, therefore, comes precisely within the definition given by the statute, of a special power in land, by which the owner of land empowers another to convey an estate to a single person. Nor is the time when this conveyance is to be made prescribed by the testator, and then the rule is that it is to be done immediately, this not being a legacy of money or chattels. If I am correct in this view, then the directions in the 44th clause of the will, that " every conveyance to be executed by the trustees at the expiration of the trust herein created, shall be to the grantee for life," &c. are inapplicable to this devise, because it is not one of them, which, by the terms of the will, was to be executed at the expiration of the trust term. And I come the more readily to this conclusion, because, if the conveyance is to be made for life with the powers of appointment, some of which are judicially made void, this devise may be in great danger of failing on account of these defects; and believing it to be my duty, as it is my disposition, to carry into effect every devise of this and every other will, which can be executed in a manner agreeable to law and to the testator's inten-

tions, I am the more disposed to give this construction to the devise in question, as it avoids all legal objections. The conveyance to Anna McBride James then should be in fee.

Those parts of the decree, which relate to the dower of the widow—to the contract made by the testator with Augustus James for the sale of lots in Syracuse—to his succeeding the testator as a partner in the firm of Moses D. Burnett & Co.—have not been appealed from; but as they are connected with the duties of the trustees, according to the form of the chancellor's decree, and as those duties are materially varied by the results of this opinion, directions should be given for carrying those parts of the decree into effect, in a manner consistent with the principles of this opinion, should it be concurred in by the court. Directions also should be given for the conveyance to the heirs at law of such real property as may have been conveyed to the trustees, and for payment to the widow and next of kin, and to the guardians of such as are minors, of their distributive shares of the testator's personal estate. I can perceive no principle, on which the shares of the minors can be directed to be brought into court, in this case more than any other where the deceased is intestate. The law makes adequate general provisions, in all such cases, for the security of the property of infants, through the care of a surrogate. Directions should also be given for the payment of the debts, charges of administration, the costs of suit and all the expenses of the trustees and for the taking and settling their accounts—and thus all the duties of the trustees having been prescribed, a general declaration may be made in the decree of this court, that they have no other estate, right or interest in or control over the real or personal property of the testator, than such as is specified in the decree. By so doing, the labor of examining the details of the chancellor's decree and providing for them will be avoided, and all occasion for doubt as to the judgment of this court removed. The trustees claimed protection, under the decree of this court, for all acts done by them in good faith, and it was assented to at the bar, in behalf of all the parties. It is

right in itself and provision to that effect should be made in the decree.

There is still another part of the chancellor's decree which requires notice, in consequence of the devises being declared void. By the revised statutes, 1 vol. p. 749, section 4, it is provided that " whenever any real estate subject to a mortgage executed by a testator, shall descend to an heir or pass to a devisee, such heir or devisee shall satisfy such mortgage out of his own property without resorting to the executor or administrator of his ancestor, unless there be an express direction in the will that the mortgage shall be otherwise paid." In the 15th clause of the will there is a direction to pay all the just debts of the testator. It seems to me, that is not the express direction required by the testator, or if it be, yet the direction is to pay out of rents and profits. Now there is no trust authorized by law to pay debts out of rents and profits, except that of leasing specific lands for the payment of any charges thereon. This the testator did not contemplate, because he provides for the payment of his debts, in common with the advances to his sons, and all other payments which are to be made by his trustees and in case of deficiency, the borrowing of money and the replacing of it by subsequent rents and profits. All this shows that he acted on the idea of a continuation of the trust term, during the period he had prescribed. The mode of payment contemplated by him cannot be pursued, and I think it will be safe to leave the payment of the mortgage debts to the general law of the land, to be made first out of the mortgaged premises and next by the heirs at law; and if the creditor choose to resort to his remedy against the personal estate, then the executors will have paid those debts in the course of administration. If the personal estate shall have been distributed, then the law gives adequate remedy against the next of kin who may have received it or any portion of it.

In closing this long and I fear tedious opinion, it is proper to observe, that many important and interesting points presented by counsel on the argument have not been ex-

ALBANY,
Dec. 1836.

Hawley
v.
James.

amined by me, because they were not necessary, although many of them might have been auxiliary to the views I have taken of the case. The examination of the case has been sufficiently prolix, from the complexity and number of the points it presents. The views I have expressed have followed much in the track of the arguments which have been presented to us, for the simple reason, that after such an elaborate discussion, in which the store-houses of the law have been literally ransacked and the ingenuity of the highest talent has been exerted, there was no point of view in which this cause could have been considered that had not been anticipated.

I am for such a modification of the chancellor's decree as shall accord with the views presented in this opinion.

Whereupon, after advisement among the members of the court, the following decree was entered:

" These several causes having been duly brought to a hearing, and counsel for the respective parties having been heard, &c. It is hereby DECLARED, ORDERED, ADJUDGED and DECREED:

" 1. That the directions in the will of the testator William James deceased, having in view the creation of a trust term to continue until the youngest of his children and grandchildren attaining the age of twenty-one years, shall have attained that age, suspend the power of alienation of an absolute fee in possession for more than two lives in being, and without reference to any designated life, or any two designated lives, and are therefore illegal and void, and that so much of the decree of the court of chancery as declares or recognizes the validity of the said trust term for twenty years and ten days, or for any other period, or for any purposes other than those herein declared, be and the same is hereby reversed.

" 2. And it is hereby declared and adjudged, that the directions in the will of the testator, William James, to pay to the society for the relief of orphan and destitute children in the city of Albany, ' an annuity of one hundred and fifty dollars, or in lieu thereof to invest the principal sum of

two thousand five hundred dollars in some public stock, and assign the same to the managers of the said society,' are valid and legal; and the executors of the said will are hereby directed, out of the personal estate of the testator, immediately to invest the said principal sum in some safe public stock, and assign such stock to the managers of the said society.

" 3. It is hereby further declared and adjudged, that the legacies of one thousand dollars to John James, and of three thousand dollars to Catharine James,. the widow of the testator, for the use of the children of Jeannette B. Gourlay, are valid and legal, and the executors of the said will are hereby directed immediately to pay over the said sums to the said John James and Catharine James, out of the personal estate of the testator in their hands, in case the same or either of them have not already been paid.

" 4. It is hereby further declared and adjudged, that the annuities directed in and by the said will to be paid to Catharine Tillman, of one hundred and twenty-five dollars, to Charlotte James of one hundred dollars, and to Susan Duffy of two hundred dollars, are valid; and the trustees and executors named in the said will, are hereby directed to lease distinct portions of the testator's real estate, one portion for the life of each of the said annuitants who shall now be living, upon a ground rent equal to the annuity to be paid, and payable annually to the said annuitants respectively, with proper clauses of distress and re-entry for default of payment; the portions so to be leased to be selected by the said executors and trustees, and to be approved by the court of chancery as being adequate, upon a hearing of the said annuitants and the said trustees; or the said trustees shall if required by any of the said annuitants, purchase of the New-York Life Insurance and Trust Company an annuity equal to the sum so directed to be paid, or invest a sum in bonds and mortgages or public stocks, to be approved by such annuitant, which will produce a sum equal to the annuity; and in such case the said executors and trustees are hereby directed to apply so much of the personal estate of the testator as may be necessary to purchase such annuity

ALBANY,
Dec. 1836.

Hawley
v.
James.

or make such investment, and on the same being purchased or secured to such annuitant the real and personal estate of the testator shall be wholly discharged from all further claim for such annuity ; and in case of any real estate being leased by the said trustees and executors under this decree, the remainder in the lands so leased shall descend to the heirs at law of the said testator in the same manner as his real estate hereinafter declared not to have been duly and legally devised by him.

"5. And, inasmuch as the whole principal of the testator's real and personal estate, except as to certain charges, and also except as to such parts as are hereinafter mentioned and referred to, are hereinafter declared to be undevised and undisposed of by his will, and are hereinafter directed to be conveyed and distributed to his heirs at law and next of kin, or are declared to have descended to his heirs at law ; it is further declared, adjudged and decreed, that the directions in the said will, to the said trustees, to make suitable provision for the education and support of the minor children of the testator, after the death of their mother, and the directions in the said will, for the support of any widow of any son of the testator, who shall die during the continuance of the trust in the said will described, and for the education and support of every child of such son, or of any daughter of the testator, and the directions in the said will for advances to the sons and grandsons of the testator, for the purchase of professional books, implements or the like, or for the purchase of real property with a view to speculation, or for the purpose of engaging in any honorable occupation requiring the employment of capital ; and the directions in the said will, for advances to any daughter of the testator, or to his grand-daughters, Mary Ann King, Anna McBride James, or Lydia James, upon their marriages respectively, have severally become inoperative, and have ceased and are void.

"6. And it is hereby further declared, adjudged and decreed, that the directions in the said will, to pay to James King ten thousand dollars, or to convey to him land equal in value, at the election of the said trustees, is valid as a spe-

cific bequest independent of the other devises in the will, except that the amount thereof is to be deducted from the share of Mary Ann King in the real and personal estate of the testator ; and the said trustees and executors, other than the said James King, shall, within ninety days after the entry of this decree, elect whether to pay the said bequest in land or in money ; and if in money, shall thereupon pay to the said James King the said sum out of the personal estate of the testator ; and if in land, shall thereupon convey to the said James King, any real estate of the testator equal in value to ten thousand dollars ; and in case of any dispute concerning the value of such lands, the same to be ascertained and determined by the court of chancery. And whatever sums in money shall be paid to the said James King under this decree, shall be deducted from the distributive share of the personal estate of the testator, hereinafter directed to be distributed to the said Mary Ann King ; and in case land be conveyed to the said James King, the same shall be deemed and taken a portion of the real estate of the testator, which has descended to the said Mary Ann King as one of his heirs at law, and shall be charged to her accordingly, in any partition or division thereof, or of the rents and profits of such estate.

" 7. It is hereby further declared, adjudged and decreed, that William James, and Henry James to whom annuities are directed to be paid by the said will, do elect within ninety days after the entry of this decree, in such manner as shall be approved by the court of chancery, whether they will renounce the said annuities and take as heirs at law and next of kin to the testator ; and upon their renouncing the said annuities, they shall severally be entitled to their respective portions of the real and personal estate of the testator, in the same manner and to the same extent as the other heirs at law and next of kin of the testator as hereinafter declared, they being respectively chargeable with the several sums heretofore paid to them respectively, on account of such annuities with interest thereon from the times of such payments and to be deducted from their distributive shares.

"8. And it is further declared, adjudged and decreed, that the directions in the said will, to set off and convey to Anna McBride James, and Lydia James, productive real property worth $20,000, are illegal and void : and so much of the decree of the court of chancery as declares or recognizes the validity of the said directions, is hereby reversed.

"9. And it is further ordered, adjudged and decreed that the portion of $50,000, bequeathed to the children of Augustus James and Elizabeth his present wife, by the 36th clause in the said will, is valid ; and it is hereby declared that the present as well as future children of the said Augustus James and Elizabeth his wife, who shall be living at the expiration of the time specified in the 36th clause of the said will, take an estate in fee subject to the power of appointment as expressed in the will, and that so much of the decree of the chancellor as declares that the present children take a life estate, be hereby reversed ; and the chancellor is hereby directed to set off from the rents and profits of the estate in the hands of the trustees, so much money as at five per cent., compound interest, will probably produce $50,000, for such child or children, at the time aforesaid, and that the same be secured as the chancellor shall direct, for the benefit of the said children, or such as may be living at the expiration of said time, subject to the power of appointment as expressed in said will, and if none be then living, then to be distributed according to law, to the heirs at law or next of kin to the testator.

"10. And it is further declared, adjudged and decreed, that the trustees and executors named in the said will, have no other authority, power or trust, in or over the real or personal estate of the testator, William James, than such as in this decree is specified ; and that all and every part of the decree of the court of chancery, declaring or recognizing any authority, power or trust of the said trustees and executors, over, in, or upon the real or personal estate of the testator, other than such as in this decree is specified, is hereby reversed : but all the right, power and authority of the said Gideon Hawley, James King, and Augustus James, as executors, in and over the personal estate of the said tes-

ALBANY,
Dec. 1836.

Hawley
v.
James.

tator, so far as may be necessary to collect the outstanding debts and assets, or convert the same into money for the purpose of settling the estate, or paying any debts, legacies or annuities, chargeable on said estate, according to the principles and provisions of this decree, are hereby declared to be unaffected by this decree.

" 11. And it is hereby further declared, adjudged and decreed, that all acts done and performed by the said trustees and executors, in good faith, in relation to the real or personal estate of the said testator, or in leasing any lands of the testator, or in making purchases of land, or in contracting for the sale of any land belonging to the testator at the time of his death, or in authorizing such contracts, or in executing any deeds in fulfilment of said contracts, whether made by themselves or by any other person in pursuance of their authority, are hereby confirmed, and declared valid and effectual; and the said heirs of law of said William James shall, under the direction of the court of chancery, execute all necessary conveyances in confirmation of agreements or deeds heretofore executed by said trustees, and all expenditures of money belonging to said estate, made by them in good faith, are hereby confirmed and allowed ; and said trustees and executors shall not be liable for any such act or expenditure. And within ninety days after the entry of this decree, the said trustees and executors shall, by proper conveyances, to be approved by a master of the court of chancery, transfer and convey to the persons who were heirs at law of the said William James at the time of his death, or their heirs at law, in fee simple as tenants in common, all lands and real estate which have been conveyed to them in persuance of any purchase or contract made by the said testator, subject to the dower of his widow; and shall also, in like manner, convey all land and real estate which have been purchased by said trustees, with the money, property or effects of the said testator, exonerated from all claim of dower of his widow, and shall assign to the said heirs, all leases, covenants and agreements, in relation to the real estate of the testator to which they as such trustees are parties ; and in such conveyances shall be inserted separate

covenants, by each trustee for himself, against any incumbrances made by himself upon the said lands, or judgments against them. And where contracts have been made or authorized by them, severally or jointly, with any other persons, for the sale of any interest in the lands embraced in the trust deed to Moses D. Burnet and Gideon Hawley, mentioned in the pleadings in these causes which have not been completed by conveyances, the same shall be so completed by the grantees named in the said deed, as therein directed ; and all such conveyances, and all future conveyances and contracts which shall be made pursuant to the authority given in the said deed, are hereby declared valid and effectual as to the heirs at law of the said William James. And where contracts have been made or authorized by the said trustees, severally or jointly, with any other persons, for the sale of any other lands belonging to the testator solely, or as tenant in common with any other person or persons, which have not been completed by conveyances, the same shall be so completed by the heirs at law of the testator who are adults, and by the guardians of such as are minors, under the direction of the court of chancery.

" 12. And it is further ordered, adjudged and decreed, that so much of the aforesaid decree of the chancellor as declares that the said Augustus James is entitled to a specific performance of the agreement with the testator to transfer to him the legal title to certain lots in the village of Syracuse, upon the payment of the sum of $1400, be affirmed ; and that upon the payment by the said Augustus James of the sum of $1400, to the heirs at law, that they then convey to the said Augustus James, or his legal representatives, by suitable deeds, under the direction of the court of chancery the said lots ; and the said executors shall also execute and perform the directions in the said decree contained relating to their duties respecting the co-partnership of Augustus James as the successor of the testator with Moses D. Burnet ; and all sums of money received by them pursuant to any of the directions aforesaid shall be accounted for and distributed as part of the personal estate of the testator.

" 13. And it is further declared, adjudged and decreed, that the estate in remainder, created by the last will of the testator, William James, in his real property, is an estate which suspends the power of alienation contrary to law, and that the said estate in remainder, including the life estates to the seven children and two grand-children named in the will, and all the contingent remainders depending thereon, and all the devises of the real estate of the said testator, and all directions concerning the same, except such as in this decree are directed to be executed, are illegal and void; and that the decree of his honor the chancellor, and every part thereof, which declares or recognizes the validity of any devise of the real estate of the testator, or the validity of any directions concerning the same, except those in this decree directed to be executed, be, and the same is hereby reversed; and each and every part of the said decree that has been appealed from, which declares any devise of the real estate of the testator, or any directions concerning the same, to be illegal and void, is hereby affirmed; and the said real estate of the testator has descended to his heirs at law, free and discharged of all conditions, devises, directions, authority, power or control of the said trustees and executors, other than such as are herein declared. But in respect to any lands of the testator situate in the state of Illinois, or elsewhere out of this state, this decree is not to be deemed a decision upon the title of the said trustees to those lands, or their power over them; but upon the record and proceedings being remitted to the court of chancery, or upon any amended or further bill being filed in that court, by any parties interested in the said lands, the said court will proceed thereon, and make such order and decree in relation to the said lands as may be legal, without prejudice to any party in consequence of this decree, and notwithstanding that the provision for any such party in the will may by this decree be declared to be void.

" 14. And it is further declared, adjudged and decreed, that the purposes for which the testator's personal property is directed by his will to be converted into real estate are

illegal and invalid; and that the personal property of the testator, except as to the legaries, specific bequests and annuities, in this decree declared valid, remains undisposed of by his will, and the same is to be distributed to the widow and next of kin of the testator, according to the statute of distributions, after paying the charges herein directed to be paid, and all the debts of the testator, and lawful claims against his estate, funeral expenses, charges of administration, and such debts and liabilities as have been contracted or incurred for the said estate by the said trustees, in good faith; and so much of the decree of his honor the chancellor as declares or recognizes the validity of any directions in the said will to convert personal into real estate, and as directs or authorizes the said trustees and executors to make such conversion, or to purchase real estate, or to sell any real estate, or to expend any personal property in the erection of buildings, or in making any other improvements on any real estate, be, and the same is hereby reversed. But the share or portion of said Jeannette Barker shall be charged with the several payments which have been made to her on account of the several advances directed to be made to her by the said will, after her marriage, together with interest thereon from the times of such payments.

" 15. And it is further declared, adjudged and decreed, that the personal estate of the testator, after paying the charges herein directed to be paid, is the primary fund for the payment of the debts and funeral expenses, and the expenses of administration and the costs and charges herein mentioned, except such debts of the testator as were secured by mortgage of his real estate, which are to be satisfied and discharged by his heirs at law, the widow of the testator paying her just proportion; and so much of the decree of his honor the chancellor as directs any other mode of satisfying such mortgages, is hereby reversed.

" 16. And it is further adjudged and decreed, that the directions in the decree of the court of chancery respecting the dower of Catharine James, widow of the testator, and the manner as ascertaining the same, be executed as therein directed; that the said widow is entitled to elect between

receiving a gross sum or a reasonable annuity in lieu of her dower; and that when such election shall be made and assented to by the adult parties, as provided in the said decree, provision may be made by the said adult parties and the guardians of the minor parties, with the approbation of the court of chancery, for securing the payment of such sum or annuity, with the assent of the said widow, by pledging and setting apart the rents and profits of such specific portions of the real estate of the testator as shall be sufficient for the purpose, and thereby exonerating the said residue of the real estate from the charge of the said dower, forwhich purpose such conveyances and releases are to be executed by the said widow as shall be approved by the court of chancery.

" 17. And it is further ordered, adjudged and decreed, that the taxable costs of all the parties in these suits in the court of chancery and in this court, be paid by the executors out of the personal estate of the testator, including the costs and expenses of ascertaining and providing for the payment of the widow's dower and the costs of passing and settling the accounts of the said trustees and executors, and that in settling such accounts the said trustees and executors be allowed their necessary and reasonable disbursements in the discharge of their trust.

" 18. And it is further ordered, adjudged and decreed, that the said executors and trustees proceed according to law to make distribution of the personal estate of the testator in their hands, and of the rents and profits of his real estate received by them, which shall remain after satisfying the legacies, providing for the annuities and specific devises herein directed to be paid and satisfied, and paying the costs, charges and expenses herein directed to be paid, including the annual allowance of five hundred dollars to Gideon Hawley, and that it be referred to such master of the court of chancery as has been already designated by that court, or may be designated by it, to pass and state the accounts of the said executors and trustees with a view to such distribution, and that in making such distribution the said trustees and executors shall pay to the widow and

next of kin of the testator, or to the guardians of such of them as are minors, the several shares and portions belonging to them, upon such guardians giving the security required by law; except that the court of chancery may take such order as shall be just in relation to the share which any of the said next of kin, who may be a married woman, may be entitled to.

" 19. And it is hereby further ordered, adjudged and decreed, that so much of the decree of the court of chancery as is repugnant to or inconsistent with this decree, and as gives directions on any subject with respect to which directions are herein given, be and the same is hereby reversed.

"20. And it is further ordered, adjudged and decreed, that so much of the decree of the court of chancery as gives any directions in conformity with the principles of this decree or upon subjects with respect to which no specific directions are herein given, and which are in conformity with the principles of this decree, and particularly the directions respecting the allowance to be made to the testamentary guardian of such of the children of the testator as were minors at his decease, for advances heretofore made for their education and support, and the directions for the allowance of a commission to Augustus James for the collection of rents and profits, and the allowance for a clerk to the trustees be and the same is hereby affirmed, except that the said allowance to Augustus James is to cease on the confirmation of the report of the master upon the accounts of the said trustees and executors, and except that the testamentary guardian of the said minor children may apply for the allowance for advances aforesaid, within six months after the entry of this decree, and that such advances shall be charged to the said minors respectively by the said executors, and deducted from their distributive shares. And the said trustees are hereby authorized to employ all necessary clerks to assist in the preparation of the accounts preparatory to and until the final settlement of said accounts, and that the annual allowance to Gideon Hawley, specified in said will, be continued during the same

period, for his services in relation to the testator's real and personal estate in this state.

" And that the said executors and trustees in settling their accounts, preparatory to a distribution of said estate, include all accounts relating both to the personal and real estate of the testator, and the rents and profits thereof.

" 21. And it is further ordered and decreed, that the record and proceedings in the said several suits be remitted to the court of chancery, to the end that all necessary orders and proceedings be had, and made in that court to carry into effect this decree."